# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------x
:
In re:                                              :    Chapter 11
:
TUBO DE PASTEJÉ, S.A. DE C.V., et al.,              :    Case No. 09-14353 (KJC)
:
:    Jointly Administered
Debtors.                        :
-----------------------------------------------------------------x

## [PROPOSED] DISCLOSURE STATEMENT RELATING TO JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF TUBO DE PASTEJÉ, S.A. DE C.V. AND CAMBRIDGE-LEE HOLDINGS, INC., AS DEBTORS AND DEBTORS-IN-POSSESSION, AND INDUSTRIAS UNIDAS, S.A. DE C.V., AS CO-PROPONENT

### June 7, 2011

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (Bar No. 2436)
Michael R. Seidl (Bar No. 3889)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
Telephone: 302.652.4100
Facsimile: 302.652.4400

**MILBANK, TWEED, HADLEY & McCLOY LLP**
Dennis F. Dunne
Risa M. Rosenberg
Brian Kinney
One Chase Manhattan Plaza
New York, New York 10005-1413
Telephone: 212.530.5000
Facsimile: 212.530.5219

*Attorneys for Tubo de Pastejé, S.A. de C.V. and
Cambridge Lee Holdings, Inc.*

THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF ANY CHAPTER 11 PLAN DESCRIBED HEREIN. ACCEPTANCES OR REJECTIONS OF A CHAPTER 11 PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED FOR BANKRUPTCY COURT APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.

THE PLAN PROPONENTS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT AT OR BEFORE THE HEARING TO CONSIDER APPROVAL OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION (THE "PLAN") OF THE TUBO DE PASTEJÉ, S.A. DE C.V., CAMBRIDGE-LEE HOLDINGS, INC. (EACH, A "DEBTOR", AND COLLECTIVELY, THE "DEBTORS") IN THE ABOVE-CAPTIONED CHAPTER 11 CASES (THE "CHAPTER 11 CASES") AND INDUSTRIAS UNIDAS, S.A. DE C.V. ("IUSA" AND TOGETHER WITH THE DEBTORS, THE "PLAN PROPONENTS" AND TOGETHER WITH THE DIRECT AND INDIRECT SUBSIDIARIES OF IUSA, THE "IUSA GROUP"). SIMULTANEOUS WITH THE SOLICITATION OF ACCEPTANCES AND REJECTIONS OF THE PLAN, IUSA IS SOLICITING (THE "CONSENSUAL EXCHANGE") HOLDERS OF COPPER DEBT AND COMMERCIAL PAPER TO EXCHANGE SUCH COPPER DEBT AND COMMERCIAL PAPER FOR NEW SERIES B NOTES.

PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE PLAN PROPONENTS AND THE MEMBERS OF THE IUSA GROUP AND THE CONDITION OF THEIR BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL, REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR EQUITY INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN (SEE 11 U.S.C. § 1125(a)) AND THE CONSENSUAL EXCHANGE.

FOR THE CONVENIENCE OF CLAIM AND EQUITY INTEREST HOLDERS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

NO REPRESENTATIONS CONCERNING THE DEBTORS' FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS OF THE DEBTORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS) AND THE PLAN IN THEIR ENTIRETY. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE EXECUTIVE SUMMARY, ARE

QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND OTHER EXHIBITS ANNEXED THERETO AND THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. ALL CREDITORS SHOULD READ CAREFULLY AND CONSIDER FULLY THE "CERTAIN RISK FACTORS TO BE CONSIDERED" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN OR ACCEPTING OR REJECTING THE CONSENSUAL EXCHANGE. **SEE SECTION VII, "CERTAIN RISK FACTORS TO BE CONSIDERED."**

THE STATEMENTS IN THIS DISCLOSURE STATEMENT ARE MADE BY THE PLAN PROPONENTS ON THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT AFTER THE DATE HEREOF DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN. THE PLAN PROPONENTS HAVE NO DUTY TO UPDATE THIS DISCLOSURE STATEMENT UNLESS OTHERWISE ORDERED TO DO SO BY THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OF THE PLAN PROPONENTS, IF ANY, SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT HAS NEITHER BEEN REVIEWED, APPROVED NOR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE RESTRUCTURING OF THE PLAN PROPONENTS AND FINANCIAL INFORMATION. ALTHOUGH THE PLAN PROPONENTS BELIEVE THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE PLAN PROPONENT'S RESPECTIVE MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE PLAN PROPONENTS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED

HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

THE PLAN CONTAINS CERTAIN RELEASE, INJUNCTION AND EXCULPATION PROVISIONS. BY VOTING TO ACCEPT THE CHAPTER 11 PLAN, YOU ARE AFFIRMATIVELY CONSENTING TO THESE PROVISIONS. *SEE SECTION V.H "DISCHARGES, RELEASES AND EXCULPATION."*

THE PURPOSE OF THIS DISCLOSURE STATEMENT IS TO PROVIDE (A) RELEVANT INFORMATION REGARDING THE HISTORY OF THE IUSA GROUP, THEIR BUSINESSES, AND THESE CHAPTER 11 CASES; (B) INFORMATION CONCERNING THE PLAN; (C) INFORMATION FOR HOLDERS OF CLAIMS AND EQUITY INTERESTS REGARDING THEIR TREATMENT UNDER THE PLAN; AND (D) INFORMATION TO ASSIST THE BANKRUPTCY COURT IN DETERMINING WHETHER THE PLAN COMPLIES WITH THE PROVISIONS OF CHAPTER 11 OF THE BANKRUPTCY CODE AND SHOULD BE CONFIRMED.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. THE DESCRIPTIONS SET FORTH HEREIN OF THE ACTIONS, CONCLUSIONS OR RECOMMENDATIONS OF THE PLAN PROPONENTS OR ANY OTHER PARTY IN INTEREST HAVE BEEN SUBMITTED TO OR APPROVED BY SUCH PARTY, BUT NO SUCH PARTY MAKES ANY REPRESENTATION REGARDING SUCH DESCRIPTIONS. NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, AND FOR PURPOSES OF ANY CONTESTED MATTER, ADVERSARY PROCEEDING, OR OTHER PENDING OR THREATENED ACTION, THE CONTENTS HEREOF SHALL CONSTITUTE STATEMENTS MADE IN FURTHERANCE OF SETTLEMENT NEGOTIATIONS AND SHALL NOT BE ADMISSIBLE TO THE EXTENT PROHIBITED BY FEDERAL RULE OF EVIDENCE 408 AND ANY SIMILAR RULE OR STATUTE. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING (OTHER THAN THE CHAPTER 11 CASES) INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE PLAN PROPONENTS. YOU SHOULD CONSULT YOUR OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

<u>**IRS CIRCULAR 230 DISCLOSURE NOTICE**</u>: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY EXHIBITS, AMENDMENTS OR SUPPLEMENTS THERETO) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE. TAX

ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY EXHIBITS, AMENDMENTS OR SUPPLEMENTS THERETO) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THE PLAN PROPONENTS PRESENTLY INTEND TO SEEK TO CONSUMMATE THE PLAN AND THE RESTRUCTURING TRANSACTIONS AS PROMPTLY AS POSSIBLE AND TO CAUSE THE PLAN EFFECTIVE DATE TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE PLAN. THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE PLAN EFFECTIVE DATE ACTUALLY WILL OCCUR. PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS AND EQUITY INTERESTS IN CERTAIN CLASSES AND THAT COULD AFFECT THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS, ARE DESCRIBED IN *SECTION V, "SUMMARY OF PLAN."*

TABLE OF CONTENTS

I. EXECUTIVE SUMMARY ...................................................................................................1

II. SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND
EQUITY INTERESTS UNDER PLAN.................................................................................4
    A.    No Substantive Consolidation.................................................................................. 4
    B.    Summary of Classification and Treatment of Claims and Interests ...................... 4
    C.    Solicitation and Acceptance of Plan ...................................................................... 8
    D.    Confirmation Hearing ........................................................................................... 10
    E.    Overview of Chapter 11 Process........................................................................... 10
    F.    Plan Effective Date and Exchange Pursuant to Consensual Exchange Conditioned
        on Each Other ........................................................................................................ 11

III. HISTORICAL INFORMATION......................................................................................12
    A.    Company History And Background........................................................................ 12
    B.    Prepetition Secured Indebtedness ......................................................................... 13
    C.    Significant Prepetition Unsecured Indebtedness of Debtors ................................ 14
    D.    Events Leading to Chapter 11 Filing .................................................................... 14

IV. CHAPTER 11 CASES....................................................................................................15
    A.    Case Administration............................................................................................... 15
    B.    Continuation of Business After Petition Date....................................................... 16

V. SUMMARY OF PLAN ....................................................................................................16
    A.    Administrative Claims, Priority Tax Claims, and Intercompany Claims and
        Intercompany Interests........................................................................................... 17
    B.    Classification and Treatment of Claims................................................................ 18
    C.    Acceptance or Rejection of Plan ........................................................................... 21
    D.    Treatment of Executory Contracts and Unexpired Leases ................................... 21
    E.    Provisions Governing Distributions....................................................................... 24
    F.    Means for Implementation of Plan ....................................................................... 27
    G.    Summary of Consensual Exchange ....................................................................... 32
    H.    Discharge, Releases and Exculpation. ................................................................... 33
    I.    Claim Resolution Process ..................................................................................... 36
    J.    Conditions to Confirmation and Plan Effective Date ........................................... 36

VI. FINANCIAL INFORMATION.......................................................................................38

VII. CERTAIN RISK FACTORS TO BE CONSIDERED....................................................39
    A.    General Bankruptcy Law Considerations .............................................................. 39
    B.    Additional Factors................................................................................................. 40

VIII. VOTING REQUIREMENTS .......................................................................................44
    A.    Voting Deadline .................................................................................................... 45
    B.    Holders of Claims Entitled to Vote....................................................................... 45
    C.    Vote Required for Acceptance by Class ................................................................ 46

D.    Voting Procedures................................................................................ 46

IX. CONFIRMATION OF PLAN ................................................................................47
    A.    Hearing on Confirmation Hearing of Plan............................................ 47
    B.    Deadline to Object to Confirmation...................................................... 48
    C.    Requirements for Confirmation of Plan................................................ 48
    D.    Alternatives to Confirmation and Consummation of Plan.................... 51

X. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN .........................52
    A.    Tax Consequences of Exchange ........................................................... 54
    B.    Tax Consequences of Owning New Series A Notes............................. 56
    C.    Non-U.S. Holders.................................................................................. 60
    D.    Information Reporting and Backup Withholding ................................. 60

XI. CERTAIN FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS ...............61
    A.    Exemption from Registration Requirements for New Securities ......................... 61
    B.    Subsequent Transfers of New Securities ............................................... 61

XII. CONCLUSION ....................................................................................................63

**TABLE OF CONTENTS**
**(continued)**

EXHIBITS TO DISCLOSURE STATEMENT

| | |
|---|---|
| Exhibit 1 | Chapter 11 Plan |
| Exhibit 2 | Plan Proponents' Liquidation Analysis |
| Exhibit 3 | Restructuring Agreement |
| Exhibit 4 | Description of Notes |
| Exhibit 5 | Consensual Exchange Documents |
| Exhibit 6 | Projected Financial Statements |

# I.

# EXECUTIVE SUMMARY

Tubo de Pasteje, S.A. de C.V. ("Tubo") and Cambridge-Lee Holdings, Inc. ("CLH" and, together with Tubo, the "Debtors") each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") on December 8, 2009 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors and their indirect parent company, Industrias Unidas, S.A. de C.V. ("IUSA" and together with the Debtors, the "Plan Proponents"), hereby transmit this disclosure statement (the "Disclosure Statement"),[1] pursuant to section 1125 of the Bankruptcy Code, to holders of claims against and equity interests in the Debtors in connection with the solicitation of votes to accept or reject the Plan Proponents' joint plan of reorganization under chapter 11 of the Bankruptcy Code (as the same may be amended, the "Plan"), attached as Exhibit 1 to this Disclosure Statement.[2]

These bankruptcy cases were commenced due to a confluence of adverse macroeconomic trends, including the downturn that occurred in the construction industry, which resulted in IUSA and its direct and indirect subsidiaries (collectively, the "IUSA Group") experiencing a continued deterioration in revenue and profitability in respect of their manufacturing businesses. Despite such unfavorable conditions, the IUSA Group maintained its operations and continued to provide high-quality goods and services to its customers. The IUSA Group's revenue, however, remained below levels necessary to maintain liquidity and support current debt levels due to the downturn in construction and the global economy in general. As a result, the IUSA Group experienced cash flow issues, and, ultimately, IUSA became unable to service its existing debt which, among other things, included obligations secured by Tubo pursuant to the Existing Pledge Agreement (defined below) of the capital stock of its direct subsidiary, CLH, and the obligations guaranteed by CLH. CLH, in turn, is the direct and indirect parent of several operating subsidiaries in both the United States and abroad (the "Non-Debtor Subsidiaries") engaged in the business of manufacturing copper tubing and related products. To maintain the status quo and preserve the valuable equity interests in the Non-Debtor Subsidiaries, the Debtors commenced these chapter 11 cases (the "Chapter 11 Cases").

The Plan Proponents are commencing this solicitation after extensive negotiations with representatives of the holders of 11.50% senior notes due 2016 issued by IUSA (the "Noteholders") as well as holders of certain other unsecured indebtedness of IUSA (together with the Noteholders, the "Consenting Creditors"). The Plan Proponents expect these negotiations to culminate with IUSA and the Consenting Creditors executing a restructuring agreement (the "Restructuring Agreement"), which summarizes the proposed treatment of certain obligations of the IUSA Group. The Plan is premised upon implementing the terms proposed in the Restructuring Agreement through a series of transactions (the "Restructuring Transactions") designed to maximize recoveries to all creditors and enhance the financial

---

[1]     Capitalized terms not otherwise defined herein shall have the meanings ascribed in the Plan.

[2]     Headings are for convenience only and shall not affect the meaning or interpretation of the Disclosure Statement.

stability of the Reorganized Debtors and the IUSA Group, as a whole. Specifically, among other things, the Restructuring Transactions include (a) the cancellation of the Old 2016 Notes and the ESBDS Loan, and (b) the issuance of (i) new debt securities (the "New Series A Notes"), which New Series A Notes shall be guaranteed by Tubo and secured by the capital stock of CLH (along with other guarantees and collateral from members of the IUSA Group), to the holders of the Old 2016 Notes and the ESBDS Loan and (ii) new debt securities (the "New Series B Notes" and together with the New Series A Notes, the "New Notes"), which New Series B Notes shall be on substantially the same terms as the New Series A Notes, but shall not be secured by any assets of the Reorganized Debtors, to holders of the Copper Debt and holders of the Commercial Paper (each, as defined below) who elect to accept such New Series B Notes in exchange for their current claims against the IUSA Group. The Plan leaves unimpaired the rights of all holders of claims against and equity interests in the Debtors, with the exception of the rights of the Holders of Old 2016 Notes and ESBDS Loan. The Plan Proponents believe that the Restructuring Transactions including the Plan and the transactions contemplated thereby are in the best interests of the estates and maximizes distributable value for all stakeholders, as evidenced by the Consenting Creditors' support for the Plan and the Restructuring Transactions.

This solicitation with respect to the Plan is being conducted at the same time as the Consensual Exchange in order to obtain sufficient votes to enable the Plan to be confirmed by the Bankruptcy Court and to enable the required holders of the Commercial Paper to participate in the proposed exchange of their debt in the Restructuring Transactions. The Plan sets forth how claims against and equity interests in the Debtors (and certain claims against the remaining members of the IUSA Group) will be treated under the Plan if it is confirmed by the Bankruptcy Court and is thereafter consummated as a part of the Restructuring Transactions. This Disclosure Statement describes certain aspects of the Plan, the Plan Proponents' business operations, significant events leading up to the Chapter 11 Cases and related matters. This Executive Summary is intended solely as a summary of the distribution provisions of the Plan and certain matters related to the Plan Proponents' businesses. **FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND ALL RELATED EXHIBITS AND SCHEDULES IN THEIR ENTIRETY.**

Attached as exhibits to this Disclosure Statement are copies of the following documents:

- the Plan (Exhibit 1);

- the Plan Proponents' Liquidation Analysis (Exhibit 2);

- the Restructuring Agreement (Exhibit 3);

- Description of Notes (Exhibit 4);

- Consensual Exchange Documents (Exhibit 5); and

- Projected Financial Statements (Exhibit 6).

2

**THE PLAN PROPONENTS BELIEVE THAT THE PLAN COMPLIES WITH ALL PROVISIONS OF THE BANKRUPTCY CODE AND WILL ENABLE THE DEBTORS TO REORGANIZE SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11, AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR ESTATES, AND THE PLAN PROPONENTS' CREDITORS AND INTEREST HOLDERS.**

On [_____], 2011, after notice and a hearing, the Bankruptcy Court issued an order (the "Disclosure Statement Order"), approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors and equity holders to make informed judgments whether to accept or reject the Plan. Approval of this Disclosure Statement does not, however, constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan.

Accompanying this Disclosure Statement and forming a part of the solicitation package (the "Solicitation Package") are copies of: (i) the Plan (Exhibit 1); (ii) the Plan Proponents' Liquidation Analysis (Exhibit 2); (iii) the Restructuring Agreement (Exhibit 3); (iv) the Description of Notes (Exhibit 4) ; (v) the Consensual Exchange Documents (Exhibit 5); (vi) the Projected Financial Statements of IUSA and the IUSA Group on a consolidated basis (Exhibit 6); and (vii) for Holders of Claims against the Debtors who are entitled to vote on the Plan, one or more Ballots. Each Holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, all exhibits thereto and the instructions accompanying the Ballot in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code. Upon Confirmation, the Plan will be a legally binding arrangement and it should therefore be read in its entirety. Accordingly, solicited parties may wish to consult with their attorneys regarding the contents of the Plan.

**WHO IS ENTITLED TO VOTE:** Under section 1126(f) of the Bankruptcy Code, holders of Claims or Equity Interests that are not impaired under the Plan are presumed to have accepted the Plan and are not entitled to vote on the Plan. Under section 1124 of the Bankruptcy Code, a Class of Claims or Equity Interests is not "impaired" under the Plan if (i) the Plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default. Under section 1126(g) of the Bankruptcy Code, a Class is deemed not to have accepted the Plan if the Plan provides that the Claims or Equity Interests of such Class do not entitle the Holders of such Claims or Equity Interests to receive or retain any property under the Plan on account of such Claims or Equity Interests. Accordingly, the only Classes that are entitled to vote on the Plan are Classes T3 and C3 because all other Classes are deemed to (i) accept the Plan, under section 1126(f) of the Bankruptcy Code.

**II.**

# SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER PLAN

### A.    No Substantive Consolidation

The Plan is a joint plan that does not provide for substantive consolidation of the Estates, and on the Plan Effective Date, the Estates shall not be deemed to be substantively consolidated for purposes thereof.  Except as specifically set forth herein, nothing in the Plan or this Disclosure Statement shall constitute or be deemed to constitute an admission that any Debtor is subject to or liable for any claim against any other Debtor.

Additionally, claimants holding Claims against multiple Debtors, to the extent Allowed in each Debtor's case, will be treated as a separate claim against each Debtor's Estate; _provided, however_, that no Holder shall be entitled to receive more than payment in full of its Allowed Claim, and such Claims will be administered and treated in the manner provided for herein by the Debtors or otherwise.

### B.    Summary of Classification and Treatment of Claims and Interests

The following table summarizes the classification and treatment of the Claims and Equity Interests under the Plan.  For a more detailed description of the classification and treatment for all Classes, please refer to the discussion in _Section V, "Summary Of Plan"_ and to the Plan itself.[3]

---

[3]    This table is only a summary of the classification, impairment and entitlement to vote of Holders of Claims and Equity Interests under the Plan.  Reference should be made to the entire Disclosure Statement, the Plan and all exhibits thereto for a complete description of the classification and treatment of Claims and Equity Interests.  Accordingly, this summary is qualified in its entirety by reference to the entire Disclosure Statement, the Plan and all exhibits thereto.

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| **Class T1 – Other Priority Claims against Tubo** | *Unimpaired*. Except to the extent that a Holder of an Allowed Other Priority Claim against Tubo agrees to less favorable treatment, each Holder of an Allowed Priority Claim shall have its Claim Reinstated to the extent such Claim is not paid in the ordinary course of business prior to the Plan Effective Date. | No – deemed to accept | Approximately $0[4] | 100% (or such other amount consented to by each Holder of an Allowed Other Priority Claim) |
| **Class T2 – Other Secured Claims against Tubo** | *Unimpaired*. Except to the extent that a holder of an Allowed Other Secured Claim against Tubo agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall have its Claim Reinstated and shall retain its Lien on the property that secures each such Claim, to the extent such Claim is not paid in the ordinary course of business prior to the Plan Effective Date. | No – deemed to accept | Approximately $0 | 100% (or such other amount consented to by each Holder of an Allowed Other Secured Claim) |
| **Class T3 – Noteholder Pledge Claim against Tubo** | *Impaired*. Each Holder of a Noteholder Pledge Claim as of the Distribution Record Date shall receive on the Plan Effective Date, in accordance with the Restructuring Transactions, in full and final satisfaction of each such Holder's Allowed Noteholder Pledge Claim, New Series A Notes to be issued by IUSA in the principal amount of (i) 100.00% of the face amount of Old 2016 Notes held by such Holder, plus (ii) unpaid and accruing interest at the rate of 4.75% per annum, from May 15, 2009 through November 15, 2011, plus (iii) 1.75% of the face amount of the Old | Yes | $200,000,000.00 | 100% |

---

[4]       The claim amounts set forth herein are the Debtors' estimates based on the Debtors' books and records.

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| | 2016 Notes held by such Holder compounded at the rate of 4.75% per annum from May 15, 2011 through November 15, 2011, which New Series A Notes shall be guaranteed by Tubo and secured by a pledge of the capital stock of CLH (along with other guarantees and collateral from members of the IUSA Group). | | | |
| **Class T4 – General Unsecured Claims against Tubo** | *Unimpaired*. Except to the extent that a Holder of an Allowed General Unsecured Claim against Tubo agrees to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall have its Claim Reinstated to the extent that such Claim is not paid in the ordinary course of business prior to the Plan Effective Date. | No – deemed to accept | Approximately $0 | 100% |
| **Class T5 – Equity Interests in Tubo** | *Unimpaired*. The Equity Interests in Tubo are unaltered by the Plan and each Holder of Equity Interests in Tubo will retain its interest in Tubo to the same extent as if the Chapter 11 Cases had not been commenced. | No – deemed to accept | N/A | N/A |
| **Class C1 – Other Priority Claims against CLH** | *Unimpaired*. Except to the extent that a Holder of an Allowed Other Priority Claim against CLH agrees to less favorable treatment, each Holder of an Allowed Other Priority Claim shall have its Claim Reinstated to the extent such Claim is not paid in the ordinary course of business prior to the Plan Effective Date. | No – deemed to accept | Approximately $0 | 100% (or such other amount consented to by each Holder of an Allowed Other Priority Claim) |
| **Class C2 – Other Secured** | *Unimpaired*. Except to the extent that a Holder of an Allowed Other Secured Claim against CLH agrees | No – deemed to accept | $66,176,326.53 | 100% (or such other amount |

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| Claims against CLH | to less favorable treatment, each Holder of an Allowed Other Secured Claim shall have its Claim Reinstated and shall retain its Lien on the property that secures each such Claim, to the extent such Claim is not paid in the ordinary course of business prior to the Plan Effective Date. | | | consented to by each Holder of an Allowed Other Secured Claim) |
| Class C3 – Unsecured Parent Guaranty Claims against CLH | *Impaired.* Each Holder of an Unsecured Parent Guaranty Claim as of the Distribution Record Date shall receive on the Plan Effective Date, in accordance with the Restructuring Transactions, in full and final satisfaction of each such Holder's Allowed an Unsecured Parent Guaranty Claim, New Series A Notes to be issued by IUSA in the principal amount of (i) 100.00% of the principal amount of Unsecured Parent Guaranty Claims held by such Holder, plus (ii) unpaid and accruing interest at the rate set forth on Schedule A to the Plan, from October 12, 2010 through November 15, 2011, plus (iii) 1.75% of the principal amount of Unsecured Parent Guaranty Claims held by such Holder compounded at the rate set forth on Schedule A of the Plan from May 15, 2011 through November 15, 2011, which New Series A Notes shall be guaranteed by Tubo and secured by a pledge of the capital stock of CLH (along with other guarantees and collateral from members of the IUSA Group). | Yes | $800,000.00 | 100% |
| Class T4 – General Unsecured Claims | *Unimpaired.* Except to the extent that a Holder of an Allowed General Unsecured Claim against CLH agrees to less favorable treatment, | No – deemed to accept | $41,677,319.33 | 100% |

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| against CLH | each Holder of an Allowed General Unsecured Claim shall have its Claim Reinstated to the extent that such Claim is not paid in the ordinary course of business prior to the Plan Effective Date. | | | |
| Class T5 – Equity Interests in CLH | *Unimpaired.* The Equity Interests in CLH are unaltered by the Plan and each Holder of Equity Interests in CLH will retain its interest in CLH to the same extent as if the Chapter 11 Cases had not been commenced. | No – deemed to accept | N/A | N/A |

## C. Solicitation and Acceptance of Plan

### 1. General

This Disclosure Statement and other documents described herein are being furnished by the Plan Proponents to Holders of Claims against and Equity Interests in the Debtors pursuant to the Disclosure Statement Order for the purpose of soliciting votes on the Plan.

A copy of the Disclosure Statement Order and a notice of, among other things, voting procedures and the dates set for objections to, and the hearing on, confirmation of the Plan (the "Confirmation Hearing Notice") are also being transmitted with this Disclosure Statement. The Disclosure Statement Order and the Confirmation Hearing Notice set forth in detail the deadlines, procedures, and instructions for casting votes to accept or reject the Plan, for filing objections to confirmation of the Plan, the treatment for balloting purposes of certain types of Claims, and the assumptions for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each Holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order, the Notice of Confirmation Hearing, and the instructions accompanying the Ballot(s) in their entirety before voting on the Plan. These documents contain important information concerning how Claims and Interests are classified for voting purposes and how votes will be tabulated.

### 2. Who Is Entitled to Vote

Pursuant to the Disclosure Statement Order, the Bankruptcy Court has established [_____], 2011 (the "Record Date") as the record date for determining the Holders of Class T3 Claims and Class C3 Claims entitled to vote to accept or reject the Plan. Under section 1126(f) of the Bankruptcy Code, holders of Claims or Equity Interests that are not impaired under the

8

Plan are presumed to have accepted the Plan and are not entitled to vote on the Plan. Under section 1124 of the Bankruptcy Code, a Class of Claims or Equity Interests is not "impaired" under the Plan if (1) the Plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default. Under section 1126(g) of the Bankruptcy Code, a Class is deemed not to have accepted the Plan if the Plan provides that the Claims or Equity Interests of such Class do not entitle the Holders of such Claims or Equity Interests to receive or retain any property under the Plan on account of such Claims or Equity Interests. Accordingly, the only Classes that are entitled to vote on the Plan are Classes T3 and C3 because all other Classes are deemed to accept the Plan, under section 1126(f) of the Bankruptcy Code.

### 3. Summary Of Voting Procedures

As set forth in Section VIII herein, if you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for voting purposes. Please vote and return your Ballot(s) in accordance with the instructions set forth in Section VIII herein and the instructions accompanying your Ballot(s).

TO BE COUNTED, YOUR VOTE INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE INSTRUCTIONS ON THE BALLOT, AND MUST BE **ACTUALLY RECEIVED** BY THE DEBTORS' NOTICE AND BALLOTING AGENT, EPIQ BANKRUPTCY SOLUTIONS, LLC (THE "NOTICE AND BALLOTING AGENT") **NO LATER THAN [__:__] [_].M., PREVAILING EASTERN TIME, ON [_____], 2011 (THE "VOTING DEADLINE")** AT:

VIA FIRST CLASS MAIL

        TUBO DE PASTEJÉ, S.A. BALLOT PROCESSING
        C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
        FDR STATION P.O. BOX 5014
        NEW YORK, NY 10150-5014

VIA HAND DELIVERY OR OVERNIGHT MAIL

        TUBO DE PASTEJÉ, S.A. BALLOT PROCESSING
        C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
        757 THIRD AVENUE, 3RD FLOOR
        NEW YORK, NY 10017

BALLOTS RECEIVED AFTER THAT TIME WILL NOT BE COUNTED. FAXED OR ELECTRONIC COPIES OF BALLOTS WILL NOT BE COUNTED.

ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED. ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT

INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL NOT BE COUNTED. **BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO THE DEBTORS, THE BANKRUPTCY COURT OR COUNSEL TO THE DEBTORS.**

### 4. Inquiries

#### (a) Related to Plan

If you are a Holder of a Noteholder Pledge Claim or an Unsecured Parent Guaranty Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have questions about the procedures for voting your Noteholder Pledge Claim or about the Solicitation Package that you received, please contact the Notice and Balloting Agent, by written request to Tubo de Pastejé, S.A. Ballot Processing, c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017, by telephone at (646) 282-2400 or by email at tabulation@epiqsystems.com.

#### (b) General Inquiries

Anyone wishing to obtain additional copies of the Plan, this Disclosure Statement, the Consensual Exchange Documents or the exhibits to those documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact the Notice and Balloting Agent by written request to Tubo de Pastejé, S.A. Ballot Processing, c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017, by telephone at (646) 282-2400 or by email at tabulation@epiqsystems.com or view such documents by accessing the Notice and Balloting Agent's website: http://dm.epiq11.com, or the Bankruptcy Court's website: www.deb.uscourts.gov. Note: a PACER password and login are needed to access documents on the Bankruptcy Court's website (https://ecf.deb.uscourts.gov/).

### D. Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on [_____], 2011 at [_____] (Prevailing Eastern Time), before The Honorable Kevin J. Carey, Chief United States Bankruptcy Judge. The Bankruptcy Court has directed that objections, if any, to Confirmation be filed and served so that they are received on or before [_____], 2011 at [__:__] [_].m. (prevailing Eastern Time). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any adjourned Confirmation Hearing.

### E. Overview of Chapter 11 Process

The filing of a chapter 11 bankruptcy petition creates a bankruptcy "estate" comprising all of the property interests of the debtor. Unless a trustee is appointed by the bankruptcy court for cause, a debtor remains in possession and control of all its assets as a "debtor in possession." The debtor in possession may continue to operate its business in the ordinary course on a day-to-day basis without bankruptcy court approval. Bankruptcy court approval is only required for various enumerated kinds of transactions (such as certain financing transactions) and transactions out of the ordinary course of a debtor's business. The filing of the bankruptcy petition gives rise

to what is known as the "automatic stay" which, generally, enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of a chapter 11 case without bankruptcy court authorization. The bankruptcy court can grant relief from the automatic stay under certain specified conditions or for cause.

The Bankruptcy Code authorizes the creation of one or more official committees to protect the interests of some or all creditors or interest holders. The fees and expenses of counsel and other professionals employed by such official committees and approved by the bankruptcy court are generally borne by a bankruptcy estate. No official committee has been appointed in the Chapter 11 Cases. No request for the appointment of a trustee or examiner has been made and no committees have been appointed or designated in the Chapter 11 Cases.

A chapter 11 debtor emerges from bankruptcy by successfully confirming a chapter 11 plan. Alternatively, the assets of a debtor may be sold and the proceeds distributed to creditors through a plan of liquidation. A plan may be either consensual or non-consensual and provide, among other things, for the treatment of the claims of creditors and equity interests of shareholders and holders of options or warrants. The provisions of the Plan are summarized below. *See Section V, "Summary of Plan."*

The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the terms for satisfying claims against and equity interests in a debtor. Upon confirmation of a plan, such plan is binding on the debtor, any issuer of securities under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debts that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

The Plan Proponents submit this Disclosure Statement to Holders of Claims against and Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code. This Disclosure Statement sets forth specific information regarding the Debtors pre-bankruptcy history, the nature of the Chapter 11 Cases, the proposed distributions to creditors upon consummation of the Plan, and the distributions to be made to creditors of the IUSA Group under the Restructuring Transactions as contemplated in the Plan and Consensual Exchange. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims and Equity Interests entitled to vote must follow for their votes to be counted.

### F. Plan Effective Date and Exchange Pursuant to Consensual Exchange Conditioned on Each Other

Neither the Plan nor the Consensual Exchange can be consummated without the other and as such the Plan Effective Date and the effective date of the exchange pursuant to the Consensual Exchange shall happen simultaneously.

## HISTORICAL INFORMATION

### A.    Company History And Background

#### 1.    IUSA Group

The IUSA Group was formed in 1939 and is one of Mexico's largest diversified industrial groups.  The IUSA Group manufactures copper-based and electrical products for the housing and electrical power sectors in the United States, Mexico, Europe and Latin America through operations organized by product line into three business groups: copper tubing, wire and cable and manufacturing.  The manufacturing group is divided into five product segments:  (a) copper alloys, (b) watt-hour meters, (c) electrical products, (d) valves and controls and (e) diversified assets.  The IUSA Group is headquartered in Mexico and has manufacturing operations in Mexico and the United States.

#### 2.    Formation and Entities of U.S. Subsidiaries

Tubo and CLH were both established on April 29, 1993, as holding companies.  Tubo is a wholly-owned subsidiary of IUSA.  Tubo is the direct parent company of CLH.  CLH is either the majority or sole parent of several United States based operating subsidiaries, some of which, in turn, are the direct or indirect parents of certain United States based and/or foreign operating subsidiaries.  The Non-Debtor Subsidiaries are part of IUSA's copper tubing and copper alloys businesses and handle related trading and manufacturing activities and personnel and services in the United States.  None of the Non-Debtor Subsidiaries is a debtor in these cases.

Each of Tubo and CLH is a privately owned entity, and equity interests in the Debtors are not listed or traded on any public exchange or market.  Tubo maintains its corporate headquarters at Paseo de la Reforma 2608, Penthouse, Colonia Lomas Altas, 11950, Mexico, D.F., Mexico. CLH maintains its corporate headquarters at 86 Tube Drive, Reading, PA 19605.

#### 3.    Operations and Assets of Debtors

Neither Tubo nor CLH has any employees.  Neither of the Debtors has any accounts or cash other than intercompany payables and receivables.  IUSA has funded retainers for the Debtors' counsel in the Chapter 11 Cases.  The Non-Debtor Subsidiaries use their own bank accounts and a system of intercompany transactions in order to fund their operations.  All United States property insurance policies are issued to the Non-Debtor Subsidiaries.  Certain other policies were historically issued in the CLH name, although payments were made by one or more of the Non-Debtor Subsidiaries and allocated to others through intercompany charges.

There are virtually no pending claims or transactions directly between CLH and its affiliates.[5]  Substantially all corporate allocations of expenses, management fees, and other fees

---

[5]    Certain advances by two Non-Debtor Subsidiaries to IUSA, which advances the Companies believe to be permanent distributions, may technically flow through CLH and Tubo before going to IUSA.  This is

allocable to the Non-Debtor Subsidiaries are levied directly on the Non-Debtor Subsidiaries. There are certain minimal allocations to CLH with respect to certain insurance policies (e.g., general liability and directors' and officers' policies) and taxes.[6] Any dividends paid by the Non-Debtor Subsidiaries to CLH are up-streamed through CLH to IUSA, as a result of CLH's status as parent of the Non-Debtor Subsidiaries.

## B.    Prepetition Secured Indebtedness

### 1.    Pledge and Security Agreement

IUSA, as issuer, certain guarantors, The Bank of New York, as trustee, (the "Trustee") and the Bank of New York (Luxembourg) S.A. are parties to that certain Indenture, dated as of November 13, 2006, with a principal amount outstanding of $200,000,000.00 (as modified and supplemented, the "Existing Indenture"), pursuant to which IUSA issued $200 million in 11.50% senior notes due November 15, 2016 (the "Old 2016 Notes"). On November 16, 2006, Tubo, as pledgor, and the Trustee entered into that certain Pledge and Security Agreement (the "Existing Pledge Agreement"). Pursuant to the Existing Pledge Agreement, Tubo granted to the Trustee for the benefit of the Old 2016 Notes a non-recourse pledge of the capital stock of CLH.

### 2.    Other IUSA Debt

IUSA and its subsidiaries have additional indebtedness consisting of: (a) $145,851,210.08 representing (i) certain promissory notes (pagarés) (the "Copper Debt Notes") issued pursuant to (1) that certain Amended and Restated Copper Cathode Sale Agreement, executed on August 1, 2009 and dated as of June 25, 2008, by and among Gerald Metals, Inc. ("Gerald"), IUSA, S.A. de C.V. and IUSA, as amended, including all annexes and exhibits thereto, and the guarantee issued by the IUSA in respect thereof; and (2) that certain Copper Cathode Sale Agreement, dated as of June 30, 2009, by and among Gerald, IUSA, S.A. de C.V. and IUSA, as amended, including all annexes and exhibits thereto, and the guarantees issued by the IUSA and IUSA, S.A. de C.V. in respect thereof (together, the "Copper Contracts") (each of which such promissory note (pagarés), for the avoidance of doubt, includes any Copper Debt Note that was originally issued in connection with any such Copper Contract, whether such Copper Debt Note is currently held by the original holder thereof or a subsequent holder thereof); and (ii) the agreed upon August 2009 finalization amount of U.S.$155,000.00 (the "August 2009 Finalization Amount"); and (b) the legal and non-legal costs and expenses accrued in connection with the Copper Contracts prior to the date of the Restructuring Agreement in an aggregate agreed amount of $2,000,000 (the "Agreed Costs" and collectively with the Copper Debt Notes and the August 2009 Finalization Amount, the "Copper Debt").

Additionally, IUSA issued, and certain of its subsidiary members of the IUSA Group guaranteed, (a) 9.75% commercial paper with a principal amount outstanding of $9,500,000 due

---

merely a book-keeping matter. The funds have been advanced to IUSA, but may not have been properly classified on the books of CLH or Tubo.

[6]    Although CLH is not an operating company, CLH and the Non-Debtor Subsidiaries file federal income tax returns on a consolidated basis, with CLH as the "taxpayer" entity.

March 26, 2010 (the "9.75% Commercial Paper"); and (b)12% commercial paper with a principal amount outstanding of $15,000,000 due August 6, 2010 (the "12% Commercial Paper" and together with the 9.75% Commercial Paper, the "Commercial Paper").

### C.    Significant Prepetition Unsecured Indebtedness of Debtors

#### 1.    Guarantee of ESBDS Loan

IUSA, S.A. de C.V., as borrower, IUSA and CLH, as guarantors, and Espirito Santo Bank are parties to that certain Credit Agreement, dated as of September 26, 2008, with a principal amount outstanding of $800,000.00, entered into by and among Espirito Santo Bank, as lender, IUSA, S.A. de C.V., as borrower, and IUSA and CLH, as Guarantors (the "ESBDS Loan"). Under the terms of the Plan, the Holders of this claim will receive a *pro rata* portion of the New Series A Notes in full settlement and discharge of all claims arising from the ESBDS Unsecured Loan.

#### 2.    Guarantee of Bank of America Loan

Cambridge-Lee Industries LLC ("CLI"), as borrower, Bank of America, as lender and agent, and certain other lenders are parties to that certain Third Amended and Restated Loan and Security Agreement, dated May 15, 2006 (as amended and restated, the "Bank of America Loan"), pursuant to which the lenders thereunder provided CLI with a revolving credit facility of up to $140,000,000.00. On September 19, 1996, CLH, as guarantor, entered into a certain Guaranty, which Guaranty CLH reaffirmed by that certain Reaffirmation of Guaranty, dated as of October 28, 2002, pursuant to which CLH guaranteed the obligations of CLI under the Bank of America Loan. As of the date hereof, the outstanding balance of the Bank of America Loan is $41,677,319.33. CLH's guarantee of the Bank of America Loan under the Guaranty will be reinstated under the Plan.

#### 3.    Pledge of UCI Stock to GECC

United Copper Industries, Inc. ("UCI"), as borrower, and General Electric Capital Corporation ("GECC"), as lender, are parties to that certain Second Amended and Restated Loan and Security Agreement, dated as of March 8, 2006 (as amended and restated, the "GECC Loan"), pursuant to which GECC provided UCI with a (a) revolving credit loan of up to $130,000,000.00 and (b) term loan of $8,000,000.00. CLH, as pledgor, entered into that certain Stock Pledge Agreement with GECC (the "GECC Stock Pledge Agreement"), pursuant to which CLH pledged 89.13% of the capital stock of UCI to GECC as security for the GECC Loan. As of the date hereof, the outstanding balance of the GECC Loan is $66,176,326.53. CLH's pledge of UCI stock under the GECC Stock Pledge Agreement will be reinstated under the Plan.

### D.    Events Leading to Chapter 11 Filing

The IUSA Group has been negatively affected by general economic conditions worldwide that have depressed spending in the construction industry, which contains major consumers of the products of the IUSA Group. In addition, increased volatility in the price of commodities, especially copper, has resulted in increased costs of manufacturing. As a result, the IUSA Group experienced cash flow issues in the months leading up to the Petition Date and

IUSA failed to make an interest payment that became due under the Old 2016 Notes on November 15, 2009 (the "Technical Default"). Pursuant to the Existing Indenture, there was a grace period for payment of interest which expired in mid-December 2009.

Beginning in 2009 and continuing through 2010 and 2011, the IUSA Group has been exploring a long term solution for its cash flow problems. Specifically, representatives of the IUSA Group initiated discussions with the Noteholders regarding the Technical Default and a potential restructuring of certain terms of the Existing Indenture. Those discussions proved fruitful and as they progressed it became clear that a meaningful restructuring of their obligations under the Existing Indenture required other restructuring, as well, of the Copper Debt and Commercial Paper. These larger negotiations are expected to culminate in the Restructuring Agreement.

## IV.

## CHAPTER 11 CASES

### A.    Case Administration

#### 1.    Retained Professionals

Prior to the Petition Date the Debtors retained Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, as their counsel ("Milbank"), and Pachulski Stang Ziehl & Jones LLP, as their co-counsel ("PSZ&J"), to assist them in exploring and facilitating their restructuring goals. On January 11, 2010, the Bankruptcy Court entered orders approving the retention of Milbank and PSZ&J as the Debtors' counsel (Docket Nos. 49 and 50).

CLH retained Deloitte Tax LLP ("Deloitte Tax") to prepare its consolidated federal income tax returns and provide related tax advisory services. On March 17, 2010, the Bankruptcy Court entered an order approving the retention of Deloitte Tax as tax professionals to CLH (Docket No. 70). On March 25, 2011, the Bankruptcy Court entered an order approving the supplemental retention of Deloitte Tax as tax professionals to CLH (Docket No. 254).

CLH also retained Deloitte & Touche LLP ("Deloitte Audit") to audit CLH's consolidated financial statements for the year ended December 31, 2009. On May 21, 2010 the Bankruptcy Court entered an order approving the retention of Deloitte Audit as audit professionals to CLH (Docket No. 110).

#### 2.    Joint Administration and Schedules

Pursuant to an order of the Bankruptcy Court dated December 10, 2009 (the "Joint Administration Order") (Docket No. 19), the Chapter 11 Cases are currently being jointly administered for procedural purposes only. No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

On December 22, 2009, each Debtor filed its Statement of Financial Affairs and Schedules of Assets and Liabilities (the "Schedules") with the Bankruptcy Court. (Docket Nos. 39–42).

As of the date of this Disclosure Statement, there are two proofs of Claim filed against the Debtors in a total amount of $26,365.85.[7] To the extent these Claims have not already been satisfied, such Claims will be treated in accordance with the Plan.

## B.    Continuation of Business After Petition Date

### 1.    Operations

Since the Petition Date, the Debtors have been authorized to continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### 2.    Insurance

Prior to the Petition Date, CLH nominally maintained a workers' compensation insurance program and various other insurance programs for, among other things, general liability, directors' and officers' and employment practices liabilities, auto liability, and international property and liability (collectively, the "Insurance Programs") provided by several insurance carriers (the "Insurance Providers"). Because CLH is a holding company with no employees or operations, most of these insurance policies were held by CLH in name only for the benefit of the Non-Debtor Subsidiaries. As a precautionary measure, CLH sought Bankruptcy Court approval to (i) continue the Insurance Programs and (ii) pay or cause the Non-Debtor Subsidiaries to pay claims in respect thereof, including, without limitation, all premiums, claims, deductibles, administrative expenses, brokerage fees, and all other charges and expenses incurred, consistent with practices in effect prior to the Petition Date, whether relating to the period prior to or after the Petition Date. On March 19, 2010, the Bankruptcy Court entered an order approving CLH's motion.

Subsequently, certain of the Non-Debtor Subsidiaries, as the operating companies for whose benefit most of the Insurance Programs were maintained, arranged for the Insurance Providers to reissue policies directly in their names as such policies were renewed. CLH remains an additional named insured on most such policies. Currently, to the Debtors' knowledge, only the policy covering directors and officers and executive liability has been maintained in CLH's name.

## V.

## SUMMARY OF PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO.

---

[7]    Another proof of claim in the amount of $13,100,823.26, filed by the Internal Revenue Service on the claims register of CLH, was subsequently withdrawn on July 12, 2010 (Docket No. 135).

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS UNDER THE PLAN AND WILL, UPON THE PLAN EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST.

## A. Administrative Claims, Priority Tax Claims, and Intercompany Claims and Intercompany Interests

### 1. Administrative Claims

Each Holder of an Allowed Administrative Claim will receive payment in full in Cash of the unpaid portion of such Allowed Administrative Claim (a) in the case of professional fees and expenses for advisors to the Debtors, as soon as practicable after Bankruptcy Court approval thereof, or, in the case of professionals retained by the Debtors in the ordinary course of their business, if any, on such terms as are customary between the Debtors and such professionals; (b) with respect to all other Holders of Allowed Administrative Claims, on the later of (i) the Plan Effective Date and (ii) the date on which such payment would be made in the ordinary course of the Debtors' business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements or regulations governing, instruments evidencing or other documents relating to such transactions; or (c) with respect to any Claims described in clauses (a) and (b) hereof, as otherwise agreed by the Holder of such Claim and the Debtors.

### 2. Professional Fee Claims

All entities seeking awards by the Bankruptcy Court of Professional Fee Claims shall File and serve on counsel for the Reorganized Debtors, the Committee, if any, the U.S. Trustee, and any other party specifically requesting a copy in writing, an application for its Professional Fee Claim no later than forty (40) days after the Plan Effective Date and be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Professional Fee Claim. Any interested party desiring to object to any Professional Fee Claim must File and serve its objection on the Reorganized Debtors, the Committee, if any, the U.S. Trustee, and the Professional Person to whose application the objection is addressed no later than sixty (60) days after the Plan Effective Date. Notwithstanding anything else provided herein, the Reorganized Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

### 3. Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall, in full satisfaction, release and discharge of such Allowed Priority Tax Claim, receive, in the Reorganized Debtors' discretion, (a) on the applicable Distribution Date, Cash in an amount equal to such Allowed Priority Tax Claim, (b) such other treatment as to which the Debtors and the Holder of such Allowed Priority Tax Claim have agreed upon in writing or (c) such other treatment as will cause such Claim not to be Impaired; provided, however, that any such Priority Tax Claim not due and owing on the Plan Effective Date will be paid when such Claim becomes due and owing.

### 4. Intercompany Claims and Intercompany Interests

Notwithstanding anything to the contrary contained in this Plan, Intercompany Claims and Intercompany Interests shall be Unimpaired and shall remain in full force and effect after the Plan Effective Date, provided that such Intercompany Claims are subject to the requirements of and restrictions (including, without limitation, the relative ranking and priority of such Intercompany Claims) contained in the New Indentures.

### B. Classification and Treatment of Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Administrative Claims and Priority Tax Claims have not been classified and thus the Holders thereof are excluded from the Classes of Claims entitled to vote on the Plan.

### 1. Summary of Classification

All Claims and Equity Interests, other than the Administrative Claims and Priority Tax Claims, are classified in the Classes set forth in Section 4 of the Plan for all purposes, including voting, Confirmation, and distributions pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Equity Interest is classified in a particular Class only to the extent that such Claim or Equity Interest is within the description of that Class and is classified in another Class to the extent that any remainder of such Claim or Equity Interest belongs within such other Class or Classes. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim in the Class and has not been paid, released, or otherwise satisfied prior to the Plan Effective Date.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| T1 | Other Priority Claims against Tubo | Unimpaired | Deemed to Accept |
| T2 | Other Secured Claims against Tubo | Unimpaired | Deemed to Accept |
| T3 | Noteholder Pledge Claims against Tubo | Impaired | Entitled to Vote |

| T4 | General Unsecured Claims against Tubo | Unimpaired | Deemed to Accept |
|----|----|----|----|
| T5 | Equity Interests in Tubo | Unimpaired | Deemed to Accept |
| C1 | Other Priority Claims against CLH | Unimpaired | Deemed to Accept |
| C2 | Other Secured Claims against CLH | Unimpaired | Deemed to Accept |
| C3 | Unsecured Parent Guaranty Claims against CLH | Impaired | Entitled to Vote |
| C4 | General Unsecured Claims against CLH | Unimpaired | Deemed to Accept |
| C5 | Equity Interests in CLH | Unimpaired | Deemed to Accept |

## 2. Treatment of Claims and Equity Interests

To the extent a Class contains Allowed Claims with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

### (a) Classes T1 and C1– Other Priority Claims

*Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed Priority Claim shall have its Claim Reinstated to the extent such Claim is not paid in the ordinary course of business prior to the Plan Effective Date.

*Voting*: Classes T1 and C1 are Unimpaired under the Plan and, consequently, the Holders of Other Priority Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

### (b) Classes T2 and C2– Other Secured Claims

*Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall have its Claim Reinstated and shall retain its Lien on the property that secures each such Claim, to the extent such Claim is not paid in the ordinary course of business prior to the Plan Effective Date.

*Voting*: Classes T2 and C2 are Unimpaired under the Plan and, consequently, the Holders of Other Secured Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

### (c) Class T3 – Noteholder Pledge Claims against Tubo

*Allowance*: On the Plan Effective Date, the Noteholder Pledge Claims against Tubo shall be deemed Allowed in full.

*Treatment*: Each Holder of a Noteholder Pledge Claim as of the Distribution Record Date shall receive on the Plan Effective Date, in accordance with the Restructuring Transactions, in full and final satisfaction of each such Holder's Allowed Noteholder Pledge Claim, New Series A Notes to be issued by IUSA in the principal amount of (i) 100.00% of the face amount of Old 2016 Notes held by such Holder, plus (ii) unpaid and accruing interest at the rate of 4.75% per annum, from May 15, 2009 through November 15, 2011, plus (iii) 1.75% of the face amount of the Old 2016 Notes held by such Holder compounded at the rate of 4.75% per annum from May 15, 2011 through November 15, 2011, which New Series A Notes shall be guaranteed by Tubo and secured by a pledge of the capital stock of CLH (along with other guarantees and collateral from members of the IUSA Group).

*Voting*: Class T3 is Impaired under the Plan and, consequently, the Holders of Allowed Noteholder Pledge Claims against Tubo are entitled to vote on the Plan.

### (d)     Class C3 – Unsecured Parent Guaranty Claims against CLH

*Allowance*: On the Plan Effective Date, the Unsecured Parent Guaranty Claims against CLH shall be deemed Allowed in full.

*Treatment*: Each Holder of an Unsecured Parent Guaranty Claim as of the Distribution Record Date shall receive on the Plan Effective Date, in accordance with the Restructuring Transactions, in full and final satisfaction of each such Holder's Allowed an Unsecured Parent Guaranty Claim, New Series A Notes to be issued by IUSA in the principal amount of (i) 100.00% of the principal amount of Unsecured Parent Guaranty Claims held by such Holder, plus (ii) unpaid and accruing interest at the rate set forth on Schedule A of the Plan, from October 12, 2010 through November 15, 2011, plus (iii) 1.75% of the principal amount of Unsecured Parent Guaranty Claims held by such Holder compounded at the rate set forth on Schedule A of the Plan from May 15, 2011 through November 15, 2011, which New Series A Notes shall be guaranteed by Tubo and secured by a pledge of the capital stock of CLH (along with other guarantees and collateral from members of the IUSA Group).

*Voting*: Class C3 is Impaired under the Plan and, consequently, the Holders of Allowed Unsecured Parent Guaranty Claims are entitled to vote on the Plan.

### (e)     Classes T4 and C4 – General Unsecured Claims

*Treatment:* Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall have its Claim Reinstated to the extent that such Claim is not paid in the ordinary course of business prior to the Plan Effective Date.

*Voting*: Classes T4 and C4 are Unimpaired under the Plan and, consequently, the Holders of General Unsecured Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

### (f) Classes T5 and C5 – Equity Interests

*Treatment*: The Equity Interests are unaltered by the Plan and each Holder of Equity Interests will retain its interests to the same extent as if the Chapter 11 Cases had not been commenced.

*Voting*: Classes T5 and C5 are Unimpaired under the Plan and, consequently, the Holders of Equity Interests are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

### C. Acceptance or Rejection of Plan

#### 1. Acceptance or Rejection of Plan

##### (a) Voting Classes

Classes T3 and C3 are Impaired under the Plan, and Holders of Claims in Classes T3 and C3 are entitled to vote on the Plan.

##### (b) Presumed Acceptance of Plan

Classes T1, C1, T2, C2, T4, C4, T5 and C5 are Unimpaired under the Plan and, therefore, are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

#### 2. Acceptance by Impaired Classes

An Impaired Class of Claims shall have accepted the Plan if (i) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

### D. Treatment of Executory Contracts and Unexpired Leases

#### 1. Assumption

Except as otherwise provided in the Plan or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, each executory contract or unexpired lease of the Debtors that has not expired by its own terms before the Plan Effective Date that either: (1) is listed on the Schedule of Assumed Contracts, (2) is not rejected prior to the Plan Effective Date, (3) is not the subject of a motion to reject Filed on or before the Confirmation Date upon which the Bankruptcy Court has not entered an Order, (4) is not listed on the Schedule of Rejected Contracts, or (5) has not been otherwise modified or superseded by agreement of the parties thereto, shall be deemed to have been assumed by the applicable Debtor as of the Plan Effective Date, pursuant to section 365 of the Bankruptcy Code. Nothing in the Plan, any annex to the Plan, or any document executed or delivered in connection with the Plan

or any such annex creates any obligation or liability on the part of the Debtors, the Reorganized Debtors or any other person or entity that is not currently liable for such obligation, with respect to any executory contract or unexpired lease except as otherwise provided in the Plan. In addition, the Confirmation Order shall constitute a finding of fact and conclusion of law that (i) each Executory Contract assumed under the Plan is an executory contract which may be assumed by the Debtors, (ii) there are no defaults of the Debtors, no cure amounts owing pursuant to section 365(b)(i) of the Bankruptcy Code (the "Cure Amount"), no compensation due for any actual pecuniary loss and there is adequate assurance of future performance with respect to each Executory Contract, (iii) such assumption is in the best interest of the Debtors and their estates, (iv) upon the Plan Effective Date, the assumed Executory Contracts constitute legal, valid, binding and enforceable contracts in accordance with the terms thereof, and (v) the counter party to each assumed Executory Contract is required to and ordered to perform under and honor the terms of the assumed Executory Contract.

Each executory contract and unexpired lease assumed pursuant to Section 6.1 of the Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan. Nothing in the Plan or any Plan Document shall create any obligation or liability on the part of any Debtor, any Reorganized Debtor or any other Person that does not currently have such liability or obligation, with respect to any executory contract or unexpired lease.

Each executory contract and unexpired lease that is assumed shall include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease and (ii) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements, or franchises, and any other interests in real estate or rights *in rem* related to such premises, but excluding any agreement rejected pursuant to an order of the Bankruptcy Court.

In the event of a dispute (each, a "Cure Dispute") regarding: (i) the Cure Amount; (ii) the ability of the applicable Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (iii) any other matter pertaining to the proposed assumption, any party in interest may file an objection to confirmation pursuant to the procedures established in the order approving this Disclosure Statement. Any objection that raises a Cure Dispute must identify the disputed executory contract and set forth with particularity the basis of the Cure Dispute. To the extent a Cure Dispute relates solely to the Cure Amount, the applicable Debtor may assume the applicable contract or lease prior to the resolution of the Cure Dispute provided that such Debtor reserves Cash in an amount sufficient to pay the full amount asserted as cure payment by the non-Debtor party to such contract or lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court). Any party that fails to object shall be forever barred, estopped and enjoined from raising a Cure Dispute in the Bankruptcy Court, in any other court, in any arbitration or otherwise.

## 2.  Rejection

Effective immediately prior to the Plan Effective Date, each executory contract or unexpired lease of the Debtors listed on the Schedule of Rejected Contracts is rejected, to the extent, if any, each constitutes an executory contract or unexpired lease, and without conceding that each constitutes an executory contract or unexpired lease or that the Debtors have any liability under each. Listing a contract or lease on the Schedule of Rejected Contracts is not deemed an admission by the Debtors or the Reorganized Debtors that such contract is an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors have any liability under the Plan. The Debtors reserve the right at any time before Confirmation to amend the Schedule of Rejected Contracts, including to (a) delete any executory contract or unexpired lease listed on such Schedule and provide for its assumption or (b) add any executory contract or unexpired lease to such Schedule, thus providing for its rejection. The Debtors shall provide notice of any amendment of such Schedule to the party to the affected executory contract or unexpired lease and the U.S. Trustee.

The Confirmation Order shall constitute an Order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving all such rejections as described above, as of the Plan Effective Date. If the rejection by the Debtors, pursuant to the Plan or otherwise, of an executory contract or unexpired lease results in a Claim that is not theretofore evidenced by a timely filed proof of claim or a proof of claim that is deemed to be timely filed under applicable law, then such Claim shall be forever barred and shall not be enforceable against the Debtors or Reorganized Debtors, or the properties of the Debtors or Reorganized Debtors, unless a proof of claim for damages arising from the rejection under the Plan of an executory contract or unexpired lease is Filed within thirty (30) days after the mailing of notice of Confirmation or such claim shall be forever barred and unenforceable against the Debtors, the Reorganized Debtors and their properties and barred from receiving any distribution under the Plan. Any such Claims that become Allowed Claims shall be classified in Class T4 or C4 of the Plan, as applicable.

## 3.  Indemnification of Directors, Officers and Employees

For purposes of the Plan, the obligation of a Debtor to exculpate, indemnify and advance any expenses to any Person serving at any time before, on or after the Petition Date as one of its current, former and future directors or officers (each, an "Indemnitee") by reason of such Person's service in such capacity, for acts or omissions occurring at or prior to the consummation of the Plan, whether asserted or claimed prior to, at or after the consummation of the Plan, to the extent provided in such Debtor's Corporate Documents, a written agreement with the Debtor, in accordance with any applicable law, or any combination of the foregoing or otherwise, shall: (a) survive confirmation of the Plan and the Plan Effective Date and continue in full force and effect (and not be modified, amended or terminated in any manner adverse to any Indemnitee without the written consent of the affected Indemnitee); (b) become an obligation of the applicable Reorganized Debtor; and (c) not be discharged in accordance with section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Petition Date.

### 4. D&O Liability and Insurance Policies

Notwithstanding anything in the Plan to the contrary, as of the Plan Effective Date, the Debtors shall assume (and assign to any of the Reorganized Debtors as necessary to continue the D&O Liability Insurance Policies in full force) all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

### 5. Compensation and Benefits Plans

Except and to the extent previously assumed by an order of the Bankruptcy Court, on or before the Confirmation Date, all employee compensation and Benefit Plans, including Benefit Plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as if they were, executory contracts that are to be assumed hereunder. The Debtors' obligations under such plans and programs shall survive confirmation of the Plan, except for (1) executory contracts or Benefit Plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code) and (2) such executory contracts or Benefit Plans as have previously been rejected, are the subject of a motion to reject as of the Confirmation Date or have been specifically waived by the beneficiaries of any of such Benefit Plans or executory contracts.

Neither of the Debtors is a sponsor of a defined benefit pension plan under ERISA. However, the Retirement Plan Sponsor, a Non-Debtor Subsidiary, is the sponsor of the Retirement Plan that has been frozen since 1993. As of the most recent FAS valuation of the Retirement Plan for the fiscal year ended December 31, 2009, the Retirement Plan was adequately funded, with funding in excess of the aggregate pension benefit obligations under the Retirement Plan. After the Plan Effective Date, the respective obligations, if any, of the Reorganized Debtors and the Retirement Plan Sponsor will be reinstated under the Plan.

### E. Provisions Governing Distributions

### 1. Timing and Calculation of Amounts to Be Distributed

Except as otherwise provided in the Plan, on the Plan Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Plan Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors as of the Distribution Record Date shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided in the Plan. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be

completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Section 7.4 of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Plan Effective Date.

### 2. Disbursing Agent

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Reorganized Debtors as Disbursing Agents or such other Entity designated by the Reorganized Debtors as a Disbursing Agent on the Plan Effective Date. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. In the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

Distributions of the New Series A Notes shall be made by IUSA to the Indenture Trustee for the benefit of the Holders of the Noteholder Pledge Claims.

### 3. Rights and Powers of Disbursing Agent

#### (a) Powers of Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

#### (b) Expenses Incurred On or After Plan Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Plan Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors. Notwithstanding the foregoing, the Reorganized Debtors shall have no obligation to pay any fees or expenses incurred, or any compensation or expense reimbursement claims made, by IUSA on account of the distributions of the New Series A Notes.

### 4. Distributions on Account of Claims Allowed After Plan Effective Date

#### (a) Payments and Distributions on Disputed Claims

Distributions made after the Plan Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Plan Effective Date but which later become Allowed Claims shall be deemed to have been made on the Plan Effective Date.

**(b)     Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Reorganized Debtors, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

**5.     Delivery of Distributions and Undeliverable or Unclaimed Distributions**

**(a)     Delivery of Distributions in General**

Except as otherwise provided in the Plan, the Reorganized Debtors shall make distributions to Holders of Allowed Claims, except for Holders of Allowed Claims in Class T3, at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; and provided, further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in the Debtors' books and records or, as applicable, any Proof of Claim filed by that Holder. Distributions of New Series A Notes of the Reorganized Debtors to Holders of Allowed Claims in Class T3 shall be made to the Indenture Trustee for the benefit of the Holders of the Noteholder Pledge Claims and Unsecured Parent Guaranty Claims as provided in the Plan. The Indenture Trustee shall, in turn, promptly administer the distributions to the Holders of Allowed Noteholder Pledge Claims, in accordance with the Plan and the Existing Indenture.

**(b)     Distributions Free and Clear**

Except as otherwise provided in the Plan, any distributions under the Plan and the issuance and distribution of the New Notes shall be free and clear of any Liens, Claims and encumbrances, and no other entity, including but not limited to the Debtors, the Reorganized Debtors, or the members of the IUSA Group shall have any interest, legal, beneficial or otherwise, in assets transferred to holders of Allowed Claims or Eligible Debt pursuant to the Plan.

**(c)     Undeliverable Distributions and Unclaimed Property**

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Plan Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors or IUSA, as applicable (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such Claim shall be discharged and forever barred.

### (d)     Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens and encumbrances. Except as otherwise provided herein, distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

### (e)     Setoff

Each Debtor and each Reorganized Debtor may withhold (but not set off except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim (other than a Noteholder Pledge Claim or the Unsecured Parent Guaranty Claims) an amount equal to any claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim. In the event that any such claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim) the amount of any adjudicated or resolved claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, equity interests, rights, and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such Holder, except as specifically provided in the Plan.

### F.     Means for Implementation of Plan

### 1.     Continued Corporate Existence

The Reorganized Debtors shall continue to exist after the Plan Effective Date as separate corporate entities in accordance with applicable law under their respective Corporate Documents, except to the extent such Corporate Documents may be amended including to comply with

section 1123(a)(6) of the Bankruptcy Code, without the need for any further corporate action. Any proposed amendments to the Corporate Documents, including but not limited to any changes in the corporate and organizational structure of the Debtors, shall be filed in the Plan Supplement. On and after the Plan Effective Date, the Corporate Documents, as so amended, if necessary, shall continue to govern the Reorganized Debtors' operations. After the Plan Effective Date, the Reorganized Debtors shall be authorized to (i) establish new by-laws or corporate charters for either of the Reorganized Debtors, and/or (ii) change the corporate structure (e.g., corporation to limited liability company) of either Reorganized Debtor under the law of its applicable jurisdiction of organization, without further order of the Bankruptcy Court.

##      2.      Revesting of Assets

Except as otherwise set forth in the Plan or in the Confirmation Order, as of the Plan Effective Date, the property of the Estates, together with any property of the Debtors that is not property of the Estates and that is not specifically disposed of pursuant to the Plan, shall revest in the applicable Reorganized Debtors free and clear of all Claims, Liens, encumbrances and other interests of the Holders of Claims or Interests. Thereafter, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, Bankruptcy Rules, and Bankruptcy Court.

##      3.      Operation of Business and Properties

Without limiting the generality of the foregoing, all rights, privileges, entitlements, authorizations, grants, permits, licenses, easements, franchises, and other similar items which constitute part of, or are necessary or useful in the operation of the property or the business of the Debtors or the Reorganized Debtors, whether in the United States, Mexico or elsewhere, shall be vested in the applicable Reorganized Debtors on the Plan Effective Date, and shall thereafter be exercisable and usable by the Reorganized Debtors to the same extent they would have been exercisable and usable by the Debtors before the Petition Date or by the Estates or Debtors in Possession during the pendency of the Chapter 11 Cases.

##      4.      Retention of Causes of Action

Except to the extent any Causes of Action are expressly and specifically waived, released or abandoned under the Plan or the Confirmation Order, or pursuant to any contract, instrument, release, or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code: (1) any and all Causes of Action accruing to any Debtor or its Estate against any Person shall remain assets of and vest in the applicable Reorganized Debtor, whether or not litigation relating thereto is pending on the Plan Effective Date, and whether or not such Causes of Action have been listed or referred to in the Plan, the Disclosure Statement, the Schedule of Retained Causes of Action, or any other document Filed with the Bankruptcy Court; and (2) neither any Debtor nor any Reorganized Debtor waives, relinquishes, or abandons (nor shall they be estopped or otherwise precluded from asserting) any Causes of Action: (a) whether or not such Causes of Action have been listed or referred to in the Plan, the Disclosure Statement, the Schedule of Retained Causes of Action, or any other document Filed with the Bankruptcy Court; (b) whether or not such Causes of Action are currently known to the Debtors; and (c) whether or not a defendant in any litigation relating to such Causes of Action Filed a