Proof of Claim, a notice of appearance or any other pleading or notice in the Chapter 11 Cases, voted for or against the Plan, or received or retained any consideration under the Plan. Without in any manner limiting the generality of the foregoing, notwithstanding any otherwise applicable principle of law or equity, including, without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion or any similar doctrine, the failure to list, disclose, describe, identify, or refer to any Causes of Action in the Plan, the Schedule of Retained Causes of Action or any other document Filed with the Bankruptcy Court shall in no manner waive, eliminate, modify, release, or alter the Reorganized Debtors' right to commence, prosecute, defend against, settle, and realize upon any Causes of Action that any Debtor or any Reorganized Debtor has, or may have, as of the Confirmation Date.

Without limiting the generality of the foregoing, except as otherwise provided in the Plan, the Confirmation Order, any other order of the Bankruptcy Court or any Plan Document, nothing shall affect any Debtor's or Reorganized Debtor's rights and defenses, both legal and equitable, with respect to any Disputed Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against such Claims.

Due to the Plan's Unimpaired and/or agreed treatment of Claims, the Debtors and the Reorganized Debtors waive their rights to institute or prosecute any Avoidance Actions.

### 5. Cancellation of Existing Agreements

Except for the purposes of evidencing a right to distribution under the Plan, and except as expressly provided in the Plan or the Confirmation Order, on the Plan Effective Date, the Existing Indenture, the Existing Pledge Agreement and any and all notes, instruments or other documents evidencing the Old 2016 Notes, the Noteholder Pledge Claims, the ESBDS Loan and the Unsecured Parent Guaranty Claims shall be deemed cancelled and extinguished and of no further force and effect, and, upon the delivery to the Holders of the Allowed Noteholder Pledge Claims and Allowed Unsecured Parent Guaranty Claims their ratable distribution of the New Series A Notes as set forth in Section 4 of the Plan, the obligations of the Debtors, the Non-Debtor Subsidiaries, IUSA, the Existing Guarantors and any of their respective affiliates to the Holders of the Old 2016 Notes and ESBDS Loan shall be discharged. The Indenture Trustee is authorized to take whatever action may be necessary or appropriate (in each case, as requested by Tubo or Reorganized Tubo) to effectuate the terms and conditions specified herein. Without limiting the generality of the foregoing, the Indenture Trustee shall be expressly obligated to deliver to the trustee under the New Series A Indenture the shares pledged pursuant to the New Pledge Agreement to be held as collateral for the New Series A Notes.

For the avoidance of doubt, Section 8.5 of the Plan shall apply only to notes, instruments or other documents which evidence the Old 2016 Notes, the ESBDS Loan and any guaranties and pledges thereunder, and except as otherwise expressly provided the Plan or the Confirmation Order, all other notes, instruments, and other documents evidencing Claims against any Debtor shall continue in full force and effect after the Plan Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

Notwithstanding the foregoing, the Existing Indenture shall continue in effect for the purposes of allowing IUSA and/or the Indenture Trustee to make all distributions on account of

the Allowed Noteholder Pledge Claims pursuant to the Plan and to perform any other necessary administrative functions with respect thereto.

### 6. Satisfaction of Copper Debt and Commercial Paper

Simultaneous with the solicitation of acceptances and rejections of the Plan and as a prerequisite to the Plan Effective Date thereunder, IUSA is soliciting holders of the Copper Debt and the Commercial Paper (the "Consensual Exchange") to exchange their Copper Debt or Commercial Paper, as applicable, for New Series B Notes. Pursuant to the Consensual Exchange, and consistent with the Plan, IUSA will issue the New Series B Notes in exchange for the claims of the holders of Copper Debt and Commercial Paper against IUSA. Upon the delivery to the holders of the Copper Debt and Commercial Paper their ratable distribution of the New Series B Notes, as set forth in the Consensual Exchange Documents, the obligations of IUSA, and any of its affiliates to the holders of the Copper Debt and Commercial Paper shall be fully discharged, released and satisfied. For a further description of the exchange pursuant to the Consensual Exchange, please refer to the Consensual Exchange Documents, attached hereto as Exhibit 5.

### 7. New Notes

A full description of the New Series A Notes and New Series B Notes is attached hereto as Exhibit 4, and the New Indentures shall be included in the Plan Supplement.

The New Notes will be IUSA's direct senior obligations and be guaranteed by substantially all of IUSA's existing and future direct and indirect Mexican subsidiaries (except certain excluded subsidiaries identified in the New Indentures, the "Excluded Businesses"). The New Notes will mature on November 15, 2016 and accrue interest at a rate of 11.50% per annum.

The New Notes will be secured by, with respect to IUSA and its direct and indirect subsidiaries (other than the Excluded Businesses and CLH and its direct and indirect subsidiaries) (i) all future and current real property, including land and buildings; (ii) substantially all other future and current unencumbered long-term assets, properties and machinery and equipment, including, without limitation, all owned capital stock (other than capital stock of subsidiaries and IUSA-GE); (iii) 30% of the future and current amounts in a lockbox account related to royalties for the use of certain payment cards in Mexico; (iv) all capital stock of IUSA's future and current direct and indirect Mexican Subsidiaries, except the Excluded Businesses; and (v) the proceeds of each of the assets described in (i) through (iv) above.

In addition, the New Series A Notes (but not the New Series B Notes) will be secured by a first-priority pledge of capital stock of CLH.

### 8. Restructuring Transactions

On the Plan Effective Date, the following Restructuring Transactions shall be effectuated:

(a)    IUSA shall enter into the New Indentures for the New Notes;

(b)    IUSA shall issue and distribute the New Series A Notes to the (a) Holders of Old 2016 Notes/Allowed Noteholder Pledge Claims and (b) Holders of the ESBDS Loan/Holders of Allowed Unsecured Parent Guaranty Claims, in each instance in full and final satisfaction and discharge of all such obligations of any member of the IUSA Group with respect to such obligations;

(c)    IUSA shall issue and distribute the New Series B Notes to the Holders of Series B Eligible Debt that have elected to participate in the Consensual Exchange, in each instance in full and final satisfaction and discharge of all such obligations of any member of the IUSA Group with respect to such Series B Eligible Debt. Each Holder of Series B Eligible Debt shall receive New Series B Notes in a principal amount equal to (i) 100.00% of the principal amount of Series B Eligible Debt held by such Holder (other than Series B Eligible Debt consisting of Agreed Costs or Copper Debt Finalization Amount), plus (ii) unpaid and accruing interest on such principal amount of Series B Eligible Debt (other than Series B Eligible Debt consisting of Agreed Costs or Copper Debt Finalization Amount) at the rate set forth on Schedule A of the Plan from the date specified on Schedule A of the Plan through November 15, 2011, plus (iii) 1.75% of the principal amount of Eligible Debt and Copper Debt Finalization Amount held by such Holder, plus interest thereon compounded at the rate set forth on Schedule A of the Plan from May 15, 2010 through November 15, 2011, plus (iv) 100% of the Agreed Costs held by such Holder, plus interest thereon compounded at the rate set forth on Schedule A of the Plan from May 15, 2010 through November 15, 2011;

(d)    Tubo, and each other subsidiary of IUSA, S.A. de C.V. that has agreed to guarantee the New Notes pursuant to the terms of the Restructuring Agreement, shall execute and deliver the New Indentures as a guarantor thereunder; and

(e)    Tubo shall execute and deliver the New Pledge Agreement.

**9.    Effectuating Documents; Further Transactions**

The entry of the Confirmation Order shall constitute a direction to and authorization for the Plan Proponents and the Reorganized Debtors (as the case may be) and their respective directors and officers to take or cause to be taken any action that they deem necessary or appropriate to consummate the transactions contemplated by the Plan and the Plan Supplement, and to execute any contracts, instruments, and other agreements or documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, in each case, without further order by the Bankruptcy Court.

The appropriate officers (including the chief executive officer, chief financial officer, president, treasurer, or any vice president thereof) of each Reorganized Debtor, each acting singly, shall be authorized to execute, deliver, file or record such contracts, instruments, releases, and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the transactions contemplated by the Plan and the Plan Supplement. The secretary, assistant secretary or other

appropriate officer of each Reorganized Debtor shall be authorized to certify or attest to any of the foregoing actions.

### 10.    Management of Reorganized Debtors

Subject to the New Corporate Documents, on the Plan Effective Date, the management, control, and operation of each Reorganized Debtor shall become the general responsibility of its respective board of directors in accordance with applicable non-bankruptcy law.  Except as otherwise disclosed on or before the Confirmation Date, the individuals serving as members of the Board of Directors of each Debtor as of the Petition Date shall continue to serve as directors of each respective Reorganized Debtor.  Subject to the New Corporate Documents, the directors of each Reorganized Debtor shall have the responsibility for the management, control, and operation of each respective Reorganized Debtor on and after the Plan Effective Date.

As part of the Plan Supplement, but in any event prior to the Confirmation Date, the Debtors will File a schedule disclosing such additional information as is necessary to satisfy section 1129(a)(5) of the Bankruptcy Code including the (1) identity and affiliation of any individual who is proposed to serve as an officer or director of any Reorganized Debtor; (2) identity of any other insider who will be employed or retained by any Reorganized Debtor; and (3) compensation for each such individual.

### G.    Summary of Consensual Exchange

The effectiveness of the Plan is contingent upon the completion of all the Restructuring Transactions.  Therefore, in order to fully provide means for the implementation of the Plan as required under section 1123(a)(5) of the Bankruptcy Code, the Plan provides for the issuance by IUSA of the New Series B Notes upon a successful completion of the Consensual Exchange, as permitted by section 1123(a)(5)(J) of the Bankruptcy Code.

### 1.    Solicitation of Holders of Copper Debt and Commercial Paper

Simultaneous with the solicitation of acceptances and rejections of the Plan and as a prerequisite to the Plan Effective Date, IUSA is soliciting holders of the Copper Debt and the Commercial Paper, through the Consensual Exchange, to exchange their Copper Debt or Commercial Paper, as applicable, for New Series B Notes.  The Plan provides for IUSA to issue the New Series B Notes in exchange for the claims of the holders of Copper Debt and Commercial Paper against IUSA.  The New Series B Notes will be issued pursuant to section 1145 of the Bankruptcy Code.  The holders of Copper Debt and Commercial Paper are not underwriters as that term as defined in section 1145 of the Bankruptcy Code.  Holders of Commercial Paper who elect to exchange their debt will receive New Series B Notes with a face value of $1,005 for each $1,000 of debt outstanding.  For purposes of calculating such amounts, such debt shall include both principal and accrued but unpaid interest.  Holders of Copper Debt and Commercial Paper that tender their Debt for exchange and have incurred Agreed Costs shall receive New Series B Notes with a face value of $1 for each $1 of such Agreed Costs.

The successful completion of the Consensual Exchange is a condition precedent to the Plan Effective Date, and the Plan Effective Date is a condition precedent to the completion of the Consensual Exchange.

### 2. New Series B Notes

The New Series B Notes will contain the following general terms. A full description of the New Series A Notes and New Series B Notes is attached hereto as Exhibit 4.

### H. Discharge, Releases and Exculpation.

### 1. Discharge

**Except as otherwise provided in the Plan or the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and Equity Interests of any nature whatsoever against the Debtors or any of their Estates, assets, properties or interests in property, and regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Equity Interests. Except as otherwise provided in the Plan, upon the Plan Effective Date, the Debtors shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims and Equity Interests, including, but not limited to, demands and liabilities that arose before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, regardless of whether or not: (a) a Proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) the Claim is Allowed, or (c) the Holder of a Claim based on such debt has accepted the Plan or is entitled to receive a distribution thereunder. Upon entry of the Confirmation Order, and subject to the occurrence of the Plan Effective Date, any Holder of such discharged Claim shall be precluded from asserting against the applicable Debtor or Reorganized Debtor, their successors and assigns, or their assets or properties any other or future Claims based upon any document, instrument, act or omission, transaction or other activity of any kind or nature that occurred before the Plan Effective Date. The Reorganized Debtors shall not be responsible for any Claims against or Interests in the Debtors or the Debtors in Possession except (a) those payments and distributions expressly provided for or due under this Plan and (b) Claims and Interests that are Unimpaired under the Plan and not previously satisfied in full.**

**In addition to the terms of Section 9.1.1 of the Plan, each Holder of a Noteholder Pledge Claim or an Unsecured Parent Guaranty Claim and any affiliate of such Holder shall be deemed to have waived, released and discharged IUSA and each member of the IUSA Group from any Liens, Claims, Causes of Action, rights or liabilities arising from the notes issued under, and the guarantees issued pursuant to, either of the Existing Indenture or the ESBDS Loan. In addition, the Confirmation Order shall provide that the Indenture Trustee is authorized and directed to take all such actions necessary to effectuate the foregoing. Upon the Plan Effective Date, all such persons shall be forever precluded and enjoined from prosecuting or asserting any such discharged Claim against IUSA, the IUSA Group, the Reorganized Debtors, or any of their respective affiliates.**

## 2. Exculpation

*To the extent permitted by applicable law and approved by the Bankruptcy Court, as of the Plan Effective Date, the Released Parties[8] shall neither have nor incur any liability to, or be subject to any right of action by, any Holder of a Claim or Equity Interest, or any other party-in-interest, or any of their respective employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of these Chapter 11 Cases, including without limitation (i) formulating, negotiating and executing the Plan, this Disclosure Statement, the Restructuring Agreement and any related agreements, instruments or other document, (ii) the solicitation of votes for and the pursuit of this Plan, (iii) the consummation of this Plan, or (iv) the implementation and administration of this Plan or the property to be distributed in conjunction with this Plan; provided, however, that the foregoing provision shall not apply to any Causes of Action arising out of an act or omission that is determined by a Final Order entered by a court of competent jurisdiction to have constituted actual or intentional fraud, willful misconduct, gross negligence or criminal conduct. Any of the Released Parties shall be entitled to rely, in all respects, upon the advice of counsel with respect to their duties and responsibilities under this Plan.*

## 3. Release by Debtors and Plan Proponents

*To the extent permitted by applicable law and approved by the Bankruptcy Court, on the Plan Effective Date, for good and valuable consideration, including the service of the Released Parties to facilitate the restructuring of the Debtors and the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors and IUSA, in their individual capacities, and, as applicable, as debtors in possession on behalf of the Debtors' Estates, shall be deemed to have unconditionally released the Released Parties from any and all claims, Causes of Action, obligations, rights, suits, damages, remedies and liabilities whatsoever, including any claims that could be asserted on behalf of the Debtors (whether derivatively or otherwise) including chapter 5 actions, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that the Debtors or their subsidiaries would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Person, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Plan Effective Date; provided, however, that: these releases shall not apply to any Causes of Action arising out of an act or omission that is determined by a Final Order entered*

---

[8]      "Released Parties" means, collectively, (a) the Debtors, (b) each Non-Debtor Subsidiary, (c) IUSA, (d) IUSA, S.A. de C.V., (e) the Indenture Trustee, (f) each Noteholder, (g) each Existing Guarantor, (k) the present and former directors, officers and employees of the Debtors, the Non-Debtor Subsidiaries, IUSA and other members of the IUSA Group, (h) any attorneys, financial advisors, investment bankers, accountants, consultants, or other professionals of the parties described in clauses (a) through (h) hereof; provided, however, that such attorneys and professional advisors shall only include those that provided services related to the Debtors, the Chapter 11 Cases, the Disclosure Statement, the Plan and all financing and other transactions leading up to and contemplated by this Plan, and (i) the officers, directors, employees, agents, affiliates, predecessors, successors and assigns of each of the parties described in clauses (a) through (h).

*by a court of competent jurisdiction to have constituted actual or intentional fraud, willful misconduct, gross negligence or criminal conduct. The releases set forth in this paragraph shall be binding upon any chapter 7 trustee in the event the Chapter 11 Cases are converted to chapter 7.*

4.    Releases by Holders of Claims

*Except as specifically set forth in the Plan or the Confirmation Order, to the fullest extent permitted by applicable law and approved by the Bankruptcy Court, on the Plan Effective Date, for good and valuable consideration, including the service of the Released Parties to facilitate the restructuring of the Debtors and the implementation of the restructuring contemplated by this Plan, the adequacy of which is hereby confirmed, each Holder of a Claim that has affirmatively voted to accept the Plan, or who, directly or indirectly, is entitled to receive a distribution under the Plan, including Persons entitled to receive a distribution via an attorney or agent shall be deemed to have unconditionally released the Released Parties from any and all claims, Causes of Action, obligations, rights, suits, damages, remedies and liabilities whatsoever, including any claims that could be asserted on behalf of the Debtors (whether derivatively or otherwise) including chapter 5 actions, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that the Debtors or their subsidiaries would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Person, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Plan Effective Date, in any way relating or pertaining to, (x) the Debtors or Reorganized Debtors, (y) the Chapter 11 Cases or (z) the negotiation, formulation, implementation and preparation of the Restructuring Agreement, this Plan, the Disclosure Statement, and any related agreements, instruments or other document, <u>provided</u>, <u>however</u>, the foregoing provision shall not apply to any Causes of Action arising out of an act or omission that is determined by a Final Order entered by a court of competent jurisdiction to have constituted actual or intentional fraud, willful misconduct, gross negligence or criminal conduct..*

5.    Injunction

*Except as otherwise provided in the Plan or the Confirmation Order, and in addition to the injunction provided under sections 524(a) and 1141 of the Bankruptcy Code, all Persons who have held, currently hold or may hold a Claim or other debt or liability or Equity Interest which is released, discharged or terminated under the Plan, are permanently enjoined, on and after the Plan Effective Date, from taking any of the following actions against a Released Party or its property on account of such released, discharged or terminated Claims, debts, liabilities or Equity Interests: (1) commencing or continuing in any manner (including by directly or indirectly assisting or facilitating the commencement or continuation of) any action or other proceeding of any kind; (2) enforcing, levying, attaching, collecting or otherwise recovering in any manner any judgment, award, decree or order; (3) creating, perfecting or enforcing any lien or encumbrance of any kind; (4) except as provided in the Plan, asserting any setoff, right of subrogation or recoupment of any kind against any obligation due from any Released Party; and (5) commencing, continuing or in any manner taking part or participating in any action, proceeding or event (whether directly or indirectly) that would be*

*in contravention of the terms, conditions and intent of the Plan. The foregoing injunction will extend to the benefit of the successors of the Released Parties and their respective properties and interests in property. Any Person injured by any willful violation of such injunction may recover actual damages, including costs and attorneys' fees and, in appropriate circumstances, may recover punitive damages from the willful violator.*

### 6. Term of Injunctions and Stays

**Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Plan Effective Date.**

### I. Claim Resolution Process

#### 1. No Bar Date; No Proofs of Claim

Except as otherwise provided in the Plan, Holders of Claims against and Equity Interests in the Debtors shall not be required to file proofs of Claim or proofs of Equity Interest with the Bankruptcy Court.

#### 2. Administrative Claim and Priority Tax Claims Allowed as Set Forth in Books and Records

Except as otherwise specified in this Plan, the amount set forth in the books and records of the applicable Debtor (or agreed to by the applicable Debtor and the Holder in the ordinary course) shall constitute the amount of the Allowed Administrative Claim an/or Allowed Priority Tax Claim of such Holder, subject to the right of such Holder to object to the amount of such Claim.

### J. Conditions to Confirmation and Plan Effective Date

#### 1. Conditions to Confirmation

Confirmation of the Plan shall not occur unless and until each of the conditions set forth below has been satisfied or duly waived by the Debtors:

(a) The Bankruptcy Court shall have entered an order in form and substance satisfactory to the Debtors, approving the Disclosure Statement used in connection with the solicitation of the votes with respect to the Plan as containing "adequate information" within the meaning of section 1125 of the Bankruptcy Code.

(b) The Confirmation Order, in form and substance satisfactory to the Debtors, shall have been entered by the Bankruptcy Court.

#### 2. Conditions to Effectiveness

The Plan Effective Date shall not occur unless and until each of the conditions set forth below has been satisfied or duly waived by the Debtors in accordance with Section 13.3 of the Plan:

(a) The Confirmation Order shall become a Final Order, shall not have been modified (except as consented to by the Debtors) and shall not be subject to any motion pursuant to Rule 60 of the Federal Rules of Civil Procedure, and shall be in full force and effect.

(b) There shall not be in effect any order or law staying, restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by the Plan.

(c) No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

(d) All necessary consents, approvals and actions of, filings with and notices to any governmental or regulatory authority necessary to permit the Reorganized Debtors to perform their obligations under the Plan and to permit the Reorganized Debtors to consummate the transactions contemplated hereby shall have been duly obtained, made or given and shall be in full force and effect, and all terminations or expirations of waiting periods imposed by any governmental or regulatory authority necessary for the consummation of the transactions contemplated by the Plan shall have occurred.

(e) All conditions to the effectiveness of the Consensual Exchange and Restructuring Agreement shall have been satisfied or waived (to the extent capable of being waived) in accordance with the terms thereof; the Consensual Exchange and Restructuring Agreement shall be successfully completed simultaneously with the effectiveness of this Plan.

(f) All conditions precedent to the issuance of the New Notes shall have been satisfied or waived (to the extent capable of being waived) in accordance with the terms thereof and the Consensual Exchange shall be successfully completed simultaneously.

(g) All other actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

## 3. Waiver of Conditions

Each of the conditions set forth in Section 13.2 of the Plan may be waived in whole or in part by the Debtors, without any notice to parties in interest or the Bankruptcy Court and without a hearing; provided that, Sections 13.2.5 and 13.2.6 of the Plan may not be waived by the Debtors except as provided for in the Consensual Exchange, the Restructuring Agreement and the New Notes. The failure to satisfy or waive any condition to the Plan Effective Date may be

asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors or any of them). The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

### 4. Effects of Failure of Conditions

If, following entry of the Confirmation Order, the Restructuring Agreement has terminated in accordance with its terms prior to the occurrence of the Plan Effective Date, then the Confirmation Order shall be vacated, pursuant to Section 13.4 of the Plan, by the Bankruptcy Court without further notice or order. If the Confirmation Order is vacated pursuant to Section 13.4 of the Plan, (a) the Debtors shall File a notice to this effect with the Bankruptcy Court, (b) the Plan shall be null and void in all respects, and (c) nothing contained in the Plan shall (x) constitute a waiver or release of any Claim against or Equity Interest in any Debtor or (y) prejudice in any manner the rights of the Holder of any Claim or Equity Interest.

## VI.

## FINANCIAL INFORMATION

As a condition to confirmation of a plan, section 1129(a)(11) of the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Plan Proponents' management and professionals have analyzed the ability of the Plan Proponents to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business. The Plan Proponents believe that the Plan satisfies this requirement.

The Projected Financial Statements (the "Projections") for the IUSA Group for the periods through 2016, which are set forth in Exhibit 6 to this Disclosure Statement, should be read in conjunction with **Section VII, "Certain Risk Factors To Be Considered"** and with **Section X, "Certain U.S. Federal Income Tax Consequences of Plan"** and with the assumptions, qualifications and footnotes to the tables containing the Projections (which include projected balance sheets, and projected statements of cash flows) and the historical consolidated financial information (including the notes and schedules thereto) set forth in Exhibit 6. The Projections have been prepared on a consolidated basis for all members of the IUSA Group that will be issuers or guarantors of the New Notes. The group as to whom the Projections have been prepared thus includes Tubo but excludes CLH and the Non-Debtor Subsidiaries.

**THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED. WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED**

UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH HAVE NOT BEEN ACHIEVED TO DATE AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS. ACCORDINGLY, THE DEBTORS DO NOT INTEND, AND DISCLAIM ANY OBLIGATION TO, (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS ON OR PRIOR TO THE PLAN EFFECTIVE DATE OR TO HOLDERS OF NEW NOTES OR ANY OTHER PARTY AFTER THE PLAN EFFECTIVE DATE, (B) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

## VII.

## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, THE CONSENSUAL EXCHANGE DOCUMENTS AND ALL OTHER RELATED DOCUMENTS. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION. RISKS AND UNCERTAINTIES NOT PRESENTLY KNOWN TO THE DEBTORS OR THAT THEY CURRENTLY DEEM IMMATERIAL MAY ALSO HARM THEIR BUSINESSES.

A.       **General Bankruptcy Law Considerations**

1.       **Failure to Complete Consensual Exchange May Result in Delay or Failure of Plan**

Although the Plan Proponents believe that the Consensual Exchange will be completed on an expeditious basis without the need for additional court processes, if the holders of less than 100% of the Copper Debt and 98% of the Commercial Paper tender their debt in the Restructuring Agreement and Consensual Exchange, respectively, the Plan Proponents may consummate the Consensual Exchange through alternative means. Additionally, there is no guaranty that IUSA would be able to consummate the Consensual Exchange in such circumstances. If IUSA cannot consummate the Consensual Exchange, the Plan will not be able to be consummated. If the Plan cannot be consummated, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that

any alternative plan or plans would be on terms as favorable to the Holders of Claims against and Equity Interest in any Debtor as the terms of the Plan. If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be substantially eroded to the detriment of all stakeholders.

**2.      Failure to Obtain Confirmation of Plan May Result in Liquidation or Alternative Plan on Less Favorable Terms**

Although the Plan Proponents believe that the Plan will satisfy all requirements for Confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not be sufficiently material as to necessitate the resolicitation of votes on the Plan. In the event that Classes T3 and C 3 fail to accept the Plan in accordance with section 1126(c) and 1129(a)(8) of the Bankruptcy Code, the Debtors reserve the right to modify the Plan in accordance with Section 12.7 thereof.

If the Plan is not confirmed, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans would be on terms as favorable to the Holders of Claims against and Equity Interest in any Debtor as the terms of the Plan. If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be substantially eroded to the detriment of all stakeholders.

**3.      Failure of Occurrence of Plan Effective Date May Result in Liquidation or Alternative Plan on Less Favorable Terms**

Although the Plan Proponents believe that the Plan Effective Date may occur on or shortly after the Confirmation Date, there can be no assurance as to such timing. The occurrence of the Plan Effective Date is also subject to certain conditions precedent a described in Section 13 of the Plan. Failure to meet any of these conditions could result in the Plan not being consummated.

If the Confirmation Order is vacated, the Plan shall be null and void in all respects and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claim against or Equity Interest in any Debtor; or (b) prejudice in any manner the rights of the Holder of any Claim or Equity Interest.

If the Plan Effective Date of the Plan does not occur, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the Holders of Claims against any Debtor as the terms of the Plan. If a liquidation or protracted reorganization of the Estates were to occur, there is a substantial risk that the Debtors' going concern value would be eroded to the detriment of all stakeholders.

**B.      Additional Factors**

**1.      Information Presented Is Based on Debtors' Books and Records; No Audit Was Performed**

While the Debtors have endeavored to present information fairly in this Disclosure Statement, because of the complexity of its financial matters, the Debtors' books and records upon which this Disclosure Statement is based might be incomplete or inaccurate. The financial information contained herein, unless otherwise expressly indicated, is unaudited.

### 2. Plan Proponents Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Plan Proponents as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Plan Proponents have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3. Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of funds or the amount of Claims in the various Classes that might be Allowed.

### 4. No Legal or Tax Advice Is Provided to You by This Disclosure Statement

The contents of this Disclosure Statement should *not* be construed as legal, business or tax advice. Each Holder of a Claim or Equity Interest should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her or its Claim or Equity Interest.

This Disclosure Statement is *not* legal advice to you. This Disclosure Statement may *not* be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5. No Admission Made

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Plan Proponents or on Holders of Claims or Equity Interests.

### 6. Market And Business Risks May Adversely Affect Business Performance

Because the Debtors are merely holding companies, they rely completely on the income-producing activities of the Non-Debtor Subsidiaries. In the normal course of business, the Non-

Debtor Subsidiaries are subject to the following types of risks and variables, which may materially affect their businesses performance following the Plan Effective Date:

(a) general economic and business conditions, particularly the current economic downturn;

(b) variations in the financial or operational condition of the Non-Debtors Subsidiaries' significant customers;

(c) material shortages, transportation systems delays or other difficulties in markets (i) relating to the delivery of products or (ii) where the Non-Debtor Subsidiaries purchase supplies for the provision of their services;

(d) significant work stoppages, disputes or any other difficulties in labor markets (i) relating to the delivery of products or (ii) where the Non-Debtor Subsidiaries obtain materials necessary for the provision of their services;

(e) increased development of competitive alternatives to the Non-Debtor Subsidiaries' products;

(f) fluctuations in interest rates;

(g) unscheduled facility shutdowns;

(h) increased operating costs;

(i) changes in prices and supply of materials;

(j) changes in credit terms offered by the Non-Debtor Subsidiaries' suppliers;

(k) the Non-Debtor Subsidiaries' ability to obtain cash adequate to fund theirs and the Reorganized Debtors' needs;

(l) various worldwide economic and political factors, changes in economic conditions, currency fluctuations and devaluations, credit risks in foreign markets or political instability in foreign countries where the Non-Debtor Subsidiaries have customers or operations;

(m) physical damage to or loss of, among other things, any facility or equipment due to fire, weather or other factors beyond the Non-Debtor Subsidiaries' control;

(n) legislative activities of governments, agencies and similar organizations, both in the United States and in foreign countries, that may affect the Non-Debtor Subsidiaries' operations;

(o)    the Non-Debtor Subsidiaries' ability to comply with government regulations, including environmental regulations; and

(p)    legal actions and claims of undetermined merit and amount involving, among other things, product liability and environmental and safety issues involving the Non-Debtor Subsidiaries' services or facilities;

### 7. Cost of Compliance with Government Regulation May Adversely Affect Financial Results

The Non-Debtor Subsidiaries are subject to various foreign, federal, state and local laws and regulations that affect the conduct of their operations, including environmental laws. The Debtors cannot assure you that compliance with these laws and regulations, or the adoption of modified or additional laws and regulations, will not require large expenditures by the Debtors or the Non-Debtor Subsidiaries or otherwise have a significant effect on the Debtors' financial condition or results of operations. Among other laws, a change in the tax laws of the United States or Mexico could materially affect the consequences of the Plan as described herein to the Debtors and the Holders of Claims. **See Section X, "Certain Federal Income Tax Consequences of the Plan."**

### 8. Access to Financing and Trade Terms

The Plan Proponents' and Non-Debtor Subsidiaries' operations are dependent on the availability and cost of working capital financing and trade terms provided by vendors and may be adversely affected by any shortage or increased cost of such financing and trade vendor support. The Plan Proponents' and Non-Debtor Subsidiaries' operations have been financed from operating cash flow, the use of cash collateral, and borrowings from credit facilities. The Plan Proponents believe that substantially all of their needs for funds necessary to consummate the Plan and for post-Plan Effective Date working capital financing will be met by projected operating cash flow and trade terms supplied by vendors. However, if the Reorganized Debtors or the Non-Debtor Subsidiaries require working capital and trade financing greater than that provided by such sources, they may be required either to (i) obtain other sources of financing or (ii) curtail their operations.

No assurance can be given, however, that any additional financing will be available, if at all, on terms that are favorable or acceptable to the Reorganized Debtors or the Non-Debtor Subsidiaries. The Plan Proponents believe that it is important to their going-forward business plan that their performance meet projected results in order to ensure continued support from vendors.

### 9. Variances from Projections

The fundamental premise of the Plan is the deleveraging of the Plan Proponents and the implementation and realization of the Plan Proponents' business plan, as reflected in the projections contained in this Disclosure Statement. The projections reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors and Non-Debtor Subsidiaries. Such assumptions include, among other items, assumptions concerning the

general economy, the ability to make necessary capital expenditures, the ability to establish market strength, consumer purchasing trends and preferences, and the ability to stabilize and grow the companies' sales base and control future operating expenses. The Plan Proponents believe that the assumptions underlying the projections are reasonable. However, unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual financial results of the Reorganized Debtors and the Non-Debtor Subsidiaries. Therefore, the actual results achieved throughout the periods covered by the projections necessarily will vary from the projected results, and such variations may be material and adverse.

## VIII.

## VOTING REQUIREMENTS

On [          ], 2011, the Bankruptcy Court entered the Disclosure Statement Order that, among other things, approved this Disclosure Statement, set voting procedures, and scheduled the Confirmation Hearing. A copy of the Disclosure Statement Order and the Confirmation Hearing Notice are enclosed with this Disclosure Statement as part of the Solicitation Package. The Disclosure Statement Order sets forth in detail, among other things, procedures governing voting deadlines and objection deadlines. The Disclosure Statement Order, the Confirmation Hearing Notice, and the instructions attached to the Ballot should be read in connection with this Section VIII of the Disclosure Statement.

If you have any questions about the procedure for voting your Claims or Interests or the packet of materials you received, please contact:

via phone: (646) 282-2400

via email: tabulation@epiqsystems.com

via first class mail:

> Tubo de Pastejé, S.A. Ballot Processing
> c/o Epiq Bankruptcy Solutions, LLC
> FDR Station, P.O. Box 5014
> New York, NY 10150-5014

via hand delivery or overnight

> Tubo de Pastejé, S.A. Ballot Processing
> c/o Epiq Bankruptcy Solutions, LLC
> 757 Third Avenue, 3rd Floor
> New York, NY 10017

Anyone wishing to obtain additional copies of the Plan, this Disclosure Statement, or the exhibits to those documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact the Notice and Balloting Agent, via email at tabulation@epiqsystems.com, or view such documents by accessing the Notice and Balloting Agent's website: http://dm.epiq11.com or the Bankruptcy Court's website:

44

www.deb.uscourts.gov. Note: a PACER password and login are needed to access documents on the Bankruptcy Court's website (https://ecf.deb.uscourts.gov/).

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures of the Plan Proponents concerning the Plan have been adequate and have included information concerning all distributions made or promised by the Plan Proponents in connection with the Plan and the Chapter 11 Cases. In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law.

In particular, in order to confirm the Plan, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that the Plan: (i) has been accepted by the requisite votes of all Classes of Impaired Claims and Equity Interests, unless approval will be sought under section 1129(b) of the Bankruptcy Code in respect of one or more dissenting Classes; (ii) is "feasible," which means that there is a reasonable probability that Confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization; and (iii) is in the "best interests" of all Holders of Claims or Equity Interests, which means that such Holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Plan Proponents believe that the Plan satisfies all of these conditions. **See Section IX, "Confirmation Of Plan."**

### A.    Voting Deadline

This Disclosure Statement and Ballot(s) are being distributed to all Holders of Claims who are entitled to vote on the Plan.

**IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER, IN ORDER TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE ACTUALLY RECEIVED BY THE NOTICE AND BALLOTING AGENT BY NO LATER THAN THE VOTING DEADLINE, THAT IS, BY NO LATER THAN [        ], 2011 AT [   :   ] [ ].M. (PREVAILING EASTERN TIME). ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN. ONLY BALLOTS CONTAINING ORIGINAL SIGNATURE PAGES WILL BE COUNTED.**

### B.    Holders of Claims Entitled to Vote

The Holder of a Claim against or Equity Interest in the Debtors that is Impaired under the Plan is entitled to vote to accept or reject the Plan if the Plan provides a distribution in respect of such Claim or Equity Interest. **NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, NO DISPUTED CLAIM OR DISPUTED EQUITY INTEREST WILL BE COUNTED FOR ANY PURPOSE IN DETERMINING WHETHER THE REQUIREMENTS OF SECTION 1126(c) OF THE BANKRUPTCY CODE HAVE BEEN MET.**

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Holders of Claims in Classes T3 and C3 are entitled to vote. Holders of Claims and Interests in Classes T1, C1, T2, C2, T4, C4, T5 and C5 are Unimpaired and, consequently, are conclusively presumed to accept the Plan and are not entitled to vote.

## C.    Vote Required for Acceptance by Class

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired claims and/or equity interests votes to accept the proposed chapter 11 plan, except under certain circumstances. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount of the allowed claims in that class and more than one-half in number of allowed claims in that class, but for that purpose, counts only those who actually vote to accept or reject the plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in dollar amount and a majority in number of the allowed claims in that class <u>actually voting</u> cast their Ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting the Plan.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, but for that purpose, counts only those who <u>actually vote</u> to accept or reject the plan. Thus, a Class of Equity Interests will have voted to accept the Plan if two-thirds of the allowed interests actually voted are voted in favor of acceptance. Holders of Equity Interests who fail to vote are not counted as either accepting or rejecting the Plan.

## D.    Voting Procedures

### 1.    Ballots

All votes to accept or reject the Plan with respect to Classes T3 and C3 must be cast by properly submitting the duly completed and executed form of Ballot. Holders of Impaired Claims voting on the Plan should complete and sign the Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan."

**ANY BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN, WILL BE AN INVALID BALLOT AND WILL NOT BE COUNTED FOR PURPOSES OF DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.**

**ANY BALLOT RECEIVED THAT IS NOT SIGNED OR THAT CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT WILL BE AN INVALID BALLOT AND WILL NOT BE COUNTED FOR PURPOSES OF DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.**

Ballots must be delivered to the Notice and Balloting Agent at its address set forth above, and received by the Voting Deadline. **THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE HOLDER.** If such delivery is by mail, it is recommended that Holders use an air courier with a guaranteed next day delivery or registered mail, properly insured, with return receipt requested. In all cases, sufficient time should be allowed to assure timely delivery.

In accordance with Bankruptcy Rule 3018(c), the Ballot is based on Official Form No. 14, but have been modified to meet the particular needs of these Chapter 11 Cases. **PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT.**

### 2.    Withdrawal or Change of Votes on Plan

A Ballot may be withdrawn by delivering a written notice of withdrawal to the Notice and Balloting Agent so that the Notice and Balloting Agent <u>actually receives</u> such notice prior to the Voting Deadline. Thereafter, withdrawal may be effected only with the approval of the Bankruptcy Court by filing a motion in accordance with Bankruptcy Rule 3018(a).

In order to be valid, a notice of withdrawal must:  (a) specify the name of the Holder who submitted the votes on the Plan to be withdrawn; (b) contain the description of the Claims to which it relates; and (c) be signed by the Holder in the same manner as on the Ballot that the Holder seeks to withdraw. The Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of votes on the Plan.

Any Holder who has submitted to the Notice and Balloting Agent prior to the Voting Deadline a properly completed Ballot may change such vote by submitting to the Notice and Balloting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received with respect to the same Claim, the Ballot that bears the latest date will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received.

### IX.

### CONFIRMATION OF PLAN

### A.    Hearing on Confirmation Hearing of Plan

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing with respect to the Plan. At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code described below are met.

The Confirmation Hearing is scheduled to commence on [_____], 2011, at [__:__] [_].m. (Prevailing Eastern Time) before the Honorable Kevin J. Carey, United States Bankruptcy Court, District of Delaware, 824 North Market Street, 5th Floor, Courtroom 5, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the

Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

## B.     Deadline to Object to Confirmation

Any objection to the confirmation of the Plan must be made in writing, specify in detail (i) the name and address of the objector, (ii) all factual and legal grounds for the objection and (iii) the amount and type of the Claims held by the objector.  Any such objection must be filed with the Bankruptcy Court and served so that it is actually received by the Bankruptcy Court, chambers, and the following parties on or before the Confirmation Objection Deadline, (i.e., [_____], 2011, at [__:__] [_].m. (Prevailing Eastern Time)):  (a) counsel for the Debtors, Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, One Chase Manhattan Plaza, New York, New York 10005, Attn.:  Dennis F. Dunne, Risa M. Rosenberg and Brian Kinney; (b)  co-counsel for the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19899-8705, Attn.:  Laura Davis Jones and Michael Seidl; and (c) the Office of the United States Trustee for the District of Delaware, 844 King Street, Room 2207, Lockbox #35, Wilmington, Delaware 19899-0035.

## C.     Requirements for Confirmation of Plan

Among the requirements for Confirmation of the Plan are that the Plan:  (i) is accepted by all Impaired Classes of Claims and Equity Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (ii) is feasible; and (iii) is in the "best interests" of creditors and equity interest holders that are Impaired under the Plan.

### 1.     Requirements of Section 1129(a) of Bankruptcy Code

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following Confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied:

(a)     The Plan complies with the applicable provisions of the Bankruptcy Code.

(b)     The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code.

(c)     The Plan has been proposed in good faith and not by any means forbidden by law.

(d)     Any payment made or to be made by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

(e)    The Plan Proponents have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation, as a director or officer of the Reorganized Debtors, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy, and the Plan Proponents have disclosed the identity of any insider (as defined in section 101 of the Bankruptcy Code) that will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider.

(f)    Any governmental regulatory commission with jurisdiction, after Confirmation, over the rates of the Debtors have approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

(g)    With respect to each Class of Claims or Equity Interests, each Holder of an Impaired Claim or Equity Interest either has accepted the Plan or will receive or retain under the Plan on account of such Holder's Claim or Equity Interest property of a value, as of the Plan Effective Date, that is not less than the amount that such Holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

(h)    Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code, each Class of Claims or Equity Interests has either accepted the Plan or is not Impaired under the Plan.

(i)    Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Priority Tax Claims will be paid in full on the Plan Effective Date.

(j)    If any Class of Claims is Impaired under the Plan, at least one such Class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider.

(k)    Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors, unless such liquidation or reorganization is proposed in the Plan.

(l)    All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Plan Effective Date.

All transfers of property of the Plan will be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation.

The Plan Proponents believe that the Plan meets all the applicable requirements of section 1129(a) of the Bankruptcy Code, or is otherwise confirmable pursuant to section 1129(b) of the Bankruptcy Code.

## 2. Best Interests of Creditors

Pursuant to section 1129(a)(7) of the Bankruptcy Code, with respect to each Impaired Class of Claims or Equity Interests, unless such Class unanimously votes to accept the Plan, the Plan Proponents must demonstrate, and the Bankruptcy Court must determine, that each Holder in such Class will receive property of a value, as of the Plan Effective Date, that is not less than the amount that such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Plan Effective Date. This requirement is commonly referred to as the "Best Interests of Creditors Test."

To determine the value that the Holders of Impaired Claims and Equity Interests would receive if the Debtors were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of chapter 7 liquidation case. Section 704 of the Bankruptcy Code requires a chapter 7 trustee to collect and reduce to money the property of the estate as expeditiously as is compatible with the best interests of parties in interest.

The cash available for satisfaction of Allowed Claims would consist of the proceeds resulting from the disposition of the Debtors' few remaining assets, augmented by any Cash held by the Debtors at the time of the commencement of the chapter 7 case. Any such Cash amount would then be reduced by the amount of any Allowed Claims secured by such assets, the costs and expenses of the liquidation and such additional Administrative Claims and Priority Tax Claims that may result from the use of chapter 7 for the purposes of liquidation.

The costs of liquidation under chapter 7 would include fees payable to a trustee in bankruptcy, as well as those that might be payable to his or her attorneys and to other professionals that such trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases that would be allowed in the chapter 7 case, such as compensation for attorneys, appraisers, accountants or other professionals and costs and expenses of the Debtors and an appointed official committee, if any. Such Administrative Claims would have to be paid in cash, in full from the liquidation proceeds before the balance of those proceeds could be made available to pay other Claims.

The Plan satisfies the Best Interests of Creditors Test. The Plan provides greater recovery to the Holders of Claims than such Holders would receive under a liquidation under chapter 7 primarily because the Plan avoids a layer of administrative expense associated with the appointment of a chapter 7 trustee, while increasing the efficiency of administrating the Debtors' assets for the benefit of their Creditors.

Moreover, in chapter 7 cases, the chapter 7 trustee would also be entitled to seek a sliding scale commission based upon the funds distributed by such trustee, even though the Debtors have already accumulated much of the funds and have already incurred many of the expenses associated with generating those funds. Accordingly, the Plan Proponents believe that there is a

reasonable likelihood that the Debtors creditors would "pay again" for the funds accumulated by the Debtors, since the chapter 7 trustee would be entitled to receive a commission in some amount for all funds distributed. It is also anticipated that a chapter 7 liquidation would result in delay in the distributions to the Debtors' creditors. Among other things, a chapter 7 case would trigger a bar date for filing claims that would be more than ninety (90) days following conversion of the cases to chapter 7. See FED. R. BANKR. P. 3002(c). Hence, a chapter 7 liquidation would not only delay distributions, but raise the prospect of additional claims that were not asserted in the Chapter 11 Cases. Based on the foregoing, the Plan provides an opportunity to bring the greatest return to the Debtors' creditors.

### 3. Acceptance by Impaired Class

The Bankruptcy Code requires, as a condition to Confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder of that claim or interest; (b) cures any default and reinstates the original terms of the obligation; or (c) provides that, on the consummation date, the holder of the claim or interest receives cash equal to the Allowed amount of that claim or, with respect to any interest, any fixed liquidation preference to which the interest holder is entitled or any fixed price at which the debtor may redeem the security.

As explained above, Holders in Classes T3 (Noteholder Pledge Claims against Tubo) and C3 (Unsecured Parent Guaranty Claims against CLH) are Impaired under the Plan and are entitled to vote. Each of the Holders of Claims and Interests in Classes T1, C1, T2, C2, T4, C4, T5, and C5 are Unimpaired and, consequently, are conclusively presumed to accept the Plan and are not entitled to vote.

### D. Alternatives to Confirmation and Consummation of Plan

The Plan reflects the negotiations held by the Plan Proponents with the Noteholders, who support the Plan. The Consenting Creditors believe that the Plan affords Holders of Claims and Equity Interests the greatest opportunity for realization on the Debtors' assets and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, however, the theoretical alternatives include: (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code; or (ii) alternative plans of reorganization or liquidation under chapter 11 of the Bankruptcy Code. Thorough consideration of these alternatives to the Plan has led the Plan Proponents to conclude that the Plan, in comparison, provides a greater recovery to creditors and equity holders on a more expeditious timetable, and in a manner that minimizes certain inherent risk in any other course of action available in these Chapter 11 Cases.

### 1. Liquidation Under Chapter 7

If the Plan is not confirmed, these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code. In a liquidation under chapter 7, a trustee or trustees may be elected or appointed to liquidate the assets of the Debtors. However, the Plan Proponents believe

that liquidation under chapter 7 would result in smaller distributions being made to creditors and interest holders than those provided for in the Plan because, among other reasons: (a) additional administrative expenses resulting from the appointment of and services to be rendered by trustees and attorneys and other professionals to assist such trustee; (b) the relative lack of familiarity with the Debtors' businesses that would inevitably hinder such professionals in the management of the estates; and (c) additional expenses and claims, some of which would be entitled to priority, that would be generated during the liquidation. In addition, distributions would be substantially delayed in a chapter 7 liquidation because of the factors set forth above and the need to litigate or otherwise resolve many of the claims settled by the Plan. If these Chapter 11 Cases are converted to chapter 7, it is likely the Debtors' operations would cease and their assets would be liquidated piecemeal under conditions that prioritize expediency over value. For these reasons, the Plan Proponents believe the reorganizing of the Debtors' businesses and capital structure under chapter 11, as provided for in the Plan, preserves value and maximizes distributions relative to a chapter 7 liquidation.

Based on the foregoing and on the Liquidation Analysis, the Plan Proponents believe that a liquidation of the Debtors' assets under chapter 7 or otherwise would produce no greater and likely less value for distribution to creditors than that recoverable under the Plan.

## 2. Alternative Plan of Reorganization or Liquidation

If the Plan is not confirmed, the Plan Proponents (or if the Bankruptcy Court were not to grant extensions of the Debtors' exclusive periods in which to file and solicit a plan, any other party in interest in these Chapter 11 Cases) could propose a different plan or plans. Such plan(s) might involve either a reorganization and continuation of the Debtors' businesses, an orderly liquidation of their assets or a combination of both. Nonetheless, the Plan Proponents believe that no alternative plan can be confirmed without the consent of the Holders of the Noteholder Pledge Claims and the Unsecured Parent Guaranty Claims.

With respect to an alternative plan, the Plan Proponents have explored various alternatives in connection with the formulation of the Plan. The Plan Proponents believe that the Plan enables creditors to realize the most value under the circumstances.

## X.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN

TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DOCUMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the holders of the Old 2016 Notes and ESBDS Loan (the "Existing Debt"). This discussion is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), final, temporary and proposed Treasury regulations promulgated thereunder, Internal Revenue Service ("IRS") rulings and pronouncements and judicial decisions in effect as of the date of this document, all of which may change, possibly with retroactive effect. This discussion applies only to holders of Existing Debt that will hold the New Series A Notes as capital assets. This discussion does not address the U.S. federal income tax consequences of the Plan to holders of Copper Debt and Commercial Paper or persons that will hold the New Series B Notes. Holders of Copper Debt and Commercial Paper or persons that will hold the New Series B Notes are urged to contact their own tax advisors regarding the U.S. federal income tax consequences of the implementation of the Plan.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to U.S. Holders, as defined below, in light of their particular circumstances, such as holders to whom special tax treatment applies, including (1) banks, regulated investment companies, real estate investment trusts, insurance companies, employee stock ownership plans, brokers, dealers in securities or currencies, subchapter S corporations, entities treated as partnerships for U.S. federal income tax purposes, and tax exempt organizations, (2) persons who hold Existing Debt or who will hold the New Series A Notes as part of a straddle, hedge, conversion transaction or other integrated investment, (3) persons whose functional currency is not the U.S. dollar, (4) persons that use a mark to market method of accounting and (5) persons who, for U.S. federal income tax purposes, are or will be considered as owning 10% or more, directly or by attribution, of IUSA. In addition, this discussion does not address alternative minimum taxes or state, local or non-U.S. taxes. Furthermore, this discussion does not address any aspects of U.S. federal tax law (such as the estate tax, gift tax or the Medicare tax on net investment income) other than U.S. federal income tax law. For purposes of this discussion, we believe, and this discussion assumes, that the New Series A Notes will be respected as debt for U.S. federal income tax purposes.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. No opinion of counsel has been sought or obtained with respect to any U.S. tax consequences of the Plan and no tax opinion is given by this discussion. No rulings or determination letters from the IRS or any other taxing authorities have been obtained or sought with respect to the Plan, and the description below is not binding upon the IRS or such other taxing authorities. Accordingly, it is possible that the IRS may disagree with the description below of the tax consequences, and there can be no certainty that the IRS would not prevail in any challenge it may decide to make in this regard.

FOR THE FOREGOING REASONS, ALL HOLDERS OF EXISTING DEBT ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (U.S. FEDERAL, STATE, LOCAL AND NON-U.S.) OF THE PLAN TO THEM. THE ISSUER IS NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN AS TO ANY SPECIFIC HOLDER, NOR IS THE ISSUER RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.

For purposes of this discussion the term "U.S. Holder" means a holder of Existing Debt who is a beneficial owner of such instrument and that is, for U.S. federal income tax purposes: (i) an individual who is a citizen or resident of the United States, (ii) a corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in the United States or under the laws of the United States or of any state of the United States or the District of Columbia, (iii) an estate, the income of which is subject to U.S. federal income tax regardless of its source, or (iv) a trust if (A) a court within the United States is able to exercise primary supervision over the administration of the trust and at least one U.S. person has authority to control all substantial decisions of the trust or (B) it has a valid election in effect to be treated as a U.S. person.

### A.    Tax Consequences of Exchange

#### 1.    Tax Treatment of U.S. Holders of Existing Debt

While the Old 2016 Notes and New Series A Notes have many similar terms, there are some significant differences, including improved collateral and effective deferral of payments on the Old 2016 Notes through payment of accrued interest with principal amount of New Series A Notes and the deferral of the first interest payment on the New Series A Notes. Based on these differences, we believe, and this discussion assumes, that the exchange of Old 2016 Notes for New Series A Notes should be treated as an exchange of property for U.S. federal income tax purposes. The tax treatment of U.S. Holders that exchange Existing Debt for the New Series A Notes will depend on whether or not such exchange qualifies as a "recapitalization" under the Tax Code. In general, for an exchange of Existing Debt for the New Series A Notes to qualify as a recapitalization, the Existing Debt surrendered and the New Series A Notes received must both be treated as "securities" for applicable U.S. federal income tax purposes. Whether a debt instrument is a security for these purposes is determined based on all the relevant facts, including the term of the debt instrument. Generally, corporate debt instruments with maturities when issued of less than five years are not considered securities while corporate debt instruments with maturities when issued of ten years or more are considered securities. The Old 2016 Notes had a term to maturity at original issuance of more than ten years. As a result, the terms of the Old 2016 Notes are consistent with debt that is generally treated as securities for applicable U.S. federal income tax purposes. The ESBDS Loan had a term to maturity at original issuance of approximately five years. As a result, it is unclear whether the ESBDS Loan should be treated as a security for U.S. federal income tax purposes. The New Series A Notes will have a term to maturity of at least five years. It therefore may be reasonable to treat the New Series A Notes as securities for U.S. federal income tax purposes.

If the Existing Debt and New Series A Notes are securities, the exchange of the Existing Debt for the New Series A Notes (other than any amounts treated as paid in respect of accrued interest) should qualify as a recapitalization under the Tax Code. In this case, a U.S. Holder of Existing Debt will not recognize gain or loss on the exchange of such Existing Debt for the New Series A Notes, except that (i) a U.S. Holder of Existing Debt will recognize gain, if any, to the extent such holder receives New Series A Notes in excess of the principal amount of the Existing Debt surrendered (including, for these purposes, the 1.75% principal amount of New Series A Notes in excess of the principal amount of Existing Debt), and (ii) to the extent any portion of the New Series A Notes is treated as payment of accrued interest on the Existing Debt, such payment

will generally be subject to tax as ordinary interest income, in accordance with a U.S. Holder's accounting method, as discussed more fully below.

If the exchange is treated as a recapitalization, a U.S. Holder's total tax basis in New Series A Notes received in exchange for the Existing Debt (other than any such New Series A Notes treated as paid in respect of accrued interest or in excess of the principal amount of Existing Debt surrendered) will be equal to that holder's tax basis in such Existing Debt surrendered pursuant to the exchange increased by the amount of any gain recognized on the exchange and decreased by the amount of any New Series A Notes received in the exchange in excess of the principal amount of the Existing Debt surrendered, which will have a fair market value basis. A U.S. Holder's holding period for New Series A Notes received in the exchange (other than any New Series A Notes treated as paid in respect of accrued interest or in excess of the principal amount of the Existing Debt surrendered) will include that person's holding period for the Existing Debt surrendered in exchange therefor.

If the exchange is not treated as a recapitalization because either the Existing Debt surrendered or New Series A Notes received are not securities, a U.S. Holder will recognize taxable gain (or loss) in an amount equal to the excess (or deficit) of (x) the issue price of the New Series A Notes (other than any New Series A Notes treated as paid in respect of accrued interest) less (y) the holder's tax basis in the Existing Debt surrendered. See below for a discussion of the determination of the issue price of the New Series A Notes. Subject to the discussion below regarding accrued market discount, any such gain or loss will be capital gain or loss, and such capital gain or loss generally will be long-term capital gain or loss if the U.S. Holder held the Existing Debt surrendered for more than one year. Furthermore, a U.S. Holder's tax basis in the New Series A Notes received pursuant to the exchange (other than any New Series A Notes treated as paid in respect of accrued interest) will be equal to the issue price of those notes and the holding period for the New Series A Notes received will begin the day after the exchange.

A U.S. Holder that acquired Existing Debt subsequent to its original issuance with more than a *de minimis* amount of market discount will be subject to the market discount rules under the Tax Code. Under those rules, assuming that a U.S. Holder has made no election to include market discount in income on a current basis, any gain recognized on the exchange will be characterized as ordinary income to the extent of the accrued market discount as of the date of the exchange. If the exchange of New Series A Notes for Existing Debt is treated as a recapitalization, any accrued market discount remaining thereon which has not been recognized as ordinary income should be carried over to the New Series A Notes. See below for a discussion regarding the treatment of market discount.

### 2. Tax Treatment of Amounts Received for Accrued Interest

Notwithstanding the discussion above, a U.S. Holder of Existing Debt will be treated as receiving an interest payment to the extent that a portion of the principal amount of New Series A Notes is treated as paid in respect of accrued interest on the Existing Debt. Any such amounts will be treated as ordinary taxable income for a U.S. Holder that had not previously included such accrued interest in income. While not free from doubt, we believe a U.S. Holder should recognize an ordinary loss to the extent of accrued interest previously included in income that is

not paid in full. A U.S. Holder's tax basis in any New Series A Notes that are received in exchange for accrued interest on Existing Debt generally will be equal to the issue price (as defined below) of such New Series A Notes, and the holding period of such notes generally will begin on the day after the exchange.

Pursuant to the Plan, U.S. Holders will treat all amounts received as allocated first to the principal portion of such Existing Debt and thereafter to any accrued interest on such notes. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. Each U.S. Holder of claims is urged to consult its tax advisor regarding the allocation of consideration.

**B. Tax Consequences of Owning New Series A Notes**

**1. Interest and OID**

If the "issue price" of the New Series A Notes is less than their "stated redemption price at maturity" by more than a *de minimis* amount (1/4 of 1 percent of a debt instrument's stated redemption price at maturity multiplied by the number of complete years or, in certain cases, weighted average life,[9] to the instrument's stated maturity), the New Series A Notes will be treated as having original issue discount ("OID").

The issue price of debt instruments issued in a debt for debt exchange depends on whether a substantial amount of the debt instruments received or surrendered are treated as "traded on an established market" within the meaning of the applicable Treasury regulations. Debt instruments are treated as "traded on an established market" if, among other things, the debt appears on a quotation medium that satisfies certain criteria, or if price quotations are readily available from dealers, brokers or traders. If neither debt surrendered nor debt received in an exchange is treated as traded on an established market, the issue price of the debt received will generally equal the principal amount of the debt if the debt provides for adequate interest.

If the New Series A Notes are treated as "traded on an established market," the issue price of the New Series A Notes would be their fair market value on the date of the exchange. If the New Series A Notes are not so traded but the Existing Debt is, the issue price of the New Series A Notes would be equal to the fair market value of the Existing Debt surrendered in exchange for the New Series A Notes. We can not currently determine whether the New Series A Notes will be treated as traded on an established market. We believe that the Old 2016 Notes should be treated as traded on an established market.

If a substantial amount of the New Series A Notes and the New Series B Notes will be issued to the same person, it is possible that the New Series A Notes could be treated as part of the same "issue" as the New Series B Notes for U.S. federal income tax purposes. If the New Series A Notes and the New Series B Notes are part of the same issue, the New Series A Notes will have the same issue price as the New Series B Notes. We cannot currently determine whether a substantial amount of the New Series A Notes and the New Series B Notes will be

---

[9]    The cash flow sweep is sufficient to treat the New Series A Notes as 1.1273-1(d)(3) Installment obligations for purposes of calculating *de minimis* OID.

issued to the same person. U.S. Holders are urged to consult their own tax advisors as to the issue price of the New Series A Notes if they are treated as part of the same issue as the New Series B Notes for U.S. federal income tax purposes.

The stated redemption price at maturity of a debt instrument is the sum of all payments due under the instrument other than payments of qualified stated interest. "Qualified stated interest" includes stated interest, calculated as the product of a single fixed rate of interest and the outstanding principal amount of the instrument, that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually.

For purposes of determining whether a note has OID where the note has a period of a teaser rate, interest holiday or other interest shortfall, thus causing later payments that would otherwise be qualified stated interest to not be treated as such, a special rule applies for calculating the stated redemption price at maturity. For purposes of calculating whether such a note has OID, the stated redemption price at maturity of such note will be equal to the issue price of the note plus the greater of (i) the amount of additional stated interest that would be required to be payable in order for all interest on the note to be qualified stated interest and (ii) the excess of the note's stated principal over such note's issue price. If the issue price of such note is less than the note's so calculated stated redemption price at maturity by more than a *de minimis* amount, as described above, such note will be treated as issued with OID.

If the New Series A Notes are issued prior to November 15, 2011, the absence of an interest accrual until November 15, 2011 may be viewed as a teaser rate, interest holiday or other interest shortfall with the result that the stated redemption price at maturity will be calculated as described in the immediately preceding paragraph for purposes of determining whether the New Series A Notes have OID. To the extent required to take a position, IUSA intends to calculate the stated redemption price at maturity of the New Series A Notes by treating any period during which there is no interest accrual as qualifying for the exceptions for teaser rates, interest holidays or other interest shortfalls and, by exchanging the Existing Debt for New Series A Notes, each U.S. Holder agrees to take no contrary position. However, the issue price of the New Series A Notes will not be known prior to the Plan Effective Date, so the amount of additional interest that would need to be payable on a New Series A Note through February 15, 2012, if any, in order for all interest on the notes to be qualified stated interest, is not known. Therefore, the greater of the two amounts described in the immediately preceding paragraph cannot currently be determined.

If the New Series A Notes are treated as issued with OID, a U.S. Holder of a note must include such OID as ordinary interest income for U.S. federal income tax purposes as it accrues under a constant yield method in advance of receipt of the cash payments attributable to such income, regardless of such U.S. Holder's regular method of tax accounting and the timing or amount of any actual payments. In general, the amount of OID included in income by a U.S. Holder of a note issued with OID is the sum of the daily portions of OID with respect to the note for each day during the taxable year (or portion of the taxable year) on which the U.S. Holder held the note. The daily portion of OID on any note issued with OID is determined by allocating to each day in an accrual period a ratable portion of the OID allocable to that accrual period. Accrual periods may be of any length and may vary in length over the term of the note, provided that each accrual period is no longer than one year and each scheduled payment of principal or

interest occurs either on the final day or first day of an accrual period. The amount of OID allocable to each accrual period generally is equal to the difference between (i) the product of the note's "adjusted issue price" at the beginning of the accrual period and the note's yield to maturity (determined on the basis of compounding at the close of each accrual period and appropriately adjusted to take into account the length of the particular accrual period) and (ii) the amount of any qualified stated interest payments allocable to such accrual period. The "adjusted issue price" of a note issued with OID at the beginning of any accrual period is the sum of the issue price of the note plus the amount of OID allocable to all prior accrual periods minus the amount of any prior payments on the note that were not qualified stated interest payments. Under these rules, U.S. Holders generally will have to include in taxable income increasingly greater amounts of OID in successive accrual periods.

In the event that the New Series A Notes have an issue price that differs from their face value, certain terms and conditions of the New Series A Notes, for example the Excess Cash Flow Sweep and any mandatory redemption could result in the New Series A Notes being treated as "Contingent Payment Debt Instruments," which are subject to special rules under applicable Treasury regulations governing instruments issued with OID.

### 2. Acquisition Premium, Market Discount and Bond Premium with Respect to New Series A Notes

If a U.S. Holder has a tax basis in a New Series A Note that is more than the issue price of such note but less than or equal to the stated redemption price at maturity of such note, such holder has acquisition premium with respect to such note to the extent of that excess, and the holder will not include OID on the new note in income to the extent of the acquisition premium.

A U.S. Holder that has a tax basis in a New Series A Note that is less than the issue price of the note will be subject to the market discount rules (unless the amount of the excess of the issue price over the basis is less than a specified *de minimis* amount, in which case market discount is considered to be zero). A U.S. Holder may elect (but is not required) to take market discount into income over the remaining life of a note, either on a ratable or economic yield basis. Once made, this election to include market discount in income currently applies to all market discount obligations acquired in or after the first taxable year to which the election applies and may not be revoked without the consent of the IRS. Absent such an election, a U.S. Holder will be required to treat any principal payment on, or any gain recognized on the sale, exchange, redemption, retirement or other taxable disposition of a New Series A Note as ordinary income to the extent of any accrued market discount that has not previously been included in income at the time of such payment or disposition. In addition, a U.S. Holder may be required to defer, until the maturity date of the note or its earlier disposition, the deduction of all or a portion of the interest expense on any indebtedness incurred or continued to purchase or carry such note.

As discussed above, if the exchange of Existing Debt for New Series A Notes is treated as a recapitalization, a U.S. Holder who acquired its Existing Debt at a market discount may be required to carry over to the New Series A Notes received any accrued market discount with respect to the Existing Debt to the extent that the accrued market discount was not previously included in income. In that case, a U.S. Holder holding such notes may have all or part of any

market discount effectively converted into OID if the issue price of the New Series A Notes is less than the stated principal amount of such notes.

If a U.S. Holder has a tax basis in a New Series A Note that exceeds the note's stated redemption price at maturity, the note has bond premium to the extent of that excess, and the holder will not be required to include OID, if any, on a New Series A Note in income. A U.S. Holder generally may elect to amortize the premium using the constant yield to maturity method as a reduction of the U.S. Holder's non-OID interest income from the note. Once made, the election to amortize premium on a constant yield to maturity method applies to all debt obligations held or subsequently acquired by the electing U.S. Holder on or after the first day of the first taxable year to which the election applies and may not be revoked without the consent of the IRS. Premium on a note held by a U.S. Holder that does not make such election will decrease the gain or increase the loss otherwise recognized on the sale, exchange, redemption, retirement or other taxable disposition of a note.

### 3.    Dispositions of New Series A Notes

A U.S. Holder will generally recognize taxable gain or loss upon the sale, exchange, redemption, retirement or other taxable disposition of a New Series A Note in an amount equal to the difference between the amount realized upon such sale, exchange, redemption, retirement or other taxable disposition (reduced by any amounts attributable to accrued but unpaid qualified stated interest, which will be taxable as ordinary interest income) and such U.S. Holder's adjusted tax basis in the note. A U.S. Holder's adjusted tax basis in a New Series A Note will be determined in the manner described above pursuant to the exchange contemplated by the Plan and (i) increased by the amount of any OID required to be included in the U.S. Holder's gross income with respect to the note and (ii) reduced by the amount of any payments received with respect to the note that are not payments of qualified stated interest. Such gain or loss will generally be long-term capital gain or loss if the Note is held for more than one year. Certain non-corporate U.S. Holders (including individuals) may be eligible for preferential tax rates in respect of long-term capital gain. The deductibility of capital losses by U.S. Holders is subject to limitations.

### 4.    Mexican Withholding Taxes and Foreign Tax Credits

Payments on the New Series A Notes may be subject to withholding tax imposed by Mexico. If a payment on the New Series A Notes is subject to Mexican withholding tax, U.S. Holders will be treated as having received the payment in full and as then paying over the withheld tax to Mexico. Pursuant to the terms of the New Series A Notes, IUSA will be required to pay additional amounts in respect of such withholding so that, subject to certain exceptions, the net amount received by each U.S. Holder will equal the amounts that would have been received in the absence of such withholding. Although not free from doubt, such additional amounts will likely be taxable to the U.S. Holder as ordinary interest income at the time they are paid by IUSA or accrue in accordance with the U.S. Holder's method of accounting for tax purposes.

Subject to numerous limitations, U.S. Holders may receive a foreign tax credit with respect to Mexican withholding taxes imposed on payments made on the New Series A Notes.

Any amounts attributable to interest or additional amounts paid in respect of New Series A Notes generally will be treated as foreign source passive category income or, in some cases, general category income, for U.S. foreign tax credit limitation purposes.

If any foreign income tax is withheld on the sale or other taxable disposition of a New Series A Note, the amount realized by a U.S. Holder will include the gross amount of the proceeds of that sale or other taxable disposition before deduction of such tax. Capital gain or loss, if any, realized by a U.S. Holder on the sale or other taxable disposition of the notes generally will be treated as U.S.-source gain or loss for U.S. foreign tax credit purposes. Consequently, in the case of a gain from the disposition of a note that is subject to foreign income tax, the U.S. Holder may not be able to benefit from the foreign tax credit for the tax unless the U.S. Holder can apply the credit against U.S. federal income tax payable on other income from foreign sources. Alternatively, the U.S. Holder may take a deduction for the foreign income tax if the U.S. Holder does not elect to claim a foreign tax credit for any foreign income taxes paid during the taxable year.

The foreign tax credit rules are complex, and U.S. Holders should consult their own tax advisors regarding the availability of foreign tax credits or deductions of foreign income taxes based on their particular circumstances.

### C.     Non-U.S. Holders

For purposes of the following discussion a "Non-U.S. Holder" means a beneficial owner of Existing Debt that is not, for U.S. federal income tax purposes, a U.S. Holder or a partnership (or an entity or arrangement classified as a partnership for such purposes). Subject to the discussion below regarding backup withholding, a Non-U.S. Holder will generally not be subject to U.S. federal income or withholding tax on:

(a)     interest (including OID) and any additional amounts paid in respect of the New Series A Notes, unless those payments are effectively connected with the conduct by the Non-U.S. Holder of a trade or business in the United States (and, if required by an applicable income tax treaty, attributable to a U.S. permanent establishment); and

(b)     gain realized on the exchange of Existing Debt for New Series A Notes or the sale, exchange, redemption, retirement or other taxable disposition of the New Series A Notes, unless (i) that gain is effectively connected with the conduct by the Non-U.S. Holder of a trade or business in the United States (and, if required by an applicable income tax treaty, attributable to a U.S. permanent establishment) or, (ii) in the case of gain realized by an individual Non-U.S. Holder, the Non-U.S. Holder is present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met.

### D.     Information Reporting and Backup Withholding

In general, U.S. tax information reporting requirements may apply to payments made with respect to the New Series A Notes and the proceeds of sale of such notes by holders other than certain exempt persons. Backup withholding of U.S. federal income tax may apply at

applicable rates to payments with respect to the New Series A Notes and the proceeds of sale of the New Series A Notes, if the holder fails to provide a correct taxpayer identification number or certification of exempt status or, with respect to certain payments, if a holder fails to report in full all interest and dividend income and the IRS notifies the payor of the holder's underreporting. Any amounts withheld under the backup withholding rules from a payment to a holder will generally be allowed as a refund or credit against the holder's federal income tax liability provided the required information is timely furnished to the IRS.

Recently enacted legislation requires certain U.S. Holders to report information with respect to their investment in certain "foreign financial assets" not held through a custodial account with a U.S. financial institution to the IRS. Investors who fail to report required information could become subject to substantial penalties. Prospective investors are encouraged to consult with their own tax advisors regarding the possible implications of this new legislation on the New Series A Notes received in the exchange.

## XI.

## CERTAIN FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS

### A. Exemption from Registration Requirements for New Securities

Upon consummation of the Plan, the Plan Proponents will rely on section 1145 of the Bankruptcy Code to exempt the offering, issuance and distribution of the New Notes from the registration requirements of the Securities Act and of any state securities or "blue sky" laws. Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of the debtor or a successor to a debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administrative expense in a case concerning, the debtor or a successor to the debtor or an affiliate under the Plan. The Plan Proponents believe that IUSA is an affiliate of the Debtors participating in the Plan for purposes of section 1145 of the Bankruptcy Code and that the offer and sale of the New Notes under the Plan satisfies the requirements of section 1145 and, therefore, the New Notes are exempt from the registration requirements of the Securities Act and state securities laws.

### B. Subsequent Transfers of New Securities

The recipients of the New Notes, will be able to resell the New Notes without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(1) of the Securities Act, unless the holder of such stock is an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code. In addition, the New Notes generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. However, the recipients of the New Notes issued under the Plan, are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who: (i) purchases a claim with a view to distribution of any security to be received in exchange for such claim;

(ii) offers to sell securities issued under a plan for the holders of such securities; (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution; or (iv) is an "issuer" of the relevant security, as such term is used in section 2(11) of the Securities Act. Under section 2(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with the issuer.

To the extent that the recipients of the New Notes under the Plan, are deemed to be "underwriters," the resale of the New Notes by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable laws. Persons deemed to be underwriters may, however, be permitted to sell such New Notes. This rule permits the public resale of securities received by "underwriters" if current information regarding the issuer is publicly available and if certain volume limitations and other conditions are met.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER WITH RESPECT TO THE NEW NOTES, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE THE NEW NOTES UNDER THE PLAN. THE DEBTORS RECOMMEND THAT HOLDERS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT.

*[Remainder of Page Intentionally Left Blank]*

# XII.

## CONCLUSION

The Plan Proponents believe that Confirmation and implementation of the Plan is preferable to any alternatives because it will provide the greatest recoveries to Holders of Claims and Equity Interests. Any alternative to Confirmation of the Plan, such as a chapter 7 liquidation or attempts to confirm another plan of reorganization or liquidation, would involve significant delays, uncertainty, and substantial additional administrative costs. Moreover, as described above, the Debtors believe that the Plan maximizes value for all parties in interest as compared to a chapter 7 liquidation.

Dated: June 7, 2011

TUBO DE PASTEJÉ, S.A. DE C.V.

_____

By: Rafael Dávila Olvera
Title: Chief Financial Officer

CAMBRIDGE-LEE HOLDINGS, INC.

_____

By: Rafael Dávila Olvera
Title: Chief Financial Officer

INDUSTRIAS UNIDAS, S.A. DE C.V.

_____

By: Rafael Dávila Olvera
Title: Attorney in Fact