# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------- x

In re:          :   Chapter 11

TUBO DE PASTEJÉ, S.A. DE C.V., <u>et</u> <u>al.</u>,  :  Case No. 09-14353 (KJC)

             :   Jointly Administered

        Debtors.  :

-------------------------------------------------------------- x

**THIRD AMENDED DISCLOSURE STATEMENT RELATING
TO JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11
OF THE BANKRUPTCY CODE OF TUBO DE PASTEJÉ, S.A. DE C.V.
AND CAMBRIDGE-LEE HOLDINGS, INC., AS DEBTORS AND
DEBTORS-IN-POSSESSION, AND INDUSTRIAS UNIDAS, S.A. DE
<u>C.V. AND THE SUBSIDIARY GUARANTORS AS CO-PROPONENTS</u>**

**July 15, 2011**

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (Bar No. 2436)
Michael R. Seidl (Bar No. 3889)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
Telephone:  302.652.4100
Facsimile:  302.652.4400

**DEWEY & LEBOEUF LLP**
Philip M. Abelson
Lauren C. Cohen
1301 Avenue of the Americas
New York, New York 10019
Telephone:  212.259.8000
Facsimile:  212.259.6333

*Attorneys for Tubo de Pastejé, S.A. de C.V. and
Cambridge Lee Holdings, Inc.*

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION (AS MAY BE AMENDED FROM TIME TO TIME, THE "PLAN")[1] OF TUBO DE PASTEJÉ, S.A. DE C.V., CAMBRIDGE-LEE HOLDINGS, INC. (EACH, A "DEBTOR," AND COLLECTIVELY, THE "DEBTORS") IN THE ABOVE-CAPTIONED CHAPTER 11 CASES (THE "CHAPTER 11 CASES") AND INDUSTRIAS UNIDAS, S.A. DE C.V. ("IUSA"), IUSA, S.A. DE C.V., INDUSTRIAS UNIDAS DE PASTEJÉ, S.A. DE C.V., GAS PADILLA, S.A. DE C.V., IUSA COMERCIALIZADORA, S.A. DE C.V., FORGAMEX, S.A. DE C.V., CENTRO COMERCIAL Y CULTURAL PASTEJÉ, S.A. DE C.V., AND CONVIVENCIA Y EDUCACIÓN INFANTIL PASTEJÉ, S.A. DE C.V., (COLLECTIVELY THE "SUBSIDIARY GUARANTORS,"AND TOGETHER WITH THE DEBTORS AND IUSA, THE "PLAN PROPONENTS").  SIMULTANEOUS WITH THE SOLICITATION OF ACCEPTANCES AND REJECTIONS OF THE PLAN, IUSA IS REQUESTING (THE "CONSENSUAL EXCHANGE") HOLDERS OF COPPER DEBT AND COMMERCIAL PAPER TO EXCHANGE SUCH COPPER DEBT AND COMMERCIAL PAPER FOR NEW SERIES B NOTES.

PLEASE READ THIS DOCUMENT WITH CARE.  THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE PLAN PROPONENTS AND THE MEMBERS OF THE IUSA GROUP AND THE CONDITION OF THEIR BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL, REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR EQUITY INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN (SEE 11 U.S.C. § 1125(a)) AND THE CONSENSUAL EXCHANGE.

FOR THE CONVENIENCE OF CLAIM AND EQUITY INTEREST HOLDERS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

NO REPRESENTATIONS CONCERNING THE DEBTORS' FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS

---

[1]     Capitalized terms used but not otherwise defined in this section shall have the meanings ascribed to such terms below or in the Plan, as applicable.

CONTAINED IN THIS DISCLOSURE STATEMENT REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS OF THE DEBTORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS) AND THE PLAN IN THEIR ENTIRETY. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE EXECUTIVE SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND OTHER EXHIBITS ANNEXED THERETO AND THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. ALL CREDITORS SHOULD READ CAREFULLY AND CONSIDER FULLY THE "CERTAIN RISK FACTORS TO BE CONSIDERED" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN OR ACCEPTING OR REJECTING THE CONSENSUAL EXCHANGE. **SEE SECTION VII, "CERTAIN RISK FACTORS TO BE CONSIDERED."**

THE STATEMENTS IN THIS DISCLOSURE STATEMENT ARE MADE BY THE PLAN PROPONENTS ON THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT AFTER THE DATE HEREOF DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN. THE PLAN PROPONENTS HAVE NO DUTY AND DO NOT INTEND TO UPDATE THIS DISCLOSURE STATEMENT UNLESS OTHERWISE ORDERED TO DO SO BY THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OF THE PLAN PROPONENTS, IF ANY, SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT HAS NEITHER BEEN REVIEWED, APPROVED, NOR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE RESTRUCTURING OF THE PLAN PROPONENTS AND FINANCIAL INFORMATION. ALTHOUGH THE PLAN PROPONENTS BELIEVE THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH

THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE PLAN PROPONENTS' RESPECTIVE MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE PLAN PROPONENTS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

**THE PLAN CONTAINS CERTAIN RELEASE, INJUNCTION AND EXCULPATION PROVISIONS.  BY VOTING TO ACCEPT THE CHAPTER 11 PLAN, YOU ARE AFFIRMATIVELY CONSENTING TO THESE PROVISIONS.  *SEE SECTION V.H "DISCHARGES, RELEASES AND EXCULPATION."***

THE PURPOSE OF THIS DISCLOSURE STATEMENT IS TO PROVIDE (A) RELEVANT INFORMATION REGARDING THE HISTORY OF THE IUSA GROUP, THEIR BUSINESSES, AND THESE CHAPTER 11 CASES; (B) INFORMATION CONCERNING THE PLAN; (C) INFORMATION FOR HOLDERS OF CLAIMS AND EQUITY  INTERESTS REGARDING THEIR TREATMENT UNDER THE PLAN; AND (D) INFORMATION TO ASSIST THE BANKRUPTCY COURT IN DETERMINING WHETHER THE PLAN COMPLIES WITH THE PROVISIONS OF CHAPTER 11 OF THE BANKRUPTCY CODE AND SHOULD BE CONFIRMED.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  THE DESCRIPTIONS SET FORTH HEREIN OF THE ACTIONS, CONCLUSIONS OR RECOMMENDATIONS OF THE PLAN PROPONENTS OR ANY OTHER PARTY IN INTEREST HAVE BEEN SUBMITTED TO OR APPROVED BY SUCH PARTY, BUT NO SUCH PARTY MAKES ANY REPRESENTATION REGARDING SUCH DESCRIPTIONS.  NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, AND FOR PURPOSES OF ANY CONTESTED MATTER, ADVERSARY PROCEEDING, OR OTHER PENDING OR THREATENED ACTION, THE CONTENTS HEREOF SHALL CONSTITUTE STATEMENTS MADE IN FURTHERANCE OF SETTLEMENT NEGOTIATIONS AND SHALL NOT BE ADMISSIBLE TO THE EXTENT PROHIBITED BY FEDERAL RULE OF EVIDENCE 408 AND ANY SIMILAR RULE OR STATUTE.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING (OTHER THAN THE CHAPTER 11 CASES) INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE PLAN PROPONENTS.  YOU SHOULD CONSULT YOUR OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

**IRS CIRCULAR 230 DISCLOSURE NOTICE:** TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, ANY TAX

ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY EXHIBITS, AMENDMENTS OR SUPPLEMENTS THERETO) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY EXHIBITS, AMENDMENTS OR SUPPLEMENTS THERETO) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THE PLAN PROPONENTS PRESENTLY INTEND TO SEEK TO CONSUMMATE THE PLAN AND THE RESTRUCTURING TRANSACTIONS AS PROMPTLY AS POSSIBLE AND TO CAUSE THE PLAN EFFECTIVE DATE TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE PLAN. THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE PLAN EFFECTIVE DATE ACTUALLY WILL OCCUR. PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS AND EQUITY INTERESTS IN CERTAIN CLASSES AND THAT COULD AFFECT THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS, ARE DESCRIBED IN *SECTION V, "SUMMARY OF PLAN."*

**TABLE OF CONTENTS**

I.      EXECUTIVE SUMMARY ......................................................................................1

II.     SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS
        AND EQUITY INTERESTS UNDER PLAN....................................................4

        A.      No Substantive Consolidation...............................................................4
        B.      Summary of Classification and Treatment of Claims and Interests .......4
        C.      Solicitation and Acceptance of Plan .....................................................9
        D.      Confirmation Hearing .........................................................................11
        E.      Overview of Chapter 11 Process.........................................................11
        F.      Plan Effective Date and Exchange Pursuant to Consensual
                Exchange Conditioned on Each Other.................................................12

III.    HISTORICAL INFORMATION .........................................................................13

        A.      Company History And Background........................................................13
        B.      Prepetition Secured Indebtedness........................................................14
        C.      Significant Prepetition Unsecured Indebtedness and Other Secured
                Obligations of the Debtors...................................................................15
        D.      Events Leading to Chapter 11 Filing ...................................................16

IV.     CHAPTER 11 CASES .........................................................................................16

        A.      Case Administration.............................................................................16
        B.      Continuation of Business After Petition Date.......................................17

V.      SUMMARY OF PLAN ........................................................................................18

        A.      Administrative Claims, Priority Tax Claims, and Intercompany
                Claims and Intercompany Interests......................................................19
        B.      Classification and Treatment of Claims................................................20
        C.      Acceptance or Rejection of Plan..........................................................23
        D.      Treatment of Executory Contracts and Unexpired Leases ...................23
        E.      Provisions Governing Distributions......................................................26
        F.      Means for Implementation of Plan .......................................................30
        G.      Summary of Consensual Exchange ......................................................35
        H.      Discharge, Releases and Exculpation...................................................36
        I.      Claim Resolution Process.....................................................................39
        J.      Conditions to Confirmation and Plan Effective Date ...........................40

VI.     FINANCIAL INFORMATION ...........................................................................41

VII.    CERTAIN RISK FACTORS TO BE CONSIDERED .........................................42

        A.      General Bankruptcy Law Considerations .............................................43
        B.      Additional Factors...............................................................................44
        C.      Additional Risk Factors .......................................................................47

VIII.    VOTING REQUIREMENTS ...................................................................................48

    A.    Voting Deadline..................................................................................49
    B.    Holders of Claims Entitled to Vote......................................................49
    C.    Vote Required for Acceptance by Class ...............................................50
    D.    Voting Procedures...............................................................................50

IX.    CONFIRMATION OF PLAN .........................................................................51

    A.    Hearing on Confirmation of the Plan...................................................51
    B.    Deadline to Object to Confirmation.....................................................52
    C.    Requirements for Confirmation of Plan................................................52
    D.    Alternatives to Confirmation and Consummation of Plan......................55

X.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF
    PLAN .........................................................................................................56

    A.    Tax Consequences of Exchange ..........................................................58
    B.    Tax Consequences of Owning New Series A Notes...............................60
    C.    Non-U.S. Holders...............................................................................65
    D.    Information Reporting and Backup Withholding ..................................65

XI.    CERTAIN FEDERAL AND STATE SECURITIES LAW
    CONSIDERATIONS ...................................................................................66

    A.    Exemption from Registration Requirements for New Securities ...........66
    B.    Legends.............................................................................................66
    C.    Subsequent Transfers of New Securities ..............................................66

XII.    CONCLUSION............................................................................................68

EXHIBITS TO DISCLOSURE STATEMENT

    Exhibit 1    Chapter 11 Plan
    Exhibit 2    Liquidation Analysis
    Exhibit 3    Restructuring Agreement
    Exhibit 4    Description of Notes
    Exhibit 5    Information Memorandum
    Exhibit 6    Projected Financial Statements
    Exhibit 7    Historical Financials

# I.

## EXECUTIVE SUMMARY[1]

Tubo de Pastejé, S.A. de C.V. ("Tubo") and Cambridge-Lee Holdings, Inc. ("CLH," and together with Tubo, the "Debtors") each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") on December 8, 2009 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors and their direct and indirect parent company, Industrias Unidas, S.A. de C.V. ("IUSA") and IUSA, S.A. de C.V., Industrias Unidas de Pastejé, S.A. de C.V., Gas Padilla, S.A. de C.V., IUSA Comercializadora, S.A. de C.V., Forgamex, S.A. de C.V., Centro Comercial y Cultural Pastejé, S.A. de C.V., and Convivencia y Educación Infantil Pastejé, S.A. de C.V. (collectively, the "Subsidiary Guarantors," and together with the Debtors and IUSA, the "Plan Proponents"), hereby transmit this disclosure statement (as may be amended from time to time pursuant to the terms and conditions of the Restructuring Agreement, the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to holders of claims against and equity interests in the Debtors in connection with the solicitation of votes to accept or reject the Plan Proponents' joint plan of reorganization under chapter 11 of the Bankruptcy Code attached hereto as Exhibit 1 (as may be amended from time to time pursuant to the terms and conditions of the Restructuring Agreement, the "Plan")[2] and to certain holders of claims against IUSA who are also being asked pursuant to the terms of the Restructuring Agreement to exchange their debt for the new notes issued pursuant to the Plan.

These bankruptcy cases were commenced due to a confluence of adverse macroeconomic trends, including the downturn that occurred in the construction industry, which resulted in IUSA and its direct and indirect subsidiaries (collectively, the "IUSA Group") experiencing a continued deterioration in revenue and profitability in respect of their manufacturing businesses. Despite such unfavorable conditions, the IUSA Group maintained its operations and continued to provide high-quality goods and services to its customers. The IUSA Group's revenue, however, remained below levels necessary to maintain liquidity and support current debt levels due to the downturn in construction and the global economy in general. As a result, the IUSA Group experienced cash flow issues, and, ultimately, IUSA became unable to service its existing debt, which, among other things, included obligations secured by Tubo pursuant to the Existing Pledge Agreement (defined below) of the capital stock of its direct subsidiary, CLH, and the obligations guaranteed by CLH. CLH, in turn, is the direct and indirect parent of several operating subsidiaries in both the United States and abroad (the "Non-Debtor Subsidiaries") engaged in the business of manufacturing copper tubing and related products. To maintain the status quo and preserve the valuable equity interests in the Non-Debtor Subsidiaries, the Debtors commenced these chapter 11 cases (the "Chapter 11 Cases").

---

[1] Headings are for convenience only and shall not affect the meaning or interpretation of the Disclosure Statement.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

The Plan Proponents are commencing this solicitation after extensive negotiations with the Consenting Creditors comprised of a group of certain holders of 11.50% senior notes due 2016 issued by IUSA (the "Noteholders") as well as certain holders of certain other unsecured indebtedness of IUSA. These negotiations have culminated in IUSA and the Consenting Creditors, among others, executing a restructuring agreement, attached hereto as Exhibit 3 (as may be amended from time to time pursuant to the terms and conditions therein, the "Restructuring Agreement"), which summarizes the proposed treatment of certain obligations of the IUSA Group. The Plan is premised upon implementing the terms proposed in the Restructuring Agreement through a series of transactions (the "Restructuring Transactions") designed to maximize recoveries to all creditors and enhance the financial stability of the Reorganized Debtors and the IUSA Group, as a whole. Specifically, among other things, the Restructuring Transactions include (a) the cancellation of the Old 2016 Notes and the ESBDS I Loan pursuant to the Plan, as well as the Eligible Series B Debt held by the holders of the Copper Debt and the holders of the Commercial Paper, and (b) the issuance pursuant to the Plan of (i) new debt securities (the "New Series A Notes"), which New Series A Notes shall be guaranteed by Tubo and secured by the capital stock of CLH (along with other guarantees and collateral from members of the IUSA Group), to the holders of the Old 2016 Notes and the ESBDS I Loan and (ii) new debt securities (the "New Series B Notes" and together with the New Series A Notes, the "New Notes"), which New Series B Notes shall be on substantially the same terms as the New Series A Notes, but shall not be secured by any assets of the Reorganized Debtors, to holders of the Copper Debt and holders of the Commercial Paper who elect to accept such New Series B Notes in exchange for their Series B Eligible Debt. The Plan leaves unimpaired the rights of all holders of claims against and equity interests in the Debtors, with the exception of the rights of the Holders of Old 2016 Notes and ESBDS I Loan. The Plan Proponents believe that the Restructuring Transactions, including the Plan and the transactions contemplated thereby are in the best interests of the estates and maximize distributable value for all stakeholders, as evidenced by the Consenting Creditors' support for the Plan and the Restructuring Transactions.

This solicitation of votes with respect to the Plan is being conducted at the same time as the Consensual Exchange in order to obtain sufficient votes to enable the Plan to be confirmed by the Bankruptcy Court and to enable the required holders of the Commercial Paper and holders of the Copper Debt to participate in the proposed exchange of their debt in the Restructuring Transactions for the New Notes issued under the Plan. The Plan sets forth how claims against and equity interests in the Debtors will be treated (and how certain claims against the remaining members of the IUSA Group will be satisfied) under the Plan if it is confirmed by the Bankruptcy Court and is thereafter consummated as a part of the Restructuring Transactions. This Disclosure Statement describes certain aspects of the Plan, the Plan Proponents' business operations, significant events leading up to the Chapter 11 Cases and related matters. This Executive Summary is intended solely as a summary of the distribution provisions of the Plan and certain matters related to the Plan Proponents' businesses. **FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND ALL RELATED EXHIBITS AND SCHEDULES IN THEIR ENTIRETY.**

NY3 3093898.3

Attached as exhibits to this Disclosure Statement are copies of the following documents:

- the Plan (Exhibit 1);

- the Liquidation Analysis (Exhibit 2);

- the Restructuring Agreement (Exhibit 3);

- Description of Notes (Exhibit 4);

- Information Memorandum (Exhibit 5);

- Projected Financial Statements (Exhibit 6); and

- Historical Financials (Exhibit 7).

**THE PLAN PROPONENTS BELIEVE THAT THE PLAN COMPLIES WITH ALL PROVISIONS OF THE BANKRUPTCY CODE AND WILL ENABLE THE DEBTORS TO REORGANIZE SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11, AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR ESTATES, AND THE PLAN PROPONENTS' CREDITORS AND INTEREST HOLDERS.**

On July 18, 2011, after notice and a hearing, the Bankruptcy Court issued an order (the "Disclosure Statement Order"), approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors and equity holders to make informed judgments whether to accept or reject the Plan. Approval of this Disclosure Statement does not, however, constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan.

Accompanying this Disclosure Statement and forming a part of the solicitation package (the "Solicitation Package") are copies of: (i) the Plan (Exhibit 1); (ii) the Liquidation Analysis (Exhibit 2); (iii) the Restructuring Agreement (Exhibit 3); (iv) the Description of Notes (Exhibit 4) ; (v) the Information Memorandum (Exhibit 5); (vi) the Projected Financial Statements of IUSA and the IUSA Group on a consolidated basis (Exhibit 6); (vii) the Historical Financials (Exhibit 7); and (viii) for Holders of Claims against the Debtors who are entitled to vote on the Plan, one or more Ballots. Each Holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, all exhibits thereto and the instructions accompanying the Ballot in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code. Upon Confirmation, the Plan will be a legally binding arrangement and it should therefore be read in its entirety. Accordingly, solicited parties may wish to consult with their attorneys regarding the contents of the Plan.

**WHO IS ENTITLED TO VOTE:** Under section 1126(f) of the Bankruptcy Code, holders of Claims or Equity Interests that are not impaired under the Plan are presumed to have accepted the Plan and are not entitled to vote on the Plan. Under section 1124 of the Bankruptcy

Code, a Class of Claims or Equity Interests is not "impaired" under the Plan if (i) the Plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default. Under section 1126(g) of the Bankruptcy Code, a Class is deemed to have rejected the Plan if the Plan provides that the Claims or Equity Interests of such Class do not entitle the Holders of such Claims or Equity Interests to receive or retain any property under the Plan on account of such Claims or Equity Interests. Accordingly, the only Classes that are entitled to vote on the Plan are Classes T3 and C3 because all other Classes are Unimpaired and deemed to accept the Plan under section 1126(f) of the Bankruptcy Code.

II.

## SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER PLAN

### A.  No Substantive Consolidation

The Plan is a joint plan that does not provide for substantive consolidation of the Estates and the Estates shall not be deemed to be substantively consolidated for purposes thereof. Except as specifically set forth herein, nothing in the Plan or this Disclosure Statement shall constitute or be deemed to constitute an admission that any Debtor is subject to or liable for any claim against any other Debtor.

Additionally, claimants holding Claims against multiple Debtors, to the extent Allowed in each Debtor's case, will be treated as a separate claim against each Debtor's Estate; _provided_, _however_, that no Holder shall be entitled to receive more than payment in full of its Allowed Claim, and such Claims will be administered and treated in the manner provided for herein by the Debtors or otherwise.

### B.  Summary of Classification and Treatment of Claims and Interests

The following table summarizes the classification and treatment of the Claims and Equity Interests under the Plan. For a more detailed description of the classification and treatment for all Classes, please refer to the discussion in _**Section V, "Summary Of Plan**_" and to the Plan itself.[3]

---

[3]     This table is only a summary of the classification, impairment and entitlement to vote of Holders of Claims and Equity Interests under the Plan. Reference should be made to the entire Disclosure Statement, the Plan and all exhibits thereto for a complete description of the classification and treatment of Claims and Equity Interests. Accordingly, this summary is qualified in its entirety by reference to the entire Disclosure Statement, the Plan and all exhibits thereto.

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| **Class T1 – Other Priority Claims against Tubo** | *Unimpaired*. Except to the extent that a Holder of an Allowed Other Priority Claim against Tubo agrees to less favorable treatment, each Holder of an Allowed Priority Claim shall have its Claim Reinstated to the extent such Claim is not paid in the ordinary course of business prior to the Plan Effective Date. | No – deemed to accept | Approximately $0 | 100% (or such other amount consented to by each Holder of an Allowed Other Priority Claim) |
| **Class T2 – Other Secured Claims against Tubo** | *Unimpaired*. Except to the extent that a holder of an Allowed Other Secured Claim against Tubo agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall have its Claim Reinstated and shall retain its Lien, to the same extent in existence and valid as of the Plan Effective Date, on the property that secures each such Claim, to the extent such Claim is not paid in the ordinary course of business prior to the Plan Effective Date. | No – deemed to accept | Approximately $0 | 100% (or such other amount consented to by each Holder of an Allowed Other Secured Claim) |
| **Class T3 – Noteholder Pledge Claim** | *Impaired*. Each Holder of a Noteholder Pledge Claim as of the Distribution Record Date shall receive on the Plan Effective Date, in accordance with the Restructuring Transactions, in full and final satisfaction of each such Holder's Allowed Noteholder Pledge Claim, New Series A Notes to be issued by IUSA in the principal amount equal to U.S.$1,143.22, which is equal to (i) the 2016 Base Amount, | Yes | $200,000,000.00[4] | 100% |

---

[4]    This amount reflects the principal amount and is exclusive of any fees, interest, or expenses.

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| | plus (ii) the amount of accrued and unpaid interest on such 2016 Base Amount from May 15, 2009 through November 15, 2011, at an interest rate of 4.75% per annum compounded quarterly, plus (iii) a restructuring fee equal to the sum of (a) 1.75% of the 2016 Base Amount (the "2016 Notes Restructuring Fee") and (b) the interest accrued on the 2016 Notes Restructuring Fee from May 15, 2011 through November 15, 2011, at an interest rate of 4.75% per annum compounded quarterly, which New Series A Notes shall be guaranteed by Tubo and secured by a pledge of the capital stock of CLH (along with other guarantees and collateral from members of the IUSA Group). | | | |
| **Class T4 – General Unsecured Claims against Tubo** | *Unimpaired*. Except to the extent that a Holder of an Allowed General Unsecured Claim against Tubo agrees to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall have its Claim Reinstated to the extent that such Claim is not paid in the ordinary course of business prior to the Plan Effective Date. | No – deemed to accept | Approximately $0 | 100% |
| **Class T5 – Equity Interests in Tubo** | *Unimpaired*. The Equity Interests in Tubo are unaltered by the Plan and each Holder of Equity Interests in Tubo will retain its interest in Tubo to the same extent as if the Chapter 11 Cases had not been commenced. | No – deemed to accept | N/A | N/A |

NY3 3093898.3

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| **Class C1 – Other Priority Claims against CLH** | *Unimpaired*. Except to the extent that a Holder of an Allowed Other Priority Claim against CLH agrees to less favorable treatment, each Holder of an Allowed Priority Claim shall have its Claim Reinstated to the extent such Claim is not paid in the ordinary course of business prior to the Plan Effective Date. | No – deemed to accept | Approximately $0 | 100% (or such other amount consented to by each Holder of an Allowed Other Priority Claim) |
| **Class C2 – Other Secured Claims against CLH** | *Unimpaired*. Except to the extent that a Holder of an Allowed Other Secured Claim against CLH agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall have its Claim Reinstated and shall retain its Lien, to the same extent in existence and valid as of the Plan Effective Date, on the property that secures each such Claim, to the extent such Claim is not paid in the ordinary course of business prior to the Plan Effective Date. | No – deemed to accept | $62,270,484.07[5] | 100% (or such other amount consented to by each Holder of an Allowed Other Secured Claim) |
| **Class C3 – Unsecured Parent Guaranty Claims** | *Impaired*. Each Holder of an Unsecured Parent Guaranty Claim as of the Distribution Record Date shall receive on the Plan Effective Date, in accordance with the Restructuring Transactions, in full and final satisfaction of each such Holder's Allowed an Unsecured Parent Guaranty Claim, New Series A Notes to be issued by IUSA in the principal amount equal to U.S.$1,036.18, which is equal to (i) the ESBDS I Base | Yes | Approximately $803,803 | 100% |

---

[5]    As of July 5, 2011.

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| | Amount, plus (ii) the amount of accrued and unpaid interest on such ESBDS I Base Amount from October 12, 2010 through November 15, 2011, at an interest rate per annum equal to the average six-month LIBOR for the period plus 1.5%, multiplied by the quotient of 4.75% divided by 11.5% (the "ESBDS I Interest Rate"), compounded quarterly, plus (iii) a restructuring fee equal to the sum of (a) 1.75% of the ESBDS I Base Amount (the "ESBDS I Restructuring Fee") and (b) the interest accrued on the ESBDS I Restructuring Fee from May 15, 2011 through November 15, 2011, at the ESBDS I Interest Rate compounded quarterly, which New Series A Notes shall be guaranteed by Tubo and secured by a pledge of the capital stock of CLH (along with other guarantees and collateral from members of the IUSA Group). | | | |
| **Class C4 – General Unsecured Claims against CLH** | _Unimpaired_. Except to the extent that a Holder of an Allowed General Unsecured Claim against CLH agrees to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall have its Claim Reinstated to the extent that such Claim is not paid in the ordinary course of business prior to the Plan Effective Date. | No – deemed to accept | Approximately, $43,855,656 | 100% |

NY3 3093898.3

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| **Class C5 – Equity Interests in CLH** | *Unimpaired*. The Equity Interests in CLH are unaltered by the Plan and each Holder of Equity Interests in CLH will retain its interest in CLH to the same extent as if the Chapter 11 Cases had not been commenced. | No – deemed to accept | N/A | N/A |

## C.    Solicitation and Acceptance of Plan

### 1.    General

This Disclosure Statement and other documents described herein are being furnished by the Plan Proponents pursuant to the Disclosure Statement Order for the purpose of soliciting votes on the Plan and in connection with the Consensual Exchange in order to provide holders of the Series B Eligible Debt with sufficient information so as to determine whether to exchange their Eligible Series B Debt for New Series B Notes pursuant to the terms of the Restructuring Agreement.

A copy of the Disclosure Statement Order and a notice of, among other things, voting procedures and the dates set for objections to, and the hearing on, confirmation of the Plan (the "Confirmation Hearing Notice") are also being transmitted with this Disclosure Statement. The Disclosure Statement Order and the Confirmation Hearing Notice set forth in detail the deadlines, procedures, and instructions for casting votes to accept or reject the Plan, for filing objections to confirmation of the Plan, the treatment for balloting purposes of certain types of Claims, and the assumptions for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each Holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order, the Notice of Confirmation Hearing, and the instructions accompanying the Ballot(s) in their entirety before voting on the Plan. These documents contain important information concerning how Claims and Interests are classified for voting purposes and how votes will be tabulated.

### 2.    Who Is Entitled to Vote

Pursuant to the Disclosure Statement Order, the Bankruptcy Court has established July 14, 2011 as the record date for determining the Holders of Class T3 Claims and Class C3 Claims entitled to vote to accept or reject the Plan (the "Record Date"). Under section 1126(f) of the Bankruptcy Code, holders of Claims or Equity Interests that are not impaired under the Plan are presumed to have accepted the Plan and are not entitled to vote on the Plan. Under section 1124 of the Bankruptcy Code, a Class of Claims or Equity Interests is not "impaired" under the Plan if (1) the Plan leaves unaltered the legal, equitable and contractual rights to which such claim or

interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.  Under section 1126(g) of the Bankruptcy Code, a Class is deemed not to have accepted the Plan if the Plan provides that the Claims or Equity Interests of such Class do not entitle the Holders of such Claims or Equity Interests to receive or retain any property under the Plan on account of such Claims or Equity Interests.  Accordingly, the only Classes that are entitled to vote on the Plan are Classes T3 and C3 because all other Classes are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code.

### 3.     Summary Of Voting Procedures

As set forth in Section VIII herein, if you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for voting purposes.  Please vote and return your Ballot(s) in accordance with the instructions set forth in Section VIII herein and the instructions accompanying your Ballot(s).

TO BE COUNTED, YOUR VOTE INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE INSTRUCTIONS ON THE BALLOT, AND MUST BE **ACTUALLY RECEIVED** BY THE DEBTORS' NOTICE AND BALLOTING AGENT, EPIQ BANKRUPTCY SOLUTIONS, LLC (THE "<u>NOTICE AND BALLOTING AGENT</u>") **NO LATER THAN 4:00 P.M., PREVAILING EASTERN TIME, ON AUGUST 19, 2011 (THE "<u>VOTING DEADLINE</u>")** AT:

VIA FIRST CLASS MAIL

      TUBO DE PASTEJÉ, S.A. BALLOT PROCESSING
      C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
      FDR STATION P.O. BOX 5014
      NEW YORK,  NY 10150-5014

VIA HAND DELIVERY OR OVERNIGHT MAIL

      TUBO DE PASTEJÉ, S.A. BALLOT PROCESSING
      C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
      757 THIRD AVENUE, 3RD FLOOR
      NEW YORK, NY 10017

BALLOTS RECEIVED AFTER THAT TIME WILL NOT BE COUNTED.  FAXED OR ELECTRONIC COPIES OF BALLOTS WILL NOT BE COUNTED.

ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.  ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL NOT BE COUNTED.  **BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO THE**

**DEBTORS, THE BANKRUPTCY COURT, THE INDENTURE TRUSTEE, OR COUNSEL TO THE DEBTORS.**

### 4. Inquiries

#### (a) Related to Plan

If you are a Holder of a Noteholder Pledge Claim or an Unsecured Parent Guaranty Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have questions about the procedures for voting your Noteholder Pledge Claim or Unsecured Parent Guaranty Claim, or about the Solicitation Package that you received, please contact the Notice and Balloting Agent, by written request to Tubo de Pastejé, S.A. Ballot Processing, c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017, by telephone at (646) 282-2400 or by email at tabulation@epiqsystems.com.

#### (b) General Inquiries

Additional copies of the Plan, this Disclosure Statement, the Consensual Exchange Documents, or the exhibits to any of those documents can be accessed free of charge from the following website: **http://dm.epiq11.com/tubo**. Copies of the Plan, this Disclosure Statement, and the Consensual Exchange Documents are also available at your own expense, upon written request to the Notice and Balloting Agent at: Tubo de Pastejé, S.A. Ballot Processing, c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017, by telephone at (646) 282-2400 or by email at tabulation@epiqsystems.com, or the Bankruptcy Court's website: www.deb.uscourts.gov. Note: a PACER password and login are needed to access documents on the Bankruptcy Court's website and a fee will be charged (https://ecf.deb.uscourts.gov/).

### D. Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on August 25, 2011 at 3:00 p.m. (Prevailing Eastern Time), before The Honorable Kevin J. Carey, Chief United States Bankruptcy Judge. The Bankruptcy Court has directed that objections, if any, to Confirmation be filed and served so that they are received on or before August 19, 2011 at 4:00 p.m. (prevailing Eastern Time). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any adjourned Confirmation Hearing.

### E. Overview of Chapter 11 Process

The filing of a chapter 11 bankruptcy petition creates a bankruptcy "estate" comprising all of the property interests of the debtor. Unless a trustee is appointed by the bankruptcy court for cause, a debtor remains in possession and control of all its assets as a "debtor in possession." The debtor in possession may continue to operate its business in the ordinary course on a day-to-day basis without bankruptcy court approval. Bankruptcy court approval is only required for various enumerated kinds of transactions (such as certain financing transactions) and transactions out of the ordinary course of a debtor's business. The filing of the bankruptcy petition gives rise to what is known as the "automatic stay" which, generally, enjoins creditors from taking any

action to collect or recover obligations owed by a debtor prior to the commencement of a chapter 11 case without bankruptcy court authorization.  The bankruptcy court can grant relief from the automatic stay under certain specified conditions or for cause.

The Bankruptcy Code authorizes the creation of one or more official committees to protect the interests of some or all creditors or interest holders.  The fees and expenses of counsel and other professionals employed by such official committees and approved by the bankruptcy court are generally borne by a bankruptcy estate.  No official committee has been appointed in the Chapter 11 Cases.  No request for the appointment of a trustee or examiner has been made and no committees have been appointed or designated in the Chapter 11 Cases.

A chapter 11 debtor emerges from bankruptcy by successfully confirming a chapter 11 plan of reorganization, or alternatively, the assets of a debtor may be sold and the proceeds distributed to creditors through a chapter 11 plan of liquidation.  A plan may be either consensual or non-consensual and provide, among other things, for the treatment of the claims of creditors and equity interests of shareholders and holders of options or warrants.  The provisions of the Plan are summarized below.  ***See Section V, "Summary of Plan."***

The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the terms for satisfying claims against and equity interests in a debtor.  Upon confirmation of a plan, such plan is binding on the debtor, any issuer of securities under the plan and any creditor or equity interest holder of a debtor.  Subject to certain limited exceptions, the confirmation order discharges a debtor from any debts that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

The Plan Proponents submit this Disclosure Statement to Holders of Claims against and Equity Interests in the Debtors in accordance with the requirements of section 1125 of the Bankruptcy Code and the holders of certain claims against IUSA expected to participate in the Consensual Exchange for New Notes issued under the Plan.  This Disclosure Statement sets forth specific information regarding the Debtors pre-bankruptcy history, the nature of the Chapter 11 Cases, the proposed distributions to creditors upon consummation of the Plan, and the distributions to be made to creditors of the IUSA Group under the Restructuring Transactions as contemplated in the Plan and Consensual Exchange.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote must follow for their votes to be counted.

### F.    Plan Effective Date and Exchange Pursuant to Consensual Exchange Conditioned on Each Other

The Consensual Exchange is an integral part of the Plan.  The Plan Proponents believe that the Consensual Exchange is in the best interests of the Debtors' creditors and these Estates and that the Consenting Creditors would not agree to support the Plan absent consummation of the Consensual Exchange and issuance of the New Series B Notes pursuant to the Plan.  Accordingly, neither the Plan nor the Consensual Exchange can be consummated without the other and as such the Plan Effective Date and the effective date of the Consensual Exchange shall happen simultaneously.

# III.

# HISTORICAL INFORMATION

## A.    Company History And Background

### 1.    IUSA Group

The IUSA Group was formed in 1939 and is one of Mexico's largest diversified industrial groups.  The IUSA Group manufactures copper-based and electrical products for the housing and electrical power sectors in the United States, Mexico, Europe and Latin America through operations organized by product line into three business groups: copper tubing, wire and cable and manufacturing.  The manufacturing group is divided into five product segments:  (a) copper alloys; (b) watt-hour meters; (c) electrical products; (d) valves and controls; and (e) diversified assets.  The IUSA Group is headquartered in Mexico and has manufacturing operations in Mexico and the United States.

### 2.    Formation and Entities of U.S. Subsidiaries

Tubo and CLH were both established on April 29, 1993, as holding companies.  Tubo is a wholly-owned subsidiary of IUSA.  Tubo is the direct parent company of CLH.  CLH is either the majority or sole parent of several United States based operating subsidiaries, some of which, in turn, are the direct or indirect parents of certain United States based and/or foreign operating subsidiaries.  The Non-Debtor Subsidiaries are part of IUSA's copper tubing and copper alloys businesses and handle related trading and manufacturing activities and personnel and services in the United States.  None of the Non-Debtor Subsidiaries is a debtor in these cases.

Each of Tubo and CLH is a privately owned entity, and equity interests in the Debtors are not listed or traded on any public exchange or market.  Tubo maintains its corporate headquarters at Paseo de la Reforma 2608, Penthouse, Colonia Lomas Altas, 11950, Mexico, D.F., Mexico. CLH maintains its corporate headquarters at 86 Tube Drive, Reading, PA 19605.

### 3.    Operations and Assets of Debtors

Neither Tubo nor CLH has any employees.  Neither of the Debtors has any accounts or cash other than intercompany payables and receivables.  IUSA has funded retainers for the Debtors' counsel in the Chapter 11 Cases.  The Non-Debtor Subsidiaries use their own bank accounts and a system of intercompany transactions in order to fund their operations.  All United States property insurance policies are issued to the Non-Debtor Subsidiaries.  Certain other policies were historically issued in the CLH name, although payments were made by one or more of the Non-Debtor Subsidiaries and allocated to others through intercompany charges.

There are virtually no pending claims or transactions directly between CLH and its affiliates.[6]  Substantially all corporate allocations of expenses, management fees, and other fees

---

[6]    Certain advances by two Non-Debtor Subsidiaries to IUSA, which advances the Companies believe to be permanent distributions, may technically flow through CLH and Tubo before going to IUSA.  This is

allocable to the Non-Debtor Subsidiaries are levied directly on the Non-Debtor Subsidiaries. There are certain minimal allocations to CLH with respect to certain insurance policies (e.g., general liability and directors' and officers' policies) and taxes.[7] Any dividends paid by the Non-Debtor Subsidiaries to CLH are up-streamed through CLH to IUSA, as a result of CLH's status as parent of the Non-Debtor Subsidiaries.

### B.    Prepetition Secured Indebtedness

### 1.    Pledge and Security Agreement

IUSA, as issuer, the Existing Guarantors, The Bank of New York, as trustee, (the "Trustee") and The Bank of New York (Luxembourg) S.A. are parties to that certain Indenture, dated as of November 13, 2006 (as modified and supplemented, the "Existing Indenture"), pursuant to which IUSA issued $200 million in 11.50% senior notes due November 15, 2016 (the "Old 2016 Notes").  On November 16, 2006, Tubo, as pledgor, and the Trustee entered into that certain Pledge and Security Agreement (the "Existing Pledge Agreement").  Pursuant to the Existing Pledge Agreement, Tubo granted to the Trustee for the benefit of the Old 2016 Notes a non-recourse pledge of the capital stock of CLH.

### 2.    Other IUSA Debt

IUSA and its subsidiaries have additional indebtedness consisting of: (i) (1) U.S.$145,696,154.54 aggregate principal amount of the promissory notes (*pagarés*) (the "Copper Debt Notes") issued pursuant to (A) the Amended and Restated Copper Cathode Sale Agreement, executed on August 1, 2009 and dated as of June 25, 2008, by and among Gerald Metals LLC, successor-in-interest to Gerald Metals, Inc. ("Gerald"), IUSA, S.A. de C.V., and IUSA, as amended, including all annexes and exhibits thereto, and the guarantee issued by IUSA in respect thereof, and (B) that certain Copper Cathode Sale Agreement, dated as of June 30, 2009, by and among Gerald, IUSA, S.A. de C.V., and IUSA, as amended, including all annexes and exhibits thereto, and the guarantees issued by IUSA and IUSA, S.A. de C.V. in respect thereof (together, the "Copper Contracts") (each of which such promissory note (*pagaré*), for the avoidance of doubt, includes any Copper Debt Note that was originally issued in connection with any such Copper Contract, whether such Copper Debt Note is currently held by the original holder thereof or a subsequent holder thereof) and (2) the agreed upon August 2009 finalization amount of U.S.$155,000.00 (the "August 2009 Finalization Amount"); and (ii) certain legal and non-legal costs and expenses accrued in connection with the Copper Contracts prior to October 22, 2010, in an aggregate agreed amount of U.S.$2,000,000 (the "Agreed Costs" and collectively with the Copper Debt Notes and the August 2009 Finalization Amount, the "Copper Debt").

Additionally, IUSA issued, and certain subsidiary members of the IUSA Group guaranteed, (a) 9.75% commercial paper with a principal amount outstanding of $9,500,000 due March 26, 2009 (the "9.75% Commercial Paper") and (b)12% commercial paper with a principal

---

merely a book-keeping matter.  The funds may be advanced to IUSA, but may not have been properly classified on the books of CLH or Tubo.

[7]    Although CLH is not an operating company, CLH and the Non-Debtor Subsidiaries file federal income tax returns on a consolidated basis, with CLH as the "taxpayer" entity.

amount outstanding of $15,000,000 due August 6, 2009 (the "12% Commercial Paper" and together with the 9.75% Commercial Paper, the "Commercial Paper").

### C. Significant Prepetition Unsecured Indebtedness and Other Secured Obligations of the Debtors

#### 1. Guarantee of ESBDS I Loan

IUSA, S.A. de C.V., as borrower, IUSA and CLH, as guarantors, and Espirito Santo Bank, as lender, are parties to that certain Credit Agreement, dated as of August 29, 2007, with a principal amount outstanding of $803,803.38 (the "ESBDS I Loan"). The ESBDS I Loan is currently held by the Export-Import Bank of the United States. Under the terms of the Plan, the Holders of this claim will receive a *pro rata* portion of the New Series A Notes in full settlement and discharge of all claims arising from the ESBDS I Loan.

#### 2. Guarantee of ESBDS II Loan

IUSA, S.A. de C.V., as borrower, IUSA and CLH, as guarantors, and Espirito Santo Bank, as lender, are parties to that certain Credit Agreement, dated as of September 26, 2008, with a principal amount outstanding of approximately $2,666,656 (the "ESBDS II Loan"). CLH's guarantee of the ESBDS II Loan under the guaranty will be reinstated under the Plan as a General Unsecured Claim against CLH in Class C4.

#### 3. Guarantee of Bank of America Loan

Cambridge-Lee Industries LLC ("CLI"), as borrower, Bank of America, as lender and agent, and certain other lenders are parties to that certain Third Amended and Restated Loan and Security Agreement, dated May 15, 2006 (as amended and restated, the "Bank of America Loan"), pursuant to which the lenders thereunder provided CLI with a revolving credit facility of up to $140,000,000.00. On September 19, 1996, CLH, as guarantor, entered into a certain guaranty, which guaranty CLH reaffirmed by that certain Reaffirmation of Guaranty, dated as of October 28, 2002, pursuant to which CLH guaranteed the obligations of CLI under the Bank of America Loan. As of the date hereof, the outstanding balance of the Bank of America Loan is approximately $39,812,000. CLH's guarantee of the Bank of America Loan under the Guaranty will be reinstated under the Plan as a General Unsecured Claim against CLH in Class C4.

#### 4. Guarantee of Texas Community Bank Loan

Eagle Tube Industries, LLC, as borrower, Texas Community Bank, as lender, and CLH, as guarantor, are parties to that certain real estate loan, dated as of August 27, 2007 (the "Texas Community Bank Loan"), secured by certain real estate assets owned by CLI and located in Laredo, Texas. As of the date hereof, the outstanding balance of the Texas Community Bank Loan is approximately $1,377,000. CLH's guarantee of the Texas Community Bank Loan under the guaranty will be reinstated under the Plan as a General Unsecured Claim against CLH in Class C4.

NY3 3093898.3

### 5. Pledge of UCI Stock to GECC

United Copper Industries, Inc. ("UCI"), as borrower, and General Electric Capital Corporation ("GECC"), as lender, are parties to that certain Second Amended and Restated Loan and Security Agreement, dated as of March 8, 2006 (as amended and restated, the "GECC Loan"), pursuant to which GECC provided UCI with a (a) revolving credit loan of up to $130,000,000.00 and (b) term loan of $8,000,000.00. CLH, as pledgor, is party to that certain Stock Pledge Agreement with GECC (the "GECC Stock Pledge Agreement"), pursuant to which CLH pledged 89.13% of the capital stock of UCI to GECC as security for the GECC Loan. As of the date hereof, the outstanding balance of the GECC Loan is $62,270,484.07.[8] The GECC Claim will be reinstated under the Plan as an Other Secured Claim against CLH in Class C2.

### D. Events Leading to Chapter 11 Filing

The IUSA Group has been negatively affected by general economic conditions worldwide that have depressed spending in the construction industry, which contains major consumers of the products of the IUSA Group. In addition, increased volatility in the price of commodities, especially copper, has resulted in increased costs of manufacturing. As a result, the IUSA Group experienced cash flow issues in the months leading up to the Petition Date and IUSA failed to make an interest payment that became due under the Old 2016 Notes on November 15, 2009 (the "Technical Default"). Pursuant to the Existing Indenture, there was a grace period for payment of interest which expired in mid-December 2009 (the "Event of Default").

Beginning in 2009 and continuing through 2010 and 2011, the IUSA Group has been exploring a long term solution for its cash flow problems. Specifically, representatives of the IUSA Group initiated discussions with a group of certain Noteholders regarding the Technical Default and Event of Default and a potential restructuring of certain terms of the Existing Indenture. Those discussions proved fruitful and as they progressed it became clear that a meaningful restructuring of their obligations under the Existing Indenture also required restructuring of the Copper Debt and Commercial Paper. These larger negotiations have culminated in the Restructuring Agreement.

## IV.

## CHAPTER 11 CASES

### A. Case Administration

### 1. Retained Professionals

Prior to the Petition Date, the Debtors retained Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, as their counsel ("Milbank"), and Pachulski Stang Ziehl & Jones LLP, as their co-counsel ("PSZ&J"), to assist them in exploring and facilitating their restructuring goals. On January 11,

---

[8]    As of July 5, 2011.

2010, the Bankruptcy Court entered orders approving the retention of Milbank and PSZ&J as the Debtors' counsel (Docket Nos. 49 and 50).

On June 13, 2011, certain attorneys at Milbank responsible for these Chapter 11 Cases and the financial restructuring of the IUSA Group joined Dewey & LeBoeuf LLP ("D&L"). To ensure consistency of representation, the Debtors requested that D&L be substituted for Milbank as Debtors' counsel. On June 23, 2011, the Debtors Filed an application seeking to retain D&L as counsel in these Chapter 11 Cases. On July 13, 2011, the Bankruptcy Court entered an order approving the retention of D&L as the Debtors' counsel.

CLH retained Deloitte Tax LLP ("Deloitte Tax") to prepare its consolidated federal income tax returns and provide related tax advisory services. On March 17, 2010, the Bankruptcy Court entered an order approving the retention of Deloitte Tax as tax professionals to CLH (Docket No. 70). On March 25, 2011, the Bankruptcy Court entered an order approving the supplemental retention of Deloitte Tax as tax professionals to CLH (Docket No. 254).

CLH also retained Deloitte & Touche LLP ("Deloitte Audit") to audit CLH's consolidated financial statements for the year ended December 31, 2009. On May 21, 2010 the Bankruptcy Court entered an order approving the retention of Deloitte Audit as audit professionals to CLH (Docket No. 110).

### 2. Joint Administration and Schedules

Pursuant to an order of the Bankruptcy Court dated December 10, 2009 (the "Joint Administration Order") (Docket No. 19), the Chapter 11 Cases are being jointly administered for procedural purposes only. No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

On December 22, 2009, each Debtor filed its Statement of Financial Affairs and Schedules of Assets and Liabilities (the "Schedules") with the Bankruptcy Court. (Docket Nos. 39–42).

As of the date of this Disclosure Statement, there are two proofs of Claim filed against the Debtors, a contingent claim filed in an unliquidated amount, and one in the amount of $26,365.85.[9] To the extent these Claims have not already been satisfied, such Claims will be treated in accordance with the Plan.

### B. Continuation of Business After Petition Date

### 1. Operations

Since the Petition Date, the Debtors have been authorized to continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

---

[9] Another proof of claim in the amount of $13,100,823.26, filed by the Internal Revenue Service on the claims register of CLH, was subsequently withdrawn on July 12, 2010 (Docket No. 135).

## 2. Insurance

Prior to the Petition Date, CLH nominally maintained a workers' compensation insurance program and various other insurance programs for, among other things, general liability, directors' and officers' and employment practices liabilities, auto liability, and international property and liability (collectively, the "Insurance Programs") provided by several insurance carriers (the "Insurance Providers"). Because CLH is a holding company with no employees or operations, most of these insurance policies were held by CLH in name only for the benefit of the Non-Debtor Subsidiaries. As a precautionary measure, CLH sought Bankruptcy Court approval to (i) continue the Insurance Programs and (ii) pay or cause the Non-Debtor Subsidiaries to pay claims in respect thereof, including, without limitation, all premiums, claims, deductibles, administrative expenses, brokerage fees, and all other charges and expenses incurred, consistent with practices in effect prior to the Petition Date, whether relating to the period prior to or after the Petition Date. On March 19, 2010, the Bankruptcy Court entered an order approving CLH's motion.

Subsequently, certain of the Non-Debtor Subsidiaries, as the operating companies for whose benefit most of the Insurance Programs were maintained, arranged for the Insurance Providers to reissue policies directly in their names as such policies were renewed. CLH remains an additional named insured on most such policies. Currently, to the Debtors' knowledge, only the policy covering directors and officers and executive liability has been maintained in CLH's name.

## V.

## SUMMARY OF PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS UNDER THE PLAN AND WILL, UPON THE PLAN EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST.

**A.**     **Administrative Claims, Priority Tax Claims, and Intercompany Claims and Intercompany Interests**

**1.**     **Administrative Claims**

Each Holder of an Allowed Administrative Claim will receive payment in full in Cash of the unpaid portion of such Allowed Administrative Claim (a) in the case of Professional Fee Claims and expenses for advisors to the Debtors, as soon as practicable after Bankruptcy Court approval thereof, as described more fully in Section 3.2 below, or, in the case of professionals retained by the Debtors in the ordinary course of their business, if any, on such terms as are customary between the Debtors and such professionals; (b) with respect to all other Holders of Allowed Administrative Claims, on, or as soon thereafter as reasonably practicable, the later of (i) the Plan Effective Date; (ii) the first Business Day that is thirty (30) calendar days after the date an Administrative Claim becomes an Allowed Claim, and (iii) the date on which such payment would be made in the ordinary course of the Debtors' business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements or regulations governing, instruments evidencing or other documents relating to such transactions; or (c) with respect to any Claims described in clauses (a) and (b) hereof, as otherwise agreed by the Holder of such Claim and the Debtors.

**2.**     **Professional Fee Claims**

All entities seeking awards by the Bankruptcy Court of Professional Fee Claims shall File and serve on counsel for the Reorganized Debtors, the Committee, if any, the U.S. Trustee, and any other party specifically requesting a copy in writing, an application for its Professional Fee Claim no later than forty (40) days after the Plan Effective Date and be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Professional Fee Claim, including any amount previously held back, if any. Any interested party desiring to object to any Professional Fee Claim must File and serve its objection on the Reorganized Debtors, the Committee, if any, the U.S. Trustee, and the affected Professional Person no later than sixty (60) days after the Plan Effective Date.  Notwithstanding anything else provided herein, the Reorganized Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

**3.**     **Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall, in full satisfaction, release and discharge of such Allowed Priority Tax Claim, receive, in the Reorganized Debtors' discretion, (a) on the applicable Distribution Date, Cash in an amount equal to such Allowed Priority Tax Claim, (b) such other treatment as to which the Debtors and the Holder of such Allowed Priority Tax Claim have agreed upon in writing, (c) deferred Cash payments following the Plan Effective Date over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim, or (d) such other treatment as will cause such Claim not to be Impaired; *provided, however*, that any such Priority Tax Claim not due and owing on the Plan Effective Date will be paid when such Claim becomes due and owing.

### 4. Intercompany Claims and Intercompany Interests

Notwithstanding anything to the contrary contained in the Plan, Intercompany Claims and Intercompany Interests shall be Unimpaired and shall remain in full force and effect after the Plan Effective Date, provided that such Intercompany Claims are subject to the requirements of and restrictions (including, without limitation, the relative ranking and priority of such Intercompany Claims) contained in the New Indentures.

### B. Classification and Treatment of Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Intercompany Claims and Intercompany Interests, and Priority Tax Claims have not been classified and thus the Holders thereof are excluded from the Classes of Claims entitled to vote on the Plan.

### 1. Summary of Classification

All Claims and Equity Interests, other than the Administrative Claims, Professional Fee Claims, Intercompany Claims and Intercompany Interests, and Priority Tax Claims, are classified in the Classes set forth in Section 4 of the Plan for all purposes, including voting, Confirmation, and distributions pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Equity Interest is classified in a particular Class only to the extent that such Claim or Equity Interest is within the description of that Class and is classified in another Class to the extent that any remainder of such Claim or Equity Interest belongs within such other Class or Classes. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Equity Interest in the Class and has not been paid, released, or otherwise satisfied prior to the Plan Effective Date.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| T1 | Other Priority Claims against Tubo | Unimpaired | Deemed to Accept |
| T2 | Other Secured Claims against Tubo | Unimpaired | Deemed to Accept |
| T3 | Noteholder Pledge Claims | Impaired | Entitled to Vote |
| T4 | General Unsecured Claims against Tubo | Unimpaired | Deemed to Accept |
| T5 | Equity Interests in Tubo | Unimpaired | Deemed to Accept |
| C1 | Other Priority Claims against CLH | Unimpaired | Deemed to Accept |
| C2 | Other Secured Claims against CLH | Unimpaired | Deemed to Accept |
| C3 | Unsecured Parent Guaranty Claims | Impaired | Entitled to Vote |
| C4 | General Unsecured Claims against CLH | Unimpaired | Deemed to Accept |
| C5 | Equity Interests in CLH | Unimpaired | Deemed to Accept |

NY3 3093898.3

## 2.     Treatment of Claims and Equity Interests

To the extent a Class contains Allowed Claims or Equity Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

### (a)     Classes T1 and C1– Other Priority Claims

*Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed Priority Claim shall have its Claim Reinstated to the extent such Claim is not paid in the ordinary course of business prior to the Plan Effective Date.

*Voting*:  Classes T1 and C1 are Unimpaired under the Plan and, consequently, the Holders of Other Priority Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

### (b)     Classes T2 and C2– Other Secured Claims

*Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall have its Claim Reinstated and shall retain its Lien, to the same extent in existence and valid as of the Plan Effective Date, on the property that secures each such Claim, to the extent such Claim is not paid in the ordinary course of business prior to the Plan Effective Date.

*Voting*:  Classes T2 and C2 are Unimpaired under the Plan and, consequently, the Holders of Other Secured Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

### (c)     Class T3 – Noteholder Pledge Claims

*Allowance*:  On the Plan Effective Date, the Noteholder Pledge Claims shall be deemed Allowed in full.

*Treatment*:  Each Holder of a Noteholder Pledge Claim as of the Distribution Record Date shall receive on the Plan Effective Date, in accordance with the Restructuring Transactions, in full and final satisfaction of each such Holder's Allowed Noteholder Pledge Claim, New Series A Notes to be issued by IUSA in the principal amount equal to U.S.$1,143.22, which is equal to (i) the 2016 Base Amount, plus (ii) the amount of accrued and unpaid interest on such 2016 Base Amount from May 15, 2009 through November 15, 2011, at an interest rate of 4.75% per annum compounded quarterly, plus (iii) a restructuring fee equal to the sum of (a) the 2016 Notes Restructuring Fee, and (b) the interest accrued on the 2016 Notes Restructuring Fee from May 15, 2011 through November 15, 2011, at an interest rate of 4.75% per annum compounded quarterly, which New Series A Notes shall be guaranteed by Tubo and secured by a pledge of the capital stock of CLH (along with other guarantees and collateral from members of the IUSA Group).

*Voting*:  Class T3 is Impaired under the Plan and, consequently, the Holders of Allowed Noteholder Pledge Claims are entitled to vote on the Plan.

### (d)  Class C3 – Unsecured Parent Guaranty Claims

*Allowance*:  On the Plan Effective Date, the Unsecured Parent Guaranty Claims shall be deemed Allowed in full.

*Treatment:*  Each Holder of an Unsecured Parent Guaranty Claim as of the Distribution Record Date shall receive on the Plan Effective Date, in accordance with the Restructuring Transactions, in full and final satisfaction of each such Holder's Allowed Unsecured Parent Guaranty Claim, New Series A Notes to be issued by IUSA in the principal amount of U.S.$1,036.18, which is equal to (i) the ESBDS I Base Amount, plus (ii) the amount of accrued and unpaid interest on such ESBDS I Base Amount from October 12, 2010 through November 15, 2011, at the ESBDS I Interest Rate, compounded quarterly, plus (iii) a restructuring fee equal to the sum of (a) the ESBDS I Restructuring Fee, and (b) the interest accrued on the ESBDS I Restructuring Fee from May 15, 2011 through November 15, 2011, at the ESBDS I Interest Rate compounded quarterly, which New Series A Notes shall be guaranteed by Tubo and secured by a pledge of the capital stock of CLH (along with other guarantees and collateral from members of the IUSA Group).

*Voting*:  Class C3 is Impaired under the Plan and, consequently, the Holders of Allowed Unsecured Parent Guaranty Claims are entitled to vote on the Plan.

### (e)  Classes T4 and C4 – General Unsecured Claims

*Treatment:*  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall have its Claim Reinstated to the extent that such Claim is not paid in the ordinary course of business prior to the Plan Effective Date.

*Voting*:  Classes T4 and C4 are Unimpaired under the Plan and, consequently, the Holders of General Unsecured Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

### (f)  Classes T5 and C5 – Equity Interests

*Treatment*:  The Equity Interests are unaltered by the Plan and each Holder of Equity Interests will retain its interests to the same extent as if the Chapter 11 Cases had not been commenced.

*Voting*:  Classes T5 and C5 are Unimpaired under the Plan and, consequently, the Holders of Equity Interests are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

NY3 3093898.3

### C. Acceptance or Rejection of Plan

#### 1. Acceptance or Rejection of Plan

##### (a) Voting Classes

Classes T3 and C3 are Impaired under the Plan, and Holders of Claims in Classes T3 and C3 are entitled to vote on the Plan.

##### (b) Presumed Acceptance of Plan

Classes T1, C1, T2, C2, T4, C4, T5 and C5 are Unimpaired under the Plan and, therefore, are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

#### 2. Acceptance by Impaired Classes

An Impaired Class of Claims shall have accepted the Plan if (i) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

### D. Treatment of Executory Contracts and Unexpired Leases

#### 1. Assumption

Except as otherwise provided in the Plan or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, each Executory Contract of the Debtors that has not expired by its own terms before the Plan Effective Date that: (1) is listed on the Schedule of Assumed Contracts; (2) is not rejected prior to the Plan Effective Date; (3) is not the subject of a motion to reject Filed on or before the Confirmation Date upon which the Bankruptcy Court has not entered an Order; (4) is not listed on the Schedule of Rejected Contracts; or (5) has not been otherwise modified or superseded by agreement of the parties thereto, shall be deemed to have been assumed by the applicable Debtor as of the Plan Effective Date, pursuant to section 365 of the Bankruptcy Code. Nothing in the Plan, any annex to the Plan, or any document executed or delivered in connection with the Plan or any such annex creates any obligation or liability on the part of the Debtors, the Reorganized Debtors or any other person or entity that is not currently liable for such obligation, with respect to any Executory Contract except as otherwise provided in the Plan. In addition, the Confirmation Order shall constitute a finding of fact and conclusion of law that (i) each Executory Contract assumed under the Plan is an executory contract which may be assumed by the Debtors, (ii) there are no defaults of the Debtors, no cure amounts owing pursuant to section 365(b)(i) of the Bankruptcy Code (the "Cure Amount"), no compensation due for any actual pecuniary loss, and there is adequate assurance of future performance with respect to each Executory Contract, (iii) such assumption is in the best interest of the Debtors and their estates, (iv) upon the Plan Effective Date, the assumed Executory Contracts constitute legal, valid, binding, and enforceable

contracts in accordance with the terms thereof, and (v) the counterparty to each assumed Executory Contract is required to and ordered to perform under and honor the terms of the assumed Executory Contract.

Each Executory Contract assumed pursuant to Section 6.1 of the Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan. Nothing in the Plan or any Plan Document shall create any obligation or liability on the part of any Debtor, any Reorganized Debtor or any other Person that does not currently have such liability or obligation, with respect to any Executory Contract.

Each Executory Contract that is assumed shall include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract and (ii) all Executory Contracts appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements, or franchises, and any other interests in real estate or rights *in rem* related to such premises, but excluding any agreement rejected pursuant to an order of the Bankruptcy Court.

In the event of a dispute (each, a "Cure Dispute") regarding: (i) the Cure Amount; (ii) the ability of the applicable Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract to be assumed; or (iii) any other matter pertaining to the proposed assumption, any party in interest may file an objection to confirmation pursuant to the procedures established in the order approving this Disclosure Statement. Any objection that raises a Cure Dispute must identify the disputed Executory Contract and set forth with particularity the basis of the Cure Dispute. To the extent a Cure Dispute relates solely to the Cure Amount, the applicable Debtor may assume the applicable Executory Contract prior to the resolution of the Cure Dispute provided that such Debtor reserves Cash in an amount sufficient to pay the full amount asserted as cure payment by the non-Debtor party to such Executory Contract (or such smaller amount as may be fixed or estimated by the Bankruptcy Court). Any party that fails to object shall be forever barred, estopped, and enjoined from raising a Cure Dispute in the Bankruptcy Court, in any other court, in any arbitration or otherwise.

The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the assumptions described above, as of the Plan Effective Date. Each Executory Contract assumed pursuant to the Plan shall be assumed only to the extent that any such contract or lease constitutes an Executory Contract. Assumption of a contract or lease pursuant to the Plan shall not constitute an admission by the Debtors, the Reorganized Debtors or the Plan Proponents (as applicable) that such contract or lease is an Executory Contract or that the Debtors or the Reorganized Debtors (as applicable) have any liability thereunder. All Executory Contracts that are assumed will be assumed under their present terms or upon such terms as are agreed to in writing between the applicable Debtor and the counterparty to such contract or lease.

NY3 3093898.3

## 2. Rejection

Effective immediately prior to the Plan Effective Date, each Executory Contract of the Debtors listed on the Schedule of Rejected Contracts is rejected, to the extent, if any, each constitutes an executory contract or unexpired lease, and without conceding that each constitutes an executory contract or unexpired lease or that the Debtors have any liability under each. Listing a contract or lease on the Schedule of Rejected Contracts is not deemed an admission by the Debtors or the Reorganized Debtors that such contract is an Executory Contract or that the Debtors or the Reorganized Debtors have any liability thereunder or under the Plan. The Debtors reserve the right at any time before Confirmation to amend the Schedule of Rejected Contracts, including to (a) delete any Executory Contract on such Schedule and provide for its assumption or (b) add any Executory Contract to such Schedule, thus providing for its rejection. The Debtors shall provide notice of any amendment of such Schedule to the party to the affected executory contract or unexpired lease and the U.S. Trustee.

The Confirmation Order shall constitute an Order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving all such rejections as described above, as of the Plan Effective Date. If the rejection by the Debtors, pursuant to the Plan or otherwise, of an Executory Contract results in a Claim that is not theretofore evidenced by a timely filed proof of claim or a proof of claim that is deemed to be timely filed under applicable law, then such Claim shall be forever barred and shall not be enforceable against the Debtors or Reorganized Debtors, or the properties of the Debtors or Reorganized Debtors, unless a proof of claim for damages arising from the rejection under the Plan of an Executory Contract is Filed within thirty (30) days after the mailing of notice of Confirmation. Any such Claims that become Allowed Claims shall be classified in Class T4 or C4 of the Plan, as applicable.

## 3. Indemnification of Directors, Officers and Employees

For purposes of the Plan, the obligation of a Debtor to exculpate, indemnify, and advance any expenses to any Person serving at any time before, on, or after the Petition Date as one of its current, former, or future directors or officers (each, an "Indemnitee") by reason of such Person's service in such capacity, for acts or omissions occurring at or prior to the consummation of the Plan, whether asserted or claimed prior to, at or after the consummation of the Plan, to the extent provided in such Debtor's Corporate Documents, a written agreement with the Debtor, in accordance with any applicable law, or any combination of the foregoing or otherwise, shall: (a) survive confirmation of the Plan and the Plan Effective Date and continue in full force and effect (and not be modified, amended, or terminated in any manner adverse to any Indemnitee without the written consent of the affected Indemnitee); (b) become an obligation of the applicable Reorganized Debtor; and (c) not be discharged in accordance with section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Petition Date.

## 4. D&O Liability Insurance Policies

Notwithstanding anything in the Plan to the contrary, as of the Plan Effective Date, the Debtors shall assume (and assign to any of the Reorganized Debtors as necessary to continue the D&O Liability Insurance Policies in full force) all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall

constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

### 5. Compensation and Benefits Plans

Except and to the extent previously assumed by an order of the Bankruptcy Court, on or before the Confirmation Date, all employee compensation and Benefit Plans, including Benefit Plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as if they were, Executory Contracts that are to be assumed hereunder. The Debtors' obligations under such plans and programs shall survive confirmation of the Plan, except for (1) employee compensation plans or Benefit Plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code) and (2) such employee compensation plans or Benefit Plans as have previously been rejected, are the subject of a motion to reject as of the Confirmation Date or have been specifically waived by the beneficiaries of any of such Benefit Plans or employee compensation plans.

Neither of the Debtors is a sponsor of a defined benefit pension plan under ERISA. However, the Retirement Plan Sponsor, a Non-Debtor Subsidiary, is the sponsor of the Retirement Plan that has been frozen since 1993. As of the most recent FAS valuation of the Retirement Plan for the fiscal year ended December 31, 2009, the Retirement Plan was adequately funded, with funding in excess of the aggregate pension benefit obligations under the Retirement Plan. After the Plan Effective Date, the respective obligations, if any, of the Reorganized Debtors and the Retirement Plan Sponsor will be reinstated under the Plan.

### E. Provisions Governing Distributions

### 1. Timing and Calculation of Amounts to Be Distributed

Except as otherwise provided in the Plan, on the Plan Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Plan Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors as of the Distribution Record Date shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided in the Plan. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Section 7.5 of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Plan Effective Date.

### 2. No Duplication of Recoveries on Series A Eligible Debt

For the avoidance of doubt, a Holder of a Noteholder Pledge Claim or a Holder of an Unsecured Parent Guaranty Claim shall only be entitled to receive a single recovery on account of such Holders' claims against the primary obligor, guarantor, or pledgor, arising under the Old 2016 Notes or the ESBDS I Loan, as applicable (i.e., a Claim for $1,000 unpaid principal amount of Old 2016 Notes and a related Claim against Tubo in respect of any pledged stock of CLH shall be deemed to be a single Noteholder Pledge Claim for $1,000 principal amount of Old 2016 Notes). Similarly, a Claim for $1,000 unpaid principal amount arising under the ESBDS I Loan against IUSA, as guarantor, and any related claims against IUSA, S.A. de C.V., as borrower, or any other member of the IUSA Group in respect of the ESBDS I Loan shall be deemed to be a single Unsecured Parent Guaranty Claim for $1,000 principal amount arising under the ESBDS I Loan).

### 3. Disbursing Agent

Except as otherwise provided in the Plan, all distributions under the Plan shall be made on the Plan Effective Date by the Reorganized Debtors as Disbursing Agents or such other Entity designated by the Reorganized Debtors as a Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. In the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

Distributions of the New Series A Notes on account of the Old 2016 Notes shall be made by IUSA to the Indenture Trustee for the benefit of the Holders of the Noteholder Pledge Claims.

### 4. Rights and Powers of Disbursing Agent

#### (a) Powers of Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

#### (b) Expenses Incurred On or After Plan Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Plan Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors. Notwithstanding the foregoing, the Reorganized Debtors shall have no obligation to pay any fees or expenses incurred, or any compensation or expense reimbursement claims made, by IUSA on account of the distributions of the New Series A Notes.

NY3 3093898.3

**5.    Distributions on Account of Claims Allowed After Plan Effective Date**

**(a)    Payments and Distributions on Disputed Claims**

Distributions made after the Plan Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Plan Effective Date but which later become Allowed Claims shall be deemed to have been made on the Plan Effective Date.

**(b)    Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Reorganized Debtors, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

**6.    Delivery of Distributions and Undeliverable or Unclaimed Distributions**

**(a)    Delivery of Distributions in General**

Except as otherwise provided in the Plan, the Reorganized Debtors shall make distributions to Holders of Allowed Claims, except for Holders of Allowed Claims in Class T3, at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; and provided, further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in the Debtors' books and records or, as applicable, any Proof of Claim filed by that Holder.  Distributions of New Series A Notes of the Reorganized Debtors to Holders of Allowed Claims in Class T3 shall be made to the Indenture Trustee for the benefit of the Holders of the Noteholder Pledge Claims as provided in the Plan.  The Indenture Trustee shall, in turn, promptly administer the distributions to the Holders of Allowed Noteholder Pledge Claims, in accordance with the Plan and the Existing Indenture.

**(b)    Distributions Free and Clear**

Except as otherwise provided in the Plan, any distributions under the Plan and the issuance and distribution of the New Notes shall be free and clear of any Liens, Claims and encumbrances, and no other entity, including but not limited to the Debtors, the Reorganized Debtors, or the members of the IUSA Group shall have any interest, legal, beneficial or otherwise, in assets transferred to holders of Allowed Claims or Eligible Debt pursuant to the Plan; provided, however, that nothing in the Plan shall affect the Indenture Trustee's charging lien, which lien is expressly preserved and shall survive confirmation of the Plan and the Plan Effective Date.

NY3 3093898.3

**(c)       Undeliverable Distributions and Unclaimed Property**

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Plan Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors or IUSA, as applicable (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such Claim shall be discharged and forever barred.

**(d)       Compliance with Tax Requirements/Allocations**

In connection with the Plan, to the extent applicable, the Reorganized Debtors and/or the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens and encumbrances. Except as otherwise provided herein, distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. For the avoidance of doubt, nothing contained herein shall require the Indenture Trustee to comply with any tax withholding or reporting requirements in connection with the distributions to be made to the Noteholders.

**(e)       Setoff**

Each Debtor and each Reorganized Debtor may withhold (but not set off except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim (other than a Noteholder Pledge Claim or the Unsecured Parent Guaranty Claim) an amount equal to any claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim. In the event that any such claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim) the amount of any adjudicated or resolved claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim, but only to

29

the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claims, Equity Interests, rights, and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such Holder, except as specifically provided in the Plan.

### F.    Means for Implementation of Plan

#### 1.    Continued Corporate Existence

The Reorganized Debtors shall continue to exist after the Plan Effective Date as separate corporate entities in accordance with applicable law under their respective Corporate Documents, except to the extent such Corporate Documents may be amended including to comply with section 1123(a)(6) of the Bankruptcy Code, without the need for any further corporate action. Any proposed amendments to the Corporate Documents, including but not limited to any changes in the corporate and organizational structure of the Debtors, shall be filed in the Plan Supplement. On and after the Plan Effective Date, the Corporate Documents, as so amended, if necessary, shall continue to govern the Reorganized Debtors' operations. After the Plan Effective Date, the Reorganized Debtors shall be authorized to (i) establish new by-laws or corporate charters for either of the Reorganized Debtors, and/or (ii) change the corporate structure (e.g., corporation to limited liability company) of either Reorganized Debtor under the law of its applicable jurisdiction of organization, without further order of the Bankruptcy Court.

#### 2.    Revesting of Assets

Except as otherwise set forth in the Plan or in the Confirmation Order, as of the Plan Effective Date, the property of the Estates, together with any property of the Debtors that is not property of the Estates and that is not specifically disposed of pursuant to the Plan, shall revest in the applicable Reorganized Debtors free and clear of all Claims, Liens, encumbrances and other interests of the Holders of Claims or Equity Interests. Thereafter, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, Bankruptcy Rules, and Bankruptcy Court.

#### 3.    Operation of Business and Properties

Without limiting the generality of the foregoing, all rights, privileges, entitlements, authorizations, grants, permits, licenses, easements, franchises, and other similar items which constitute part of, or are necessary or useful in the operation of the property or the business of the Debtors or the Reorganized Debtors, whether in the United States, Mexico or elsewhere, shall be vested in the applicable Reorganized Debtors on the Plan Effective Date, and shall thereafter be exercisable and usable by the Reorganized Debtors to the same extent they would have been exercisable and usable by the Debtors before the Petition Date or by the Estates or Debtors in Possession during the pendency of the Chapter 11 Cases.

#### 4.    Retention of Causes of Action

Except to the extent any Causes of Action are expressly and specifically waived, released or abandoned under the Plan or the Confirmation Order, or pursuant to any contract, instrument,

release, or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code: (1) any and all Causes of Action accruing to any Debtor or its Estate against any Person shall remain assets of and vest in the applicable Reorganized Debtor, whether or not litigation relating thereto is pending on the Plan Effective Date, and whether or not such Causes of Action have been listed or referred to in the Plan, the Disclosure Statement, the Schedule of Retained Causes of Action, or any other document Filed with the Bankruptcy Court; and (2) neither any Debtor nor any Reorganized Debtor waives, relinquishes, or abandons (nor shall they be estopped or otherwise precluded from asserting) any Causes of Action: (a) whether or not such Causes of Action have been listed or referred to in the Plan, the Disclosure Statement, the Schedule of Retained Causes of Action, or any other document Filed with the Bankruptcy Court; (b) whether or not such Causes of Action are currently known to the Debtors; and (c) whether or not a defendant in any litigation relating to such Causes of Action Filed a Proof of Claim, a notice of appearance or any other pleading or notice in the Chapter 11 Cases, voted for or against the Plan, or received or retained any consideration under the Plan. Without in any manner limiting the generality of the foregoing, notwithstanding any otherwise applicable principle of law or equity, including, without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion or any similar doctrine, the failure to list, disclose, describe, identify, or refer to any Causes of Action in the Plan, the Schedule of Retained Causes of Action or any other document Filed with the Bankruptcy Court shall in no manner waive, eliminate, modify, release, or alter the Reorganized Debtors' right to commence, prosecute, defend against, settle, and realize upon any Causes of Action that any Debtor or any Reorganized Debtor has, or may have, as of the Confirmation Date.

Without limiting the generality of the foregoing, except as otherwise provided in the Plan, the Confirmation Order, any other order of the Bankruptcy Court or any Plan Document, nothing shall affect any Debtor's or Reorganized Debtor's rights and defenses, both legal and equitable, with respect to any Disputed Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against such Claims.

Due to the Plan's Unimpaired and/or agreed treatment of Claims, the Debtors and the Reorganized Debtors waive their rights to institute or prosecute any Avoidance Actions.

### 5. Cancellation of Existing Agreements

Except as provided in Section 8.5.3 of the Plan, or otherwise expressly provided in the Plan or the Confirmation Order, on the Plan Effective Date, the Existing Indenture, the Existing Pledge Agreement and any and all notes, instruments or other documents evidencing the Old 2016 Notes, the Noteholder Pledge Claims, the ESBDS I Loan and the Unsecured Parent Guaranty Claims shall be deemed cancelled, extinguished, discharged, and of no further force and effect, and, upon the delivery to the Holders of the Allowed Noteholder Pledge Claims and Allowed Unsecured Parent Guaranty Claims their ratable distribution of the New Series A Notes as set forth in Section 4 of the Plan, the obligations of the Debtors, the Non-Debtor Subsidiaries, IUSA, the Existing Guarantors, the Indenture Trustee, and any of their respective affiliates to the Holders of the Old 2016 Notes and ESBDS I Loan for obligations and/or duties arising under or related to the Old 2016 Notes and the ESBDS I Loan, respectively, shall be discharged. The Indenture Trustee is authorized to take whatever action may be necessary or appropriate (in each case, as requested by Tubo or reorganized Tubo) to effectuate the terms and conditions specified herein. Without limiting the generality of the foregoing, the Indenture Trustee shall be expressly

31

obligated to deliver to the Debtors, the Reorganized Debtors or the New Indenture Trustee, as directed by the Debtors, the shares pledged pursuant to the New Pledge Agreement to be held as collateral for the New Series A Notes.

For the avoidance of doubt, Section 8.5 of the Plan shall apply only to notes, instruments or other documents which evidence the Old 2016 Notes, the ESBDS I Loan and any guaranties and pledges thereunder, and except as otherwise expressly provided in the Plan or the Confirmation Order, all other notes, instruments, and other documents evidencing Claims against any Debtor shall continue in full force and effect after the Plan Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

Notwithstanding the foregoing, the Existing Indenture, the Old 2016 Notes and the Existing Pledge Agreement, shall continue in effect for the purposes of allowing (a) the Holders of the Noteholder Pledge Claims to receive their distributions under the Plan, (b) IUSA and/or the Indenture Trustee to make all distributions on account of the Allowed Noteholder Pledge Claims pursuant to the Plan and to perform any other necessary administrative functions with respect thereto, and (c) permitting the Indenture Trustee to assert its charging lien against such distribution for payment of any fees and expenses.

### 6.    Satisfaction of Copper Debt and Commercial Paper

Simultaneous with the solicitation of acceptances and rejections of the Plan by holders of Claims against the Debtors and as a prerequisite to the Plan Effective Date thereunder, pursuant to the Consensual Exchange, IUSA is requesting holders of the Copper Debt and the Commercial Paper to exchange their Copper Debt or Commercial Paper, as applicable, for New Series B Notes.  Pursuant to the Consensual Exchange, and consistent with the Plan, IUSA will issue the New Series B Notes pursuant to the Plan in exchange for the Series B Eligible Debt held by the holders of Copper Debt and Commercial Paper.  Upon the delivery to the holders of the Copper Debt and Commercial Paper their ratable distribution of the New Series B Notes, as set forth in the Consensual Exchange Documents, the obligations of IUSA, and any of its affiliates to the holders of the Copper Debt and Commercial Paper for obligations arising under the Series B Eligible Debt held by such holder, respectively, shall be fully discharged, released and satisfied. For a further description of the exchanges pursuant to the Consensual Exchange, please refer to the Restructuring Agreement, attached hereto as <u>Exhibit 3</u>, and the Information Memorandum, attached hereto as <u>Exhibit 5</u>.

### 7.    New Notes

A full description of the New Series A Notes and New Series B Notes is attached hereto as <u>Exhibit 4</u>, and the New Indentures shall be included in the Plan Supplement.

The New Notes will be IUSA's direct senior obligations and be guaranteed by substantially all of IUSA's existing and future direct and indirect Mexican subsidiaries (except certain excluded subsidiaries identified in the New Indentures, the "<u>Excluded Businesses</u>").  The New Notes will mature on November 15, 2016 and accrue interest at a rate of 11.50% per annum.

The New Notes will be secured by, with respect to IUSA and its direct and indirect subsidiaries (other than the Excluded Businesses and CLH and its direct and indirect subsidiaries) (i) all future and current real property, including land and buildings; (ii) substantially all other future and current unencumbered long-term assets, properties and machinery and equipment, including, without limitation, all owned capital stock (other than capital stock of subsidiaries and IUSA-GE); (iii) 30% of the future and current amounts in a lockbox account related to royalties for the use of certain payment cards in Mexico; (iv) all capital stock of IUSA's future and current direct and indirect Mexican Subsidiaries, except the Excluded Businesses; (v) a second priority lien on currently encumbered assets; and (vi) the proceeds of each of the assets described in (i) through (v) above.

In addition, the New Series A Notes (but not the New Series B Notes) will be secured by a first-priority pledge of capital stock of CLH.

## 8. Restructuring Transactions

The Consensual Exchange is an integral part of the Plan. The Plan Proponents believe that the Consensual Exchange is in the best interests of the Debtors' creditors and the Estates and that the Consenting Creditors would not agree to support the Plan absent consummation of the Consensual Exchange and issuance of the New Series B Notes pursuant to the Plan. On the Plan Effective Date, the following Restructuring Transactions shall be effectuated:

      (a)      IUSA shall enter into the New Indentures for the New Notes;

      (b)      IUSA shall issue and distribute the New Series A Notes to the (a) Holders of Old 2016 Notes/Allowed Noteholder Pledge Claims and (b) Holders of the ESBDS I Loan/ Allowed Unsecured Parent Guaranty Claims, in each instance in full and final satisfaction and discharge of all such obligations of any member of the IUSA Group with respect to such obligations;

      (c)      IUSA shall issue and distribute the New Series B Notes to the Holders of Series B Eligible Debt that have elected to participate in the Consensual Exchange, in each instance in full and final satisfaction and discharge of Series B Eligible Debt owed by any member of the IUSA Group with respect to such Series B Eligible Debt.

          (i)      Each holder of the Copper Base Amount shall receive pursuant to the terms of the Consensual Exchange in the Restructuring Agreement Series B Notes with a principal amount ranging from U.S.$1,100.34 to U.S.$1,121.73, depending on the Copper Debt Interest Accrual Date applicable to the specific series of Copper Debt, which is equal to (i) the Copper Debt Base Amount, plus (ii) the amount of accrued and unpaid interest on each component of such Copper Debt Base Amount from the applicable Copper Debt Interest Accrual Date through November 15, 2011, at an interest rate of 3.717% per annum compounded quarterly, plus (iii) a restructuring fee equal to the sum of (a) the Copper Debt Restructuring Fee, and (b) the interest accrued on the Copper Debt Restructuring Fee from May 15, 2011 through November 15, 2011, at an interest rate of 3.717% per annum compounded quarterly.

(ii)     Each holder of the 9.75% CP Base Amount shall receive pursuant to the terms of the Exchange Offer Series B notes with a principal amount equal to U.S.$1,129.265, which is equal to (i) the 9.75% CP Base Amount, plus (ii) the amount of accrued and unpaid interest on such 9.75% CP Base Amount from the stated maturity date of the 9.75% CP Base Amount through November 15, 2011, at an interest rate of 4.027% per annum compounded quarterly, plus (iii) a restructuring fee equal to the sum of (a) the 9.75% CP Restructuring Fee and (b) the interest accrued on the 9.75% CP Restructuring Fee from May 15, 2011 through November 15, 2011, at an interest rate of 4.027% per annum compounded quarterly.

(iii)    Each holder of the 12% CP Base Amount shall receive pursuant to the terms of the Exchange Offer Series B notes with a principal amount equal to U.S.$1,136.525, which is equal to (i) the 12% CP Base Amount, plus (ii) the amount of accrued and unpaid interest on such 12% CP Base Amount from the stated maturity date of the 12% CP Base Amount through November 15, 2011, at an interest rate of 4.957% per annum compounded quarterly, plus (iii) a restructuring fee equal to the sum of (a) the 12% CP Restructuring Fee, and (b) the interest accrued on the 12% CP Restructuring Fee from May 15, 2011 through November 15, 2011, at an interest rate of 4.957% per annum compounded quarterly.

(d)     Tubo, and each other subsidiary of IUSA that has agreed to guarantee the New Notes pursuant to the terms of the Restructuring Agreement, shall execute and deliver the New Indentures as a guarantor thereunder; and

(e)     Tubo shall execute and deliver the New Pledge Agreement.

**9.     Effectuating Documents; Further Transactions**

The entry of the Confirmation Order shall constitute a direction to and authorization for the Plan Proponents and the Reorganized Debtors (as the case may be) and their respective directors and officers to take or cause to be taken any action that they deem necessary or appropriate to consummate the transactions contemplated by the Plan and the Plan Supplement, and to execute any contracts, instruments, and other agreements or documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, in each case, without further order by the Bankruptcy Court.

The appropriate officers (including the chief executive officer, chief financial officer, president, treasurer, or any vice president thereof) of each Reorganized Debtor, each acting singly, shall be authorized to execute, deliver, file or record such contracts, instruments, releases, and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the transactions contemplated by the Plan and the Plan Supplement, without any requirement of further action by the board of directors or stockholders of the applicable Debtor.  The secretary, assistant secretary or other appropriate officer of each Reorganized Debtor shall be authorized to certify or attest to any of the foregoing actions.

### 10. Management of Reorganized Debtors

Subject to the New Corporate Documents, on the Plan Effective Date, the management, control, and operation of each Reorganized Debtor shall become the general responsibility of its respective board of directors in accordance with applicable non-bankruptcy law. Except as otherwise disclosed on or before the Confirmation Date, the individuals serving as members of the Board of Directors of each Debtor as of the Petition Date shall continue to serve as directors of each respective Reorganized Debtor. Subject to the New Corporate Documents, the directors of each Reorganized Debtor shall have the responsibility for the management, control, and operation of each respective Reorganized Debtor on and after the Plan Effective Date.

As part of the Plan Supplement, but in any event prior to the Confirmation Date, the Debtors will File a schedule disclosing such additional information as is necessary to satisfy section 1129(a)(5) of the Bankruptcy Code including the (1) identity and affiliation of any individual who is proposed to serve as an officer or director of any Reorganized Debtor; (2) identity of any other insider who will be employed or retained by any Reorganized Debtor; and (3) compensation for each such individual.

### G. Summary of Consensual Exchange

The effectiveness of the Plan is contingent upon the completion of all the Restructuring Transactions. Therefore, in order to fully provide means for the implementation of the Plan as required under section 1123(a)(5) of the Bankruptcy Code, the Plan provides for the issuance by IUSA of the New Series B Notes upon a successful completion of the Consensual Exchange.

### 1. Solicitation of Holders of Copper Debt and Commercial Paper

Simultaneous with the solicitation of acceptances and rejections of the Plan and as a prerequisite to the Plan Effective Date, IUSA and the Subsidiary Guarantors are soliciting holders of the Copper Debt and the Commercial Paper, through the Consensual Exchange, to exchange their Copper Debt or Commercial Paper, as applicable, for New Series B Notes. The Plan provides for IUSA and the Subsidiary Guarantors to issue the New Series B Notes in exchange for the Series B Eligible Debt held by the holders of Copper Debt and Commercial Paper. The New Series B Notes will be issued pursuant to section 1145 of the Bankruptcy Code. The holders of Copper Debt and Commercial Paper are not underwriters as that term is defined in section 1145 of the Bankruptcy Code. Holders of Copper Debt and Commercial Paper who elect to exchange their debt will receive New Series B Notes with a face value as provided for in Section 8(c) hereof.

The simultaneous consummation of the Consensual Exchange is a condition precedent to the Plan Effective Date.

### 2. New Series B Notes

A full description of the New Series A Notes and New Series B Notes is attached hereto as Exhibit 4.

### H. Discharge, Releases and Exculpation.

#### 1. Discharge

**Except as otherwise provided in the Plan or the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and Equity Interests of any nature whatsoever against the Debtors or any of their Estates, assets, properties or interests in property, and regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Equity Interests. Except as otherwise provided in the Plan, upon the Plan Effective Date, the Debtors shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims and Equity Interests, including, but not limited to, demands and liabilities that arose before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, regardless of whether or not: (a) a Proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) the Claim is Allowed, or (c) the Holder of a Claim based on such debt has accepted the Plan or is entitled to receive a distribution thereunder. Upon entry of the Confirmation Order, and subject to the occurrence of the Plan Effective Date, any Holder of such discharged Claim shall be precluded from asserting against the applicable Debtor or Reorganized Debtor, their successors and assigns, or their assets or properties any other or future Claims based upon any document, instrument, act or omission, transaction or other activity of any kind or nature that occurred before the Plan Effective Date. The Reorganized Debtors shall not be responsible for any Claims against or Equity Interests in the Debtors or the Debtors in Possession except (a) those payments and distributions expressly provided for or due under this Plan and (b) Claims and Equity Interests that are Unimpaired under the Plan and not previously satisfied in full.**

**In addition to the terms of Section 9.1.1 of the Plan, upon the Plan Effective Date, each Holder of a Noteholder Pledge Claim or an Unsecured Parent Guaranty Claim and any affiliate of such Holder shall be deemed to have waived, released and discharged IUSA and each member of the IUSA Group from any Liens, Claims, Causes of Action, rights or liabilities arising from the notes issued under, and the guarantees issued pursuant to, either of the Existing Indenture or the ESBDS I Loan. In addition, the Confirmation Order shall provide that the Indenture Trustee is authorized and directed to take all such actions necessary to effectuate the foregoing. Upon the Plan Effective Date, all such persons shall be forever precluded and enjoined from prosecuting or asserting any such discharged Claim against IUSA, the IUSA Group, the Reorganized Debtors, or any of their respective affiliates. Notwithstanding any other provision in the Plan to the contrary, the Indenture Trustee's charging lien shall not be discharged, released, or otherwise impaired by confirmation of the Plan.**

NY3 3093898.3

## 2. Exculpation

*To the extent permitted by applicable law and approved by the Bankruptcy Court, as of the Plan Effective Date, the Released Parties[10] and any attorneys, financial advisors, investment bankers, accountants, consultants, or other professionals of the Released Parties shall neither have nor incur any liability to, or be subject to any right of action by, any Holder of a Claim or Equity Interest, or any other party-in-interest, or any of their respective employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of these Chapter 11 Cases, including without limitation (i) formulating, negotiating and executing the Plan, this Disclosure Statement, the Restructuring Agreement and any related agreements, instruments or other documents, (ii) the solicitation of votes for and the pursuit of this Plan, (iii) the consummation of this Plan, or (iv) the implementation and administration of this Plan or the property to be distributed in conjunction with this Plan; provided, however, that the foregoing provision shall not apply to any Causes of Action arising out of an act or omission that is determined by a Final Order entered by a court of competent jurisdiction to have constituted actual or intentional fraud, willful misconduct, gross negligence, or criminal conduct.*

## 3. Release by Debtors and Plan Proponents

*To the extent permitted by applicable law and approved by the Bankruptcy Court, on the Plan Effective Date, for good and valuable consideration, including the service of the Released Parties to facilitate the restructuring of the Debtors and the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors and IUSA, in their individual capacities, and, as applicable, as debtors in possession on behalf of the Debtors' Estates, shall be deemed to have unconditionally released the Released Parties and any attorneys, financial advisors, investment bankers, accountants, consultants, or other professionals of the Released Parties from any and all claims, Causes of Action, obligations, rights, suits, damages, remedies, and liabilities whatsoever, including any claims that could be asserted on behalf of the Debtors (whether derivatively or otherwise) including chapter 5 actions, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that the Debtors or their subsidiaries would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Person, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Plan Effective Date; provided, however, that these releases shall not apply to any Causes of Action arising out of an act or omission that is determined by a Final Order entered by a court of competent*

---

[10] "Released Parties" means, collectively, (a) the Debtors, (b) each Non-Debtor Subsidiary, (c) IUSA, (d) the Subsidiary Guarantors, (e) the Indenture Trustee, (f) each Noteholder, (g) each Existing Guarantor, (h) the current directors, officers and employees of the Debtors, the Non-Debtor Subsidiaries, IUSA and other members of the IUSA Group, and (i) the officers, directors, employees, agents, affiliates, predecessors, successors and assigns of each of the parties described in clauses (a) through (h).

NY3 3093898.3

*jurisdiction to have constituted actual or intentional fraud, willful misconduct, gross negligence, or criminal conduct. The releases set forth in this paragraph shall be binding upon any chapter 7 trustee in the event the Chapter 11 Cases are converted to chapter 7.*

### 4. Releases by Holders of Claims

*Except as specifically set forth in the Plan or the Confirmation Order, to the fullest extent permitted by applicable law and approved by the Bankruptcy Court, on the Plan Effective Date, for good and valuable consideration, including the service of the Released Parties to facilitate the restructuring of the Debtors and the implementation of the restructuring contemplated by this Plan, the adequacy of which is hereby confirmed, each Holder of a Claim shall unconditionally release the Released Parties from any and all claims, Causes of Action, obligations, rights, suits, damages, remedies and liabilities whatsoever, including any claims that could be asserted on behalf of the Debtors (whether derivatively or otherwise) including chapter 5 actions, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that the Debtors or their subsidiaries would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Person, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Plan Effective Date, in any way relating or pertaining to, (x) the Debtors or Reorganized Debtors, (y) the Chapter 11 Cases or (z) the negotiation, formulation, implementation and preparation of the Restructuring Agreement, this Plan, the Disclosure Statement, and any related agreements, instruments or other document, <u>provided</u>, <u>however</u>, the foregoing provision shall not apply to any Causes of Action arising out of an act or omission that is determined by a Final Order entered by a court of competent jurisdiction to have constituted actual or intentional fraud, willful misconduct, gross negligence, or criminal conduct, <u>provided</u>, <u>further</u>, <u>however</u>, the foregoing provision shall not apply to any claim, Cause of Action, right, suit, damage or remedy against UCI held by GECC (or any other lender or holder of obligations, if any, related to the GECC Loan), or to any obligation or liability of UCI to GECC (or any other lender or holder of obligations, if any, related to the GECC Loan), arising from or related to the GECC Loan; <u>provided</u>, <u>further</u>, <u>however</u>, nothing in the Chapter 11 Cases, the Confirmation Order, the Plan, or section 1141 of the Bankruptcy Code shall in any way be construed to discharge, release, exculpate, limit, or relieve the Released Parties, or any other entity that may be liable with respect to the Cambridge-Lee Industries, Inc. Employees Retirement Plan or any other IUSA Group defined benefit plan from the claims of the PBGC or the Cambridge-Lee Industries, Inc. Employees Retirement Plan under any law, governmental policy, or regulatory provision, and the PBGC, the Cambridge-Lee Industries, Inc. Employees Retirement Plan, and any other IUSA Group defined benefit plan shall not be enjoined or precluded from enforcing such liability or responsibility by any of the provisions of the Plan, Confirmation Order, or section 1141 of the Bankruptcy Code. Nevertheless, the PBGC is not aware of any claims or causes of action as of the Plan Effective Date that the PBGC or the Cambridge-Lee Industries, Inc. Employee Retirement Plan would assert against the Released Parties, any member of the IUSA Group, or any other entity.*

NY3 3093898.3

## 5. Injunction

*Except as otherwise provided in the Plan or the Confirmation Order, and in addition to the injunction provided under sections 524(a) and 1141 of the Bankruptcy Code, all Persons who have held, currently hold or may hold a Claim or other debt or liability or Equity Interest which is released, discharged or terminated under the Plan, are permanently enjoined, on and after the Plan Effective Date, from taking any of the following actions against a Released Party or its property on account of such released, discharged or terminated Claims, debts, liabilities or Equity Interests: (1) commencing or continuing in any manner (including by directly or indirectly assisting or facilitating the commencement or continuation of) any action or other proceeding of any kind; (2) enforcing, levying, attaching, collecting or otherwise recovering in any manner any judgment, award, decree or order; (3) creating, perfecting or enforcing any lien or encumbrance of any kind; (4) except as provided in the Plan, asserting any setoff, right of subrogation or recoupment of any kind against any obligation due from any Released Party; and (5) commencing, continuing or in any manner taking part or participating in any action, proceeding or event (whether directly or indirectly) that would be in contravention of the terms, conditions and intent of the Plan. The foregoing injunction will extend to the benefit of the successors of the Released Parties and their respective properties and interests in property. Any Person injured by any willful violation of such injunction may recover actual damages, including costs and attorneys' fees and, in appropriate circumstances, may recover punitive damages from the willful violator.*

## 6. Term of Injunctions and Stays

**Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Plan Effective Date.**

## I. Claim Resolution Process

### 1. No Bar Date; No Proofs of Claim

Except as otherwise provided in the Plan, Holders of Claims against and Equity Interests in the Debtors shall not be required to file proofs of Claim or proofs of Equity Interest with the Bankruptcy Court. For the avoidance of doubt, holders of Claims that are Allowed pursuant to the terms of the Plan need not file proofs of claim as to the amounts expressly Allowed under the Plan.

### 2. Administrative Claim and Priority Tax Claims Allowed as Set Forth in Books and Records

Except as otherwise specified in this Plan, the amount set forth in the books and records of the applicable Debtor (or agreed to by the applicable Debtor and the Holder in the ordinary course) shall constitute the amount of the Allowed Administrative Claim and/or Allowed Priority Tax Claim of such Holder, subject to the right of such Holder to object to the amount of such Claim.

### J. Conditions to Confirmation and Plan Effective Date

#### 1. Conditions to Confirmation

Confirmation of the Plan shall not occur unless and until each of the conditions set forth below has been satisfied or duly waived by the Debtors:

(a) The Bankruptcy Court shall have entered an order in form and substance satisfactory to the Debtors, approving the Disclosure Statement used in connection with the solicitation of the votes with respect to the Plan as containing "adequate information" within the meaning of section 1125 of the Bankruptcy Code.

(b) The Confirmation Order, in form and substance satisfactory to the Debtors, shall have been entered by the Bankruptcy Court.

#### 2. Conditions to Effectiveness

The Plan Effective Date shall not occur unless and until each of the conditions set forth below has been satisfied or duly waived by the Debtors in accordance with Section 13.3 of the Plan:

(a) The Confirmation Order shall become a Final Order, shall not have been modified (except as consented to by the Debtors) and shall be in full force and effect.

(b) There shall not be in effect any order or law staying, restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by the Plan.

(c) No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

(d) All necessary consents, approvals and actions of, filings with and notices to any governmental or regulatory authority necessary to permit the Reorganized Debtors to perform their obligations under the Plan and to permit the Reorganized Debtors to consummate the transactions contemplated hereby shall have been duly obtained, made or given and shall be in full force and effect, and all terminations or expirations of waiting periods imposed by any governmental or regulatory authority necessary for the consummation of the transactions contemplated by the Plan shall have occurred.

(e) All conditions to the effectiveness of the Consensual Exchange and Restructuring Agreement shall have been satisfied or waived (to the extent capable of being waived) in accordance with the terms thereof; the Consensual Exchange and Restructuring Agreement shall be successfully completed simultaneously with the effectiveness of this Plan.

(f) All conditions precedent to the issuance of the New Notes shall have been satisfied or waived (to the extent capable of being waived) in accordance with the terms thereof and the Consensual Exchange shall be successfully completed simultaneously.

(g)     All other actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

### 3.     Waiver of Conditions

Each of the conditions set forth in Section 13.2 of the Plan may be waived in whole or in part by the Debtors, without any notice to parties in interest or the Bankruptcy Court and without a hearing; provided that, Sections 13.2.5 and 13.2.6 of the Plan may not be waived by the Debtors except as provided for in the Consensual Exchange, the Restructuring Agreement and the New Notes.  The failure to satisfy or waive any condition to the Plan Effective Date may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors or any of them).  The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

### 4.     Effects of Failure of Conditions

If, following entry of the Confirmation Order, the Restructuring Agreement has terminated in accordance with its terms prior to the occurrence of the Plan Effective Date, then the Confirmation Order shall be vacated, pursuant to Section 13.4 of the Plan, by the Bankruptcy Court without further notice or order.  If the Confirmation Order is vacated pursuant to Section 13.4 of the Plan, (a) the Debtors shall File a notice to this effect with the Bankruptcy Court, (b) the Plan shall be null and void in all respects, and (c) nothing contained in the Plan shall (x) constitute a waiver or release of any Claim against or Equity Interest in any Debtor or (y) prejudice in any manner the rights of the Debtors or the Holder of any Claim or Equity Interest.

## VI.

## FINANCIAL INFORMATION

As a condition to confirmation of a plan, section 1129(a)(11) of the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Plan Proponents' management and professionals have analyzed the ability of the Plan Proponents to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business. The Plan Proponents believe that the Plan satisfies this requirement.

The Projected Financial Statements (the "Projections") for the IUSA Group for the periods through 2016, which are set forth in Exhibit 6 to this Disclosure Statement, should be read in conjunction with **Section VII, "Certain Risk Factors To Be Considered"** and with **Section X, "Certain U.S. Federal Income Tax Consequences of Plan"** and with the assumptions, qualifications and footnotes to the tables containing the Projections (which include projected balance sheets and projected statements of cash flows) and the historical consolidated financial information (including the notes and schedules thereto) set forth in Exhibit 6. The

Projections have been prepared on a consolidated basis for all members of the IUSA Group that will be issuers or guarantors of the New Notes. The group as to whom the Projections have been prepared thus includes Tubo but excludes CLH and the Non-Debtor Subsidiaries.

**THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED. WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH HAVE NOT BEEN ACHIEVED TO DATE AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.**

**THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS. ACCORDINGLY, THE DEBTORS DO NOT INTEND, AND DISCLAIM ANY OBLIGATION TO, (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS ON OR PRIOR TO THE PLAN EFFECTIVE DATE OR TO HOLDERS OF NEW NOTES OR ANY OTHER PARTY AFTER THE PLAN EFFECTIVE DATE, (B) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), OR (C) SUBJECT TO THE TERMS OF ANY EXISTING CONFIDENTIALITY AGREEMENT BETWEEN IUSA AND ANY OF THE CONSENTING CREDITORS, OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.**

## VII.

## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, THE CONSENSUAL EXCHANGE DOCUMENTS AND ALL OTHER RELATED DOCUMENTS.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.  RISKS AND UNCERTAINTIES NOT PRESENTLY KNOWN TO THE DEBTORS, OR THAT THEY CURRENTLY DEEM IMMATERIAL, MAY ALSO HARM THEIR BUSINESSES.

NY3 3093898.3

## A.    General Bankruptcy Law Considerations

### 1.    Failure to Complete Consensual Exchange May Result in Delay or Failure of Plan

Although the Plan Proponents believe that the Consensual Exchange will be completed on an expeditious basis without the need for additional court processes, if the holders of less than 100% of the Copper Debt and 95% of the Commercial Paper tender their debt pursuant to the Restructuring Agreement and Consensual Exchange, respectively, the Plan Proponents may consummate the Consensual Exchange through alternative means.  Additionally, there is no guaranty that IUSA would be able to consummate the Consensual Exchange in such circumstances.  If IUSA cannot consummate the Consensual Exchange, the Plan will not be able to be consummated.  If the Plan cannot be consummated, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans would be on terms as favorable to the Holders of Claims against and Equity Interests in any Debtor as the terms of the Plan.  If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be substantially eroded to the detriment of all stakeholders.

### 2.    Failure to Obtain Confirmation of Plan May Result in Liquidation or Alternative Plan on Less Favorable Terms

Although the Plan Proponents believe that the Plan will satisfy all requirements for Confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not be sufficiently material as to necessitate the resolicitation of votes on the Plan.  In the event that Classes T3 and C3 fail to accept the Plan in accordance with section 1126(c) and 1129(a)(8) of the Bankruptcy Code, the Debtors reserve the right to modify the Plan in accordance with Section 12.7 thereof.

If the Plan is not confirmed, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans would be on terms as favorable to the Holders of Claims against and Equity Interests in any Debtor as the terms of the Plan.  If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be substantially eroded to the detriment of all stakeholders.

### 3.    Failure of Occurrence of Plan Effective Date May Result in Liquidation or Alternative Plan on Less Favorable Terms

Although the Plan Proponents believe that the Plan Effective Date may occur on or shortly after the Confirmation Date, there can be no assurance as to such timing.  The occurrence of the Plan Effective Date is also subject to certain conditions precedent as described in Section 13 of the Plan.  Failure to meet any of these conditions could result in the Plan not being consummated.

If the Confirmation Order is vacated, the Plan shall be null and void in all respects and nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claim against or

Equity Interest in any Debtor; or (b) prejudice in any manner the rights of the Debtors or the Holder of any Claim or Equity Interest.

If the Plan Effective Date does not occur, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the Holders of Claims against or Equity Interests in any Debtor as the terms of the Plan. If a liquidation or protracted reorganization of the Estates were to occur, there is a substantial risk that the Debtors' going concern value would be eroded to the detriment of all stakeholders.

## B.     Additional Factors

### 1.     Information Presented Is Based on Debtors' Books and Records; No Audit Was Performed

While the Debtors have endeavored to present information fairly in this Disclosure Statement, because of the complexity of its financial matters, the Debtors' books and records upon which this Disclosure Statement is based might be incomplete or inaccurate. The financial information contained herein, unless otherwise expressly indicated, is unaudited.

### 2.     Plan Proponents Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Plan Proponents as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Plan Proponents have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3.     Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of funds or the amount of Claims in the various Classes that might be Allowed.

### 4.     Ability to Service Debt

The Reorganized Debtors will still have substantial indebtedness. The degree to which the Reorganized Debtors will be leveraged could affect, among other things, the Reorganized Debtors' ability to satisfy their obligations under the New Series A Notes, the New Series B Notes, and Allowed Claims under the Plan, the ability to obtain financing in the future, or the flexibility in planning for or reacting to business changes in the future. There can be no assurance that the Reorganized Debtors will be able to generate sufficient cash flow from operations or that sufficient future borrowings will be available to pay off, or refinance, the Reorganized Debtors' debt obligations.

## 5. Sale of Assets and/or Equity Interests

IUSA has received several unsolicited offers to acquire the assets or stock of certain of the IUSA Group's United States subsidiaries and may from time to time receive additional unsolicited proposals. IUSA is evaluating these offers and has commenced discussions in respect of the terms of some of these offers. No assurances can be made as to the timing or terms of any such sale or as to whether any such offers will result in definitive documentation with respect to, or consummation of, an actual sale.

## 6. No Legal or Tax Advice Is Provided to You by This Disclosure Statement

The contents of this Disclosure Statement should *not* be construed as legal, business or tax advice. Each Holder of a Claim or Equity Interest should consult his, her or its own legal counsel and tax advisor as to legal, tax and other matters concerning his, her or its Claim or Equity Interest.

This Disclosure Statement is *not* legal advice to you. This Disclosure Statement may *not* be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

## 7. No Admission Made

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Plan Proponents or on Holders of Claims or Equity Interests.

## 8. Market And Business Risks May Adversely Affect Business Performance

Because the Debtors are merely holding companies, they rely completely on the income-producing activities of the Non-Debtor Subsidiaries. In the normal course of business, the Non-Debtor Subsidiaries are subject to the following types of risks and variables, which may materially affect their businesses' performance following the Plan Effective Date:

(a) general economic and business conditions, particularly the current economic downturn;

(b) variations in the financial or operational condition of the Non-Debtors Subsidiaries' significant customers;

(c) material shortages, transportation systems delays or other difficulties in markets (i) relating to the delivery of products or (ii) where the Non-Debtor Subsidiaries purchase supplies for the provision of their services;

(d) significant work stoppages, disputes or any other difficulties in labor markets (i) relating to the delivery of products or (ii) where the Non-Debtor Subsidiaries obtain materials necessary for the provision of their services;

(e)     increased development of competitive alternatives to the Non-Debtor Subsidiaries' products;

(f)     fluctuations in interest rates;

(g)     unscheduled facility shutdowns;

(h)     increased operating costs;

(i)     changes in prices and supply of materials;

(j)     changes in credit terms offered by the Non-Debtor Subsidiaries' suppliers;

(k)     the Non-Debtor Subsidiaries' ability to obtain cash adequate to fund theirs and the Reorganized Debtors' needs;

(l)     various worldwide economic and political factors, changes in economic conditions, currency fluctuations and devaluations, credit risks in foreign markets or political instability in foreign countries where the Non-Debtor Subsidiaries have customers or operations;

(m)     physical damage to or loss of, among other things, any facility or equipment due to fire, weather or other factors beyond the Non-Debtor Subsidiaries' control;

(n)     legislative activities of governments, agencies and similar organizations, both in the United States and in foreign countries, that may affect the Non-Debtor Subsidiaries' operations;

(o)     the Non-Debtor Subsidiaries' ability to comply with government regulations, including environmental regulations; and

(p)     legal actions and claims of undetermined merit and amount involving, among other things, product liability and environmental and safety issues involving the Non-Debtor Subsidiaries' services or facilities;

### 9.     Cost of Compliance with Government Regulation May Adversely Affect Financial Results

The Non-Debtor Subsidiaries are subject to various foreign, federal, state and local laws and regulations that affect the conduct of their operations, including environmental laws.  The Debtors cannot assure you that compliance with these laws and regulations, or the adoption of modified or additional laws and regulations, will not require large expenditures by the Debtors or the Non-Debtor Subsidiaries or otherwise have a significant effect on the Debtors' financial condition or results of operations.  Among other laws, a change in the tax laws of the United States or Mexico could materially affect the consequences of the Plan as described herein to the Debtors and the Holders of Claims.  **See Section X, "Certain Federal Income Tax Consequences of the Plan."**

### 10. Access to Financing and Trade Terms

The Plan Proponents' and Non-Debtor Subsidiaries' operations are dependent on the availability and cost of working capital financing and trade terms provided by vendors and may be adversely affected by any shortage or increased cost of such financing and trade vendor support. The Plan Proponents' and Non-Debtor Subsidiaries' operations have been financed from operating cash flow, the use of cash collateral, and borrowings from credit facilities. The Plan Proponents believe that substantially all of their needs for funds necessary to consummate the Plan and for post-Plan Effective Date working capital financing will be met by projected operating cash flow and trade terms supplied by vendors. However, if the Reorganized Debtors or the Non-Debtor Subsidiaries require working capital and trade financing greater than that provided by such sources, they may be required either to (i) obtain other sources of financing or (ii) curtail their operations.

No assurance can be given, however, that any additional financing will be available, if at all, on terms that are favorable or acceptable to the Reorganized Debtors or the Non-Debtor Subsidiaries. The Plan Proponents believe that it is important to their going-forward business plan that their performance meet projected results in order to ensure continued support from vendors.

### 11. Variances from Projections

The fundamental premise of the Plan is the deleveraging of the Plan Proponents and the implementation and realization of the Plan Proponents' business plan, as reflected in the projections contained in this Disclosure Statement. The projections reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors and Non-Debtor Subsidiaries. Such assumptions include, among other items, assumptions concerning the general economy, the ability to make necessary capital expenditures, the ability to establish market strength, consumer purchasing trends and preferences, and the ability to stabilize and grow the companies' sales base and control future operating expenses. The Plan Proponents believe that the assumptions underlying the projections are reasonable. However, unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual financial results of the Reorganized Debtors and the Non-Debtor Subsidiaries. Therefore, the actual results achieved throughout the periods covered by the projections necessarily will vary from the projected results, and such variations may be material and adverse.

### C. Additional Risk Factors

For additional detail regarding risk factors related to the IUSA Group business, the Exchange Offer, and/or the New Series B Notes, please see the Information Memorandum attached hereto as Exhibit 5. Many of the risk factors highlighted in the Information Memorandum may be applicable to the New Series A Notes and should be read in conjunction with this **Section VII** of the Disclosure Statement.

# VIII.

## VOTING REQUIREMENTS

On July 18, 2011, the Bankruptcy Court entered the Disclosure Statement Order that, among other things, approved this Disclosure Statement, set voting procedures, and scheduled the Confirmation Hearing. A copy of the Disclosure Statement Order and the Confirmation Hearing Notice are enclosed with this Disclosure Statement as part of the Solicitation Package. The Disclosure Statement Order sets forth in detail, among other things, procedures governing voting deadlines and objection deadlines. The Disclosure Statement Order, the Confirmation Hearing Notice, and the instructions attached to the Ballot should be read in connection with this Section VIII of the Disclosure Statement.

If you have any questions about the procedure for voting your Claims or Interests or the packet of materials you received, please contact:

via phone: (646) 282-2400

via email: tabulation@epiqsystems.com

via first class mail:

> Tubo de Pasteje, S.A. Ballot Processing
> c/o Epiq Bankruptcy Solutions, LLC
> FDR Station, P.O. Box 5014
> New York, NY 10150-5014

via hand delivery or overnight

> Tubo de Pasteje, S.A. Ballot Processing
> c/o Epiq Bankruptcy Solutions, LLC
> 757 Third Avenue, 3rd Floor
> New York, NY 10017

Additional copies of the Plan, this Disclosure Statement, and the Consensual Exchange Documents or the exhibits to any of those documents can be accessed free of charge from the following website: **http://dm.epiq11.com/tubo**. Copies of the Plan, this Disclosure Statement, the Consensual Exchange Documents are also available at your own expense, upon written request to the Notice and Balloting Agent at: Tubo de Pasteje, S.A. Ballot Processing, c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017, by telephone at (646) 282-2400 or by email at tabulation@epiqsystems.com, or the Bankruptcy Court's website: www.deb.uscourts.gov. Note: a PACER password and login are needed to access documents on the Bankruptcy Court's website and a fee will be charged (https://ecf.deb.uscourts.gov/).

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures of the Plan Proponents concerning the Plan have been adequate and have included information concerning all distributions made or promised by the Plan Proponents in connection with the

Plan and the Chapter 11 Cases. In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law.

In particular, in order to confirm the Plan, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that the Plan: (i) has been accepted by the requisite votes of all Classes of Impaired Claims and Equity Interests, unless approval will be sought under section 1129(b) of the Bankruptcy Code in respect of one or more dissenting Classes; (ii) is "feasible," which means that there is a reasonable probability that Confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization; and (iii) is in the "best interests" of all Holders of Claims or Equity Interests, which means that such Holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Plan Proponents believe that the Plan satisfies all of these conditions. <u>See</u> Section IX, "Confirmation Of Plan."

### A. Voting Deadline

This Disclosure Statement and Ballot(s) are being distributed to all Holders of Claims who are entitled to vote on the Plan.

**IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER, IN ORDER TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE ACTUALLY RECEIVED BY THE NOTICE AND BALLOTING AGENT BY NO LATER THAN THE VOTING DEADLINE, THAT IS, BY NO LATER THAN <u>AUGUST 19, 2011 AT 4:00 P.M. (PREVAILING EASTERN TIME)</u>. ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN. ONLY BALLOTS CONTAINING ORIGINAL SIGNATURE PAGES WILL BE COUNTED. HOLDERS OF NOTEHOLDER PLEDGE CLAIMS SHOULD FOLLOW THE INSTRUCTIONS INCLUDED WITH THEIR BALLOTS TO ENSURE THAT, TO THE EXTENT APPLICABLE, THEIR NOMINEES RECEIVE THEIR BALLOTS WITH SUFFICIENT TIME TO TABULATE SUCH BALLOTS ON A MASTER BALLOT AND FOR SUCH NOMINEE TO RETURN SUCH MASTER BALLOT TO THE VOTING AGENT BY THE VOTING DEADLINE.**

### B. Holders of Claims Entitled to Vote

The Holder of a Claim against or Equity Interest in the Debtors that is Impaired under the Plan is entitled to vote to accept or reject the Plan if the Plan provides a distribution in respect of such Claim or Equity Interest. **NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, NO DISPUTED CLAIM OR DISPUTED EQUITY INTEREST WILL BE COUNTED FOR ANY PURPOSE IN DETERMINING WHETHER THE REQUIREMENTS OF SECTION 1126(c) OF THE BANKRUPTCY CODE HAVE BEEN MET.**

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Holders of Claims in Classes T3 and C3 are entitled to vote. Holders of Claims and Equity Interests in Classes T1, C1, T2, C2, T4, C4, T5 and C5 are Unimpaired and, consequently, are conclusively presumed to accept the Plan and are not entitled to vote.

### C. Vote Required for Acceptance by Class

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired claims and/or equity interests votes to accept the proposed chapter 11 plan, except under certain circumstances. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount of the allowed claims in that class and more than one-half in number of allowed claims in that class, but for that purpose, counts only those who actually vote to accept or reject the plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in dollar amount and a majority in number of the allowed claims in that class <u>actually voting</u> cast their Ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting the Plan.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, but for that purpose, counts only those who <u>actually vote</u> to accept or reject the plan. Thus, a Class of Equity Interests will have voted to accept the Plan if two-thirds of the allowed interests actually voted are voted in favor of acceptance. Holders of Equity Interests who fail to vote are not counted as either accepting or rejecting the Plan.

### D. Voting Procedures

#### 1. Ballots

All votes to accept or reject the Plan with respect to Classes T3 and C3 must be cast by properly submitting the duly completed and executed form of Ballot. Holders of Impaired Claims voting on the Plan should complete and sign the Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan."

**ANY BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN, WILL BE AN INVALID BALLOT AND WILL NOT BE COUNTED FOR PURPOSES OF DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.**

**ANY BALLOT RECEIVED THAT IS NOT SIGNED OR THAT CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT WILL BE AN INVALID BALLOT AND WILL NOT BE COUNTED FOR PURPOSES OF DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.**

Ballots must be delivered to the Notice and Balloting Agent at its address set forth above, and received by the Voting Deadline. **THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE HOLDER.** If such delivery is by mail, it is recommended

that Holders use an air courier with a guaranteed next day delivery or registered mail, properly insured, with return receipt requested. In all cases, sufficient time should be allowed to assure timely delivery.

In accordance with Bankruptcy Rule 3018(c), the Ballots are based on Official Form No. 14, but have been modified to meet the particular needs of these Chapter 11 Cases. **PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT.**

### 2. Withdrawal or Change of Votes on Plan

A Ballot may be withdrawn by delivering a written notice of withdrawal to the Notice and Balloting Agent so that the Notice and Balloting Agent <u>actually receives</u> such notice prior to the Voting Deadline. Thereafter, withdrawal may be effected only with the approval of the Bankruptcy Court by filing a motion in accordance with Bankruptcy Rule 3018(a).

In order to be valid, a notice of withdrawal must: (a) specify the name of the Holder who submitted the votes on the Plan to be withdrawn; (b) contain the description of the Claims to which it relates; and (c) be signed by the Holder in the same manner as on the Ballot that the Holder seeks to withdraw. The Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of votes on the Plan.

Any Holder who has submitted to the Notice and Balloting Agent prior to the Voting Deadline a properly completed Ballot may change such vote by submitting to the Notice and Balloting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received with respect to the same Claim, the Ballot that bears the latest date will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received.

IX.

**CONFIRMATION OF PLAN**

### A. Hearing on Confirmation of the Plan

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing with respect to the Plan. At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code described below are met.

The Confirmation Hearing is scheduled to commence on August 25, 2011, at 3:00 p.m. (Prevailing Eastern Time) before the Honorable Kevin J. Carey, United States Bankruptcy Court, District of Delaware, 824 North Market Street, 5th Floor, Courtroom 5, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

## B. Deadline to Object to Confirmation

Any objection to the confirmation of the Plan must be made in writing, specify in detail (i) the name and address of the objector, (ii) all factual and legal grounds for the objection and (iii) the amount and type of the Claims held by the objector. Any such objection must be filed with the Bankruptcy Court and served so that it is <u>actually received</u> by the Bankruptcy Court, chambers, and the following parties on or before the Confirmation Objection Deadline, (<u>i.e.</u>, August 19, 2011, at 4:00 p.m. (Prevailing Eastern Time)): (a) counsel for the Debtors, Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York 10019, Attn.: Philip M. Abelson and Lauren C. Cohen; (b) co-counsel for the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19899-8705, Attn.: Laura Davis Jones and Michael Seidl; and (c) the Office of the United States Trustee for the District of Delaware, 844 King Street, Room 2207, Lockbox #35, Wilmington, Delaware 19899-0035.

## C. Requirements for Confirmation of Plan

Among the requirements for Confirmation of the Plan are that the Plan: (i) is accepted by all Impaired Classes of Claims and Equity Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (ii) is feasible; and (iii) is in the "best interests" of creditors and equity interest holders that are Impaired under the Plan.

### 1. Requirements of Section 1129(a) of Bankruptcy Code

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following Confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied:

(a) The Plan complies with the applicable provisions of the Bankruptcy Code.

(b) The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code.

(c) The Plan has been proposed in good faith and not by any means forbidden by law.

(d) Any payment made or to be made by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

(e) The Plan Proponents have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation, as a director or officer of the Reorganized Debtors, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy, and the Plan Proponents have disclosed the identity of any insider (as

defined in section 101 of the Bankruptcy Code) that will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider.

(f)     Any governmental regulatory commission with jurisdiction, after Confirmation, over the rates of the Debtors have approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

(g)     With respect to each Class of Claims or Equity Interests, each Holder of an Impaired Claim or Equity Interest either has accepted the Plan or will receive or retain under the Plan on account of such Holder's Claim or Equity Interest property of a value, as of the Plan Effective Date, that is not less than the amount that such Holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

(h)     Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code, each Class of Claims or Equity Interests has either accepted the Plan or is not Impaired under the Plan.

(i)     Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Priority Tax Claims will be paid in full on the Plan Effective Date.

(j)     If any Class of Claims is Impaired under the Plan, at least one such Class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider.

(k)     Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors, unless such liquidation or reorganization is proposed in the Plan.

(l)     All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Plan Effective Date.

All transfers of property of the Plan will be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation.

The Plan Proponents believe that the Plan meets all the applicable requirements of section 1129(a) of the Bankruptcy Code, or is otherwise confirmable pursuant to section 1129(b) of the Bankruptcy Code.

## 2.     Best Interests of Creditors

Pursuant to section 1129(a)(7) of the Bankruptcy Code, with respect to each Impaired Class of Claims or Equity Interests, unless such Class unanimously votes to accept the Plan, the Plan Proponents must demonstrate, and the Bankruptcy Court must determine, that each Holder in such Class will receive property of a value, as of the Plan Effective Date, that is not less than the amount that such Holder would receive if the Debtors were liquidated under chapter 7 of the

Bankruptcy Code on the Plan Effective Date.  This requirement is commonly referred to as the "Best Interests of Creditors Test."

To determine the value that the Holders of Impaired Claims and Equity Interests would receive if the Debtors were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of chapter 7 liquidation case.  Section 704 of the Bankruptcy Code requires a chapter 7 trustee to collect and reduce to money the property of the estate as expeditiously as is compatible with the best interests of parties in interest.

The cash available for satisfaction of Allowed Claims would consist of the proceeds resulting from the disposition of the Debtors' few remaining assets, augmented by any Cash held by the Debtors at the time of the commencement of the chapter 7 case.  Any such Cash amount would then be reduced by the amount of any Allowed Claims secured by such assets, the costs and expenses of the liquidation and such additional Administrative Claims and Priority Tax Claims that may result from the use of chapter 7 for the purposes of liquidation.

The costs of liquidation under chapter 7 would include fees payable to a trustee in bankruptcy, as well as those that might be payable to his or her attorneys and to other professionals that such trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases that would be allowed in the chapter 7 case, such as compensation for attorneys, appraisers, accountants, or other professionals and costs and expenses of the Debtors and an appointed official committee, if any.  Such Administrative Claims would have to be paid in cash, in full from the liquidation proceeds before the balance of those proceeds could be made available to pay other Claims.

Conway Mackenzie, as financial advisor to certain of the Debtors' subsidiaries, with the assistance of the Debtors, has prepared a liquidation analysis, which is annexed hereto as Exhibit 2 (the "Liquidation Analysis").  The information set forth in the Liquidation Analysis provides a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' Estates and distribute the proceeds of such liquidation to the Holders of Allowed Claims and Equity Interests.

The Plan satisfies the Best Interests of Creditors Test.  The Plan provides no less of a recovery to the Holders of Claims than such Holders would receive under a liquidation under chapter 7 primarily because the Plan avoids a layer of administrative expense associated with the appointment of a chapter 7 trustee, while increasing the efficiency of administering the Debtors' assets for the benefit of their Creditors.

Moreover, in chapter 7 cases, the chapter 7 trustee would also be entitled to seek a sliding scale commission based upon the funds distributed by such trustee, even though the Debtors have already accumulated much of the funds and have already incurred many of the expenses associated with generating those funds.  Accordingly, the Plan Proponents believe that there is a reasonable likelihood that the Debtors creditors would "pay again" for the funds accumulated by the Debtors, since the chapter 7 trustee would be entitled to receive a commission in some amount for all funds distributed.  It is also anticipated that a chapter 7 liquidation would result in delay in the distributions to the Debtors' creditors.  Among other things, a chapter 7 case would

trigger a bar date for filing claims that would be more than ninety (90) days following conversion of the cases to chapter 7.  See FED. R. BANKR. P. 3002(c).  Hence, a chapter 7 liquidation would not only delay distributions, but raise the prospect of additional claims that were not asserted in the Chapter 11 Cases.  Based on the foregoing, the Plan provides an opportunity to bring the greatest return to the Debtors' creditors.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors or their management.  All Holders of Claims entitled to vote to accept or reject the Plan should carefully review the Liquidation Analysis.

### 3.  Acceptance by Impaired Class

The Bankruptcy Code requires, as a condition to Confirmation that, except as described in the following section, each class of claims or equity interests that is impaired under a plan accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan:  (a) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder of that claim or interest; (b) cures any default and reinstates the original terms of the obligation; or (c) provides that, on the consummation date, the holder of the claim or interest receives cash equal to the Allowed amount of that claim or, with respect to any interest, any fixed liquidation preference to which the interest holder is entitled or any fixed price at which the debtor may redeem the security.

As explained above, Holders of Claims in Classes T3 (Noteholder Pledge Claims) and C3 (Unsecured Parent Guaranty Claims) are Impaired under the Plan and are entitled to vote.  Each of the Holders of Claims and Interests in Classes T1, C1, T2, C2, T4, C4, T5, and C5 are Unimpaired and, consequently, are conclusively presumed to accept the Plan and are not entitled to vote.

### D.  Alternatives to Confirmation and Consummation of Plan

The Plan reflects the negotiations held by the Plan Proponents with a group of certain Noteholders who support the Plan.  The Consenting Creditors believe that the Plan affords Holders of Claims and Equity Interests the greatest opportunity for realization on the Debtors' assets and, therefore, is in the best interests of such Holders.  If the Plan is not confirmed, however, the theoretical alternatives include:  (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code; or (ii) alternative plans of reorganization or liquidation under chapter 11 of the Bankruptcy Code.  Thorough consideration of these alternatives to the Plan has led the Plan Proponents to conclude that the Plan, in comparison, provides a greater recovery to creditors and equity holders on a more expeditious timetable, and in a manner that minimizes certain inherent risk in any other course of action available in these Chapter 11 Cases.

### 1.  Liquidation Under Chapter 7

If the Plan is not confirmed, these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.  In a liquidation under chapter 7, a trustee or trustees may be

NY3 3093898.3

elected or appointed to liquidate the assets of the Debtors. However, the Plan Proponents believe that liquidation under chapter 7 would result in smaller distributions being made to creditors and interest holders than those provided for in the Plan because, among other reasons: (a) additional administrative expenses resulting from the appointment of and services to be rendered by trustees and attorneys and other professionals to assist such trustee; (b) the relative lack of familiarity with the Debtors' businesses that would inevitably hinder such professionals in the management of the estates; and (c) additional expenses and claims, some of which would be entitled to priority, that would be generated during the liquidation. In addition, distributions would be substantially delayed in a chapter 7 liquidation because of the factors set forth above and the need to litigate or otherwise resolve many of the claims settled by the Plan. If these Chapter 11 Cases are converted to chapter 7, it is likely the Debtors' operations would cease and their assets would be liquidated piecemeal under conditions that prioritize expediency over value. For these reasons, the Plan Proponents believe the reorganizing of the Debtors' businesses and capital structure under chapter 11, as provided for in the Plan, preserves value and maximizes distributions relative to a chapter 7 liquidation.

Based on the foregoing and on the Liquidation Analysis, the Plan Proponents believe that a liquidation of the Debtors' assets under chapter 7 or otherwise would produce no greater and likely less value for distribution to creditors than that recoverable under the Plan.

### 2. Alternative Plan of Reorganization or Liquidation

If the Plan is not confirmed, the Plan Proponents (or if the Bankruptcy Court were not to grant extensions of the Debtors' exclusive periods in which to file and solicit a plan, any other party in interest in these Chapter 11 Cases) could propose a different plan or plans. Such plan(s) might involve either a reorganization and continuation of the Debtors' businesses, an orderly liquidation of their assets or a combination of both. Nonetheless, the Plan Proponents believe that no alternative plan can be confirmed without the consent of the Holders of the Noteholder Pledge Claims and the Unsecured Parent Guaranty Claims.

With respect to an alternative plan, the Plan Proponents have explored various alternatives in connection with the formulation of the Plan. The Plan Proponents believe that the Plan enables creditors to realize the most value under the circumstances.

## X.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN

TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DOCUMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the holders of the Old 2016 Notes and ESBDS I Loan (the "Existing Debt"). This discussion is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), final, temporary and proposed Treasury regulations promulgated thereunder, Internal Revenue Service ("IRS") rulings and pronouncements and judicial decisions in effect as of the date of this document, all of which may change, possibly with retroactive effect. This discussion applies only to holders of Existing Debt that will hold the New Series A Notes as capital assets. This discussion does not address the U.S. federal income tax consequences of the Plan to holders of Copper Debt and Commercial Paper or persons that will hold the New Series B Notes. Holders of Copper Debt and Commercial Paper or persons that will hold the New Series B Notes are urged to contact their own tax advisors regarding the U.S. federal income tax consequences of the implementation of the Plan.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to U.S. Holders, as defined below, in light of their particular circumstances, such as holders to whom special tax treatment applies, including (1) banks, regulated investment companies, real estate investment trusts, insurance companies, employee stock ownership plans, brokers, dealers in securities or currencies, subchapter S corporations, entities treated as partnerships for U.S. federal income tax purposes, beneficial owners of pass-through entities, and tax exempt organizations, (2) persons who hold Existing Debt or who will hold the New Series A Notes as part of a straddle, hedge, conversion transaction or other integrated investment, (3) persons whose functional currency is not the U.S. dollar, (4) persons who use a mark to market method of accounting and (5) persons who, for U.S. federal income tax purposes, are or will be considered as owning 10% or more, directly, indirectly or by attribution, of IUSA. In addition, this discussion does not address alternative minimum taxes or state, local or non-U.S. taxes. Furthermore, this discussion does not address any aspects of U.S. federal tax law (such as the estate tax, gift tax or the Medicare tax on net investment income) other than U.S. federal income tax law. This discussion assumes that the Old 2016 Notes and ESBDS I Loan are, and the New Series A Notes will be, respected as debt for U.S. federal income tax purposes.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. No opinion of counsel has been sought or obtained with respect to any U.S. tax consequences of the Plan and no tax opinion is given by this discussion. No rulings or determination letters from the IRS or any other taxing authorities have been obtained or sought with respect to the Plan, and the description below is not binding upon the IRS or such other taxing authorities. Accordingly, it is possible that the IRS may disagree with the description below of the tax consequences, and there can be no certainty that the IRS would not prevail in any challenge it may decide to make in this regard.

FOR THE FOREGOING REASONS, ALL HOLDERS OF EXISTING DEBT ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (U.S. FEDERAL, STATE, LOCAL AND NON-U.S.) OF THE PLAN TO THEM. THE ISSUER IS NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN AS TO ANY SPECIFIC HOLDER, NOR IS THE ISSUER RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.

For purposes of this discussion the term "U.S. Holder" means a holder of Existing Debt who is a beneficial owner of such instrument and that is, for U.S. federal income tax purposes: (i) an individual who is a citizen or resident of the United States, (ii) a corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in the United States or under the laws of the United States or of any state of the United States or the District of Columbia, (iii) an estate, the income of which is subject to U.S. federal income tax regardless of its source, or (iv) a trust if (A) a court within the United States is able to exercise primary supervision over the administration of the trust and at least one U.S. person has authority to control all substantial decisions of the trust or (B) it has a valid election in effect to be treated as a U.S. person.

## A.     Tax Consequences of Exchange

### 1.     Tax Treatment of U.S. Holders of Existing Debt

While the Old 2016 Notes and New Series A Notes have many similar terms, there are some significant differences, including improved collateral and effective deferral of certain payments on the Old 2016 Notes as a result of the inclusion of certain accrued but unpaid interest on such notes in the principal amount of the New Series A Notes. Based on these differences, the exchange of Old 2016 Notes for New Series A Notes should be treated as an exchange of property for U.S. federal income tax purposes. The tax treatment of U.S. Holders that exchange Existing Debt for the New Series A Notes will depend on whether or not such exchange qualifies as a "recapitalization" under the Tax Code. In general, for an exchange of Existing Debt for the New Series A Notes to qualify as a recapitalization, the Existing Debt surrendered and the New Series A Notes received must both be treated as "securities" for applicable U.S. federal income tax purposes. Whether a debt instrument is a security for these purposes is determined based on all the relevant facts, including the term of the debt instrument. Generally, corporate debt instruments with maturities when issued of less than five years are not considered securities while corporate debt instruments with maturities when issued of ten years or more are considered securities. The Old 2016 Notes had a term to maturity at original issuance of more than ten years. As a result, the terms of the Old 2016 Notes are consistent with debt instruments that are generally treated as securities for applicable U.S. federal income tax purposes. The ESBDS I Loan had a term to maturity at original issuance of approximately five years. As a result, it is unclear whether the ESBDS I Loan should be treated as a security for U.S. federal income tax purposes. The New Series A Notes should have a term to maturity of at least five years. It therefore may be reasonable to treat the New Series A Notes as securities for U.S. federal income tax purposes.

If the Existing Debt and New Series A Notes are securities, the exchange of the Existing Debt for the New Series A Notes (other than any amounts treated as paid in respect of accrued interest on the Existing Debt) should qualify as a recapitalization under the Tax Code. In this case, a U.S. Holder of Existing Debt will not recognize gain or loss on the exchange of such Existing Debt for the New Series A Notes, except that (i) a U.S. Holder of Existing Debt will recognize gain, if any, to the extent such holder receives New Series A Notes in excess of the principal amount of the Existing Debt surrendered (which may include, for these purposes, amounts related to restructuring fees), and (ii) to the extent any portion of the New Series A Notes is treated as payment of accrued interest on the Existing Debt, such payment will generally

be subject to tax as ordinary interest income, in accordance with a U.S. Holder's accounting method, as discussed more fully below.

If the exchange is treated as a recapitalization, a U.S. Holder's total tax basis in New Series A Notes received in exchange for the Existing Debt (other than any such New Series A Notes treated as paid in respect of accrued interest or in excess of the principal amount of Existing Debt surrendered) will be equal to that holder's tax basis in such Existing Debt surrendered pursuant to the exchange increased by the amount of any gain recognized on the exchange and decreased by the amount of any New Series A Notes received in the exchange in excess of the principal amount of the Existing Debt surrendered, which will have a fair market value basis. A U.S. Holder's holding period for New Series A Notes received in the exchange (other than any New Series A Notes treated as paid in respect of accrued interest or in excess of the principal amount of the Existing Debt surrendered) will include that person's holding period for the Existing Debt surrendered in exchange therefor.

If the exchange is not treated as a recapitalization because either the Existing Debt surrendered or New Series A Notes received are not securities, a U.S. Holder will recognize taxable gain (or loss) in an amount equal to the excess (or deficit) of (x) the issue price of the New Series A Notes (other than any New Series A Notes treated as paid in respect of accrued interest on the Existing Debt) less (y) the holder's tax basis in the Existing Debt surrendered. See below for a discussion of the determination of the issue price of the New Series A Notes. Subject to the discussion below regarding accrued market discount, any such gain or loss will be capital gain or loss, and such capital gain or loss generally will be long-term capital gain or loss if the U.S. Holder held the Existing Debt surrendered for more than one year. Furthermore, a U.S. Holder's tax basis in the New Series A Notes received pursuant to the exchange (other than any New Series A Notes treated as paid in respect of accrued interest) will be equal to the issue price of those notes and the holding period for the New Series A Notes received will begin the day after the exchange.

A U.S. Holder that acquired Existing Debt subsequent to its original issuance with more than a *de minimis* amount of market discount will be subject to the market discount rules under the Tax Code. Under those rules, assuming that a U.S. Holder has made no election to include market discount in income on a current basis, any gain recognized on the exchange will be characterized as ordinary income to the extent of the accrued market discount as of the date of the exchange. If the exchange of New Series A Notes for Existing Debt is treated as a recapitalization, any accrued market discount remaining thereon which has not been recognized as ordinary income should be carried over to the New Series A Notes. See below for a discussion regarding the treatment of market discount.

## 2. Tax Treatment of Amounts Received for Accrued Interest

Notwithstanding the discussion above, a U.S. Holder of Existing Debt will be treated as receiving an interest payment to the extent that a portion of the principal amount of New Series A Notes is treated as paid in respect of accrued interest on the Existing Debt. Any such amounts will be treated as ordinary taxable income for a U.S. Holder that had not previously included such accrued interest in income. While not free from doubt, a U.S. Holder should recognize an ordinary loss to the extent of accrued interest previously included in income that is not paid in full. A U.S. Holder's tax basis in any New Series A Notes that are received in exchange for

accrued interest on Existing Debt generally will be equal to the issue price (as defined below) of such New Series A Notes, and the holding period of such notes generally will begin on the day after the exchange.

Pursuant to the Plan, U.S. Holders will treat all amounts received as allocated first to the principal portion of such Existing Debt and thereafter to any accrued interest on such notes. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. Each U.S. Holder of claims is urged to consult its tax advisor regarding the allocation of consideration.

### B.     Tax Consequences of Owning New Series A Notes

#### 1.     Interest and OID

If the "issue price" of the New Series A Notes is less than their "stated redemption price at maturity" by more than a *de minimis* amount (1/4 of 1 percent of a debt instrument's stated redemption price at maturity multiplied by the number of complete years or, in certain cases, weighted average life, to the instrument's stated maturity), the New Series A Notes will be treated as having original issue discount ("OID").

The issue price of debt instruments issued in a debt for debt exchange depends on whether a substantial amount of the debt instruments received or surrendered are treated as "traded on an established market" within the meaning of the applicable Treasury regulations. Debt instruments are treated as "traded on an established market" if, among other things, the debt appears on a quotation medium that satisfies certain criteria, or if price quotations are readily available from dealers, brokers or traders. If neither debt surrendered nor debt received in an exchange is treated as traded on an established market, the issue price of the debt received will generally equal the principal amount of the debt if the debt provides for adequate interest.

If the New Series A Notes are treated as "traded on an established market," the issue price of the New Series A Notes would be their fair market value on the date of the exchange. If the New Series A Notes are not so traded but the Existing Debt is, the issue price of the New Series A Notes would be equal to the fair market value of the Existing Debt surrendered in exchange for the New Series A Notes. It currently cannot be determined whether the ESBDS I Loan is, or whether the New Series A Notes will be, treated as traded on an established market. The Old 2016 Notes, however, should be treated as traded on an established market.

If a substantial amount of the New Series A Notes and the New Series B Notes will be issued to the same person, it is possible that the New Series A Notes could be treated as part of the same "issue" as the New Series B Notes for U.S. federal income tax purposes. If the New Series A Notes and the New Series B Notes are part of the same issue, the New Series A Notes will have the same issue price as the New Series B Notes. It currently cannot be determined whether a substantial amount of the New Series A Notes and the New Series B Notes will be issued to the same person. U.S. Holders are urged to consult their own tax advisors as to the issue price of the New Series A Notes if they are treated as part of the same issue as the New Series B Notes for U.S. federal income tax purposes.

The stated redemption price at maturity of a debt instrument is the sum of all payments due under the instrument other than payments of qualified stated interest. "Qualified stated interest" includes stated interest, calculated as the product of a single fixed rate of interest and the outstanding principal amount of the instrument, that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually.

For purposes of determining whether a note has OID where the note has a period of a teaser rate, interest holiday or other interest shortfall, thus causing later payments that would otherwise be qualified stated interest to not be treated as such, a special rule applies for calculating the stated redemption price at maturity. For purposes of calculating whether such a note has OID, the stated redemption price at maturity of such note will be equal to the issue price of the note plus the greater of (i) the amount of additional stated interest that would be required to be payable in order for all interest on the note to be qualified stated interest and (ii) the excess of the note's stated principal over such note's issue price. If the issue price of such note is less than the note's so calculated stated redemption price at maturity by more than a *de minimis* amount, as described above, such note will be treated as issued with OID.

If the New Series A Notes are issued prior to November 15, 2011, the absence of an interest accrual until November 15, 2011 may be viewed as a teaser rate, interest holiday or other interest shortfall with the result that the stated redemption price at maturity will be calculated as described in the immediately preceding paragraph for purposes of determining whether the New Series A Notes have OID. To the extent required to take a position, IUSA intends to calculate the stated redemption price at maturity of the New Series A Notes by treating any period during which there is no interest accrual as qualifying for the exceptions for teaser rates, interest holidays or other interest shortfalls and, by exchanging the Existing Debt for New Series A Notes, each U.S. Holder agrees to take no contrary position. However, the issue price of the New Series A Notes will not be known prior to the Plan Effective Date, so the amount of additional interest that would need to be payable on a New Series A Note through November 15, 2011, if any, in order for all interest on the notes to be qualified stated interest, is not known. Therefore, the greater of the two amounts described in the immediately preceding paragraph cannot currently be determined.

Subject to the discussion below with respect to "contingent payment debt instruments" ("CPDIs"), if the New Series A Notes are treated as issued with OID, a U.S. Holder of a note must include such OID as ordinary interest income for U.S. federal income tax purposes as it accrues under a constant yield method in advance of receipt of the cash payments attributable to such income, regardless of such U.S. Holder's regular method of tax accounting and the timing or amount of any actual payments. In general, the amount of OID included in income by a U.S. Holder of a note issued with OID is the sum of the daily portions of OID with respect to the note for each day during the taxable year (or portion of the taxable year) on which the U.S. Holder held the note. The daily portion of OID on any note issued with OID is determined by allocating to each day in an accrual period a ratable portion of the OID allocable to that accrual period. Accrual periods may be of any length and may vary in length over the term of the note, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the final day or first day of an accrual period. The amount of OID allocable to each accrual period generally is equal to the difference between (i) the product of the note's "adjusted issue price" at the beginning of the accrual period and the note's yield to

maturity (determined on the basis of compounding at the close of each accrual period and appropriately adjusted to take into account the length of the particular accrual period) and (ii) the amount of any qualified stated interest payments allocable to such accrual period. The "adjusted issue price" of a note issued with OID at the beginning of any accrual period is the sum of the issue price of the note plus the amount of OID allocable to all prior accrual periods minus the amount of any prior payments on the note that were not qualified stated interest payments. Under these rules, U.S. Holders generally will have to include in taxable income increasingly greater amounts of OID in successive accrual periods.

In the event that, among other things, the New Series A Notes have an issue price that differs from their stated redemption price at maturity, certain terms and conditions of the New Series A Notes involving contingent payments, including certain mandatory prepayments, could result in the New Series A Notes being treated as CPDIs, which are subject to special rules under the Treasury regulations governing instruments issued with OID. If (i) the New Series A Notes are treated as CPDIs and (ii) as discussed above, the Old 2016 Notes are treated as traded on an established market or the New Series A Notes are so treated, the OID regulations applicable to CPDIs that are traded on an established market or that are exchanged for property that is so traded ("Publicly Traded CPDIs") would apply to the New Series A Notes. The application of these regulations can result in potentially significant adverse tax consequences, including the inclusion of amounts in gross income, regardless of whether a holder is a cash or accrual basis taxpayer, in advance of receipt of corresponding cash payments on a Publicly Traded CPDI, the potential treatment of amounts that might otherwise be viewed for non-tax purposes as returns of principal as payments of interest and the treatment of any gain from the disposition of a Publicly Traded CPDI as ordinary income. In general, under the regulations applicable to Publicly Traded CPDIs, interest on a Publicly Traded CPDI accrues on the entire issue price of the debt instrument at a rate equal to the yield on a comparable noncontingent debt instrument, and this approach is called the "noncontingent bond method." Under the noncontingent bond method, the amount of interest taken into account for each accrual period is determined by constructing a projected payment schedule for the debt instrument that reflects expected contingent payments and adjusted to reflect the comparable yield. Adjustments are made if the actual amount of a contingent payment differs from the projected amount. The issuer of a Publicly Traded CPDI is required to prepare the projected payment schedule and any amendments thereto, and, subject to certain exceptions, a holder of a Publicly Traded CPDI generally is required to report accrual of OID and adjustments in a manner consistent with the issuer's schedule of projected payments. A holder generally can procure a projected payment schedule and any amendments thereto by submitting a written request to the issuer after the issuance of the debt instrument.

The regulations applicable to Publicly Traded CPDI's are reserved with respect to the treatment of certain timing contingencies, including those related to prepayments. Accordingly, there is some uncertainty as to the application of the OID regulations to Publicly Traded CPDIs with timing contingencies. Application of the rules in the OID regulations to prepayments may lead to distortive noneconomic results with potentially significant adverse tax consequences to holders and/or issuers of CPDIs. The rest of this discussion assumes that the New Series A Notes are not treated as CPDIs. However, U.S. Holders of Existing Debt are strongly urged to consult their tax advisors as to the application and effect of the OID regulations pertaining to Publicly Traded CPDIs to the reporting of income with respect to the New Series A Notes they receive.

NY3 3093898.3

### 2. Acquisition Premium, Market Discount and Bond Premium with Respect to New Series A Notes

If a U.S. Holder has a tax basis in a New Series A Note that is more than the issue price of such note but less than or equal to the stated redemption price at maturity of such note, such holder has acquisition premium with respect to such note to the extent of that excess, and the holder will not include OID on the new note in income to the extent of the acquisition premium.

A U.S. Holder that has a tax basis in a New Series A Note that is less than the issue price of the note will be subject to the market discount rules (unless the amount of the excess of the issue price over the basis is less than a specified *de minimis* amount, in which case market discount is considered to be zero). A U.S. Holder may elect (but is not required) to take market discount into income over the remaining life of a note, either on a ratable or economic yield basis. Once made, this election to include market discount in income currently applies to all market discount obligations acquired in or after the first taxable year to which the election applies and may not be revoked without the consent of the IRS. Absent such an election, a U.S. Holder will be required to treat any principal payment on, or any gain recognized on the sale, exchange, redemption, retirement or other taxable disposition of a New Series A Note as ordinary income to the extent of any accrued market discount that has not previously been included in income at the time of such payment or disposition. In addition, a U.S. Holder may be required to defer, until the maturity date of the note or its earlier disposition, the deduction of all or a portion of the interest expense on any indebtedness incurred or continued to purchase or carry such note.

As discussed above, if the exchange of Existing Debt for New Series A Notes is treated as a recapitalization, a U.S. Holder who acquired its Existing Debt at a market discount may be required to carry over to the New Series A Notes received any accrued market discount with respect to the Existing Debt to the extent that the accrued market discount was not previously included in income. In that case, a U.S. Holder holding such notes may have all or part of any market discount effectively converted into OID if the issue price of the New Series A Notes is less than the stated redemption price at maturity of such notes.

If a U.S. Holder has a tax basis in a New Series A Note that exceeds the note's stated redemption price at maturity, the note has bond premium to the extent of that excess, and the holder will not be required to include OID, if any, on a New Series A Note in income. A U.S. Holder generally may elect to amortize the premium using the constant yield to maturity method as a reduction of the U.S. Holder's non-OID interest income from the note. Once made, the election to amortize premium on a constant yield to maturity method applies to all debt obligations held or subsequently acquired by the electing U.S. Holder on or after the first day of the first taxable year to which the election applies and may not be revoked without the consent of the IRS. Premium on a note held by a U.S. Holder that does not make such election will decrease the gain or increase the loss otherwise recognized on the sale, exchange, redemption, retirement or other taxable disposition of a note.

### 3. Dispositions of New Series A Notes

A U.S. Holder will generally recognize taxable gain or loss upon the sale, exchange, redemption, retirement or other taxable disposition of a New Series A Note in an amount equal

NY3 3093898.3

to the difference between the amount realized upon such sale, exchange, redemption, retirement or other taxable disposition (reduced by any amounts attributable to accrued but unpaid qualified stated interest, which will be taxable as ordinary interest income) and such U.S. Holder's adjusted tax basis in the note. A U.S. Holder's adjusted tax basis in a New Series A Note will be determined in the manner described above pursuant to the exchange contemplated by the Plan and (i) increased by the amount of any OID required to be included in the U.S. Holder's gross income with respect to the note and (ii) reduced by the amount of any payments received with respect to the note that are not payments of qualified stated interest. Such gain or loss will generally be long-term capital gain or loss if the note is held for more than one year. Certain non-corporate U.S. Holders (including individuals) may be eligible for preferential tax rates in respect of long-term capital gain. The deductibility of capital losses by U.S. Holders is subject to limitations.

### 4. Mexican Withholding Taxes and Foreign Tax Credits

**THE INFORMATION PROVIDED HEREIN WITH RESPECT TO FOREIGN TAX LAW AND ANY U.S. TAX CONSEQUENCES RELATED THERETO HAS BEEN PREPARED BY THE COMPANY AND NOT BY DEBTORS' COUNSEL. NEITHER D&L NOR PSZ&J MAKES ANY REPRESENTATIONS WITH RESPECT TO THE ACCURACY AND COMPLETENESS OF SUCH INFORMATION. EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSULT HIS, HER OR ITS OWN LEGAL COUNSEL AND TAX ADVISOR AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS, HER OR ITS CLAIM OR EQUITY INTEREST.**

Payments on the New Series A Notes potentially may be subject to withholding tax imposed by Mexico, and the rest of this discussion assumes the imposition of such withholding tax. In the event of a payment on the New Series A Notes that is subject to Mexican withholding tax, U.S. Holders will be treated as having received the payment in full and as then paying over the withheld tax to Mexico. Pursuant to the terms of the New Series A Notes, IUSA will be required to pay additional amounts in respect of such withholding so that, subject to certain exceptions, the net amount received by each U.S. Holder will equal the amounts that would have been received in the absence of such withholding. Although not free from doubt, such additional amounts should be taxable to the U.S. Holder as ordinary interest income at the time they are paid by IUSA or accrue in accordance with the U.S. Holder's method of accounting for tax purposes.

Subject to numerous limitations, U.S. Holders may receive a foreign tax credit with respect to Mexican withholding taxes imposed on payments made on the New Series A Notes. Any amounts attributable to interest or additional amounts paid in respect of New Series A Notes generally will be treated as foreign source passive category income or, in some cases, general category income, for U.S. foreign tax credit limitation purposes.

If any foreign income tax is withheld on the sale or other taxable disposition of a New Series A Note, the amount realized by a U.S. Holder will include the gross amount of the proceeds of that sale or other taxable disposition before deduction of such tax. The rules regarding the availability of foreign tax credits with respect to foreign taxes withheld or, alternatively, deductions of foreign income taxes, and sourcing of gain (or loss) on sales or dispositions are complex. Accordingly, U.S. Holders should consult their own tax advisors

regarding the application and effect of these rules in their particular circumstances, taking into account the United States-Mexico Income Tax Convention, in connection with any sale or taxable disposition of the New Series A Notes.

### C. Non-U.S. Holders

For purposes of the following discussion a "Non-U.S. Holder" means a beneficial owner of Existing Debt that is not, for U.S. federal income tax purposes, a U.S. Holder or a partnership (or an entity or arrangement classified as a partnership for such purposes). Subject to the discussion below regarding backup withholding, a Non-U.S. Holder will generally not be subject to U.S. federal income or withholding tax on:

(a)     interest (including OID) and any additional amounts paid in respect of the New Series A Notes, unless those payments are effectively connected with the conduct by the Non-U.S. Holder of a trade or business in the United States (and, if required by an applicable income tax treaty, attributable to a U.S. permanent establishment); and

(b)     gain realized on the exchange of Existing Debt for New Series A Notes or the sale, exchange, redemption, retirement or other taxable disposition of the New Series A Notes, unless (i) that gain is effectively connected with the conduct by the Non-U.S. Holder of a trade or business in the United States (and, if required by an applicable income tax treaty, attributable to a U.S. permanent establishment) or, (ii) in the case of gain realized by an individual Non-U.S. Holder, the Non-U.S. Holder is present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met.

### D. Information Reporting and Backup Withholding

In general, U.S. tax information reporting requirements may apply to payments made with respect to the New Series A Notes and the proceeds of sale of such notes by holders other than certain exempt persons. Backup withholding of U.S. federal income tax may apply at applicable rates to payments with respect to the New Series A Notes and the proceeds of sale of the New Series A Notes, if the holder fails to provide a correct taxpayer identification number or certification of exempt status or, with respect to certain payments, if a holder fails to report in full all interest and dividend income and the IRS notifies the payor of the holder's underreporting. Any amounts withheld under the backup withholding rules from a payment to a holder will generally be allowed as a refund or credit against the holder's federal income tax liability provided the required information is timely furnished to the IRS.

Recently enacted legislation requires certain investors to report information with respect to their investment in certain "foreign financial assets" not held through a custodial account with a U.S. financial institution to the IRS. Investors who fail to report required information could become subject to substantial penalties. U.S. Holders are encouraged to consult with their own tax advisors regarding the possible implications of this new legislation on the New Series A Notes received in the exchange.

# XI.

## CERTAIN FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS

### A.      Exemption from Registration Requirements for New Securities

Upon consummation of the Plan, the Plan Proponents will rely on section 1145 of the Bankruptcy Code to exempt the offering, issuance and distribution of the New Notes and the guarantees thereof from the registration requirements of the Securities Act and of any state securities or "blue sky" laws.  Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of the debtor, an affiliate participating in a joint plan with the debtor, or a successor to a debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, an equity interest in, or a claim for an administrative expense in the case concerning, the debtor or such affiliate under the Plan.  The Plan Proponents believe that IUSA and each of the Subsidiary Guarantors are affiliates of the Debtors participating in the Plan for purposes of section 1145 of the Bankruptcy Code and that the offer and sale of the New Notes and guarantees thereof under the Plan satisfies the requirements of section 1145 and, therefore, the New Notes and the guarantees thereof are exempt from the registration requirements of the Securities Act and state securities laws.

### B.      Legends

Each New Series A Note and New Series B Note may bear a legend substantially in the form below:

> THE SECURITIES REPRESENTED BY THIS NOTE HAVE BEEN ISSUED
> PURSUANT TO SECTION 1145 OF THE U.S. BANKRUPTCY CODE, AS
> AMENDED (THE "BANKRUPTCY CODE") THAT PROVIDES AN
> EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE
> SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE
> STATUTES.

### C.      Subsequent Transfers of New Securities

The recipients of the New Notes and the guarantees thereof will be able to resell the New Notes and the guarantees thereof without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(1) of the Securities Act, unless the holder of such stock is an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code.  In addition, the New Notes and the guarantees thereof generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.  However, the recipients of the New Notes and the guarantees thereof issued under the Plan, are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who:  (i) purchases a claim with a view to distribution of any security to be received in exchange for such claim; (ii) offers to sell securities issued under a plan for the holders of such securities; (iii) offers to

buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution; or (iv) is an "issuer" of the relevant security, as such term is used in section 2(11) of the Securities Act. Under section 2(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with the issuer.

To the extent that the recipients of the New Notes and the guarantees thereof under the Plan, are deemed to be "underwriters," the resale of the New Notes and the guarantees thereof by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable laws. Persons deemed to be underwriters may, however, be permitted to sell such New Notes pursuant to Rule 144 under the Securities Act. This rule permits the public resale of securities received by "underwriters" if current information regarding the issuer is publicly available and if certain volume limitations and other conditions are met.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER WITH RESPECT TO THE NEW NOTES AND THE GUARANTEES THEREOF, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE THE NEW NOTES AND THE GUARANTEES THEREOF UNDER THE PLAN. THE DEBTORS RECOMMEND THAT HOLDERS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT.

*[Remainder of Page Intentionally Left Blank]*

# XII.

## CONCLUSION

The Plan Proponents believe that Confirmation and implementation of the Plan is preferable to any alternatives because it will provide the greatest recoveries to Holders of Claims and Equity Interests.  Any alternative to Confirmation of the Plan, such as a chapter 7 liquidation or attempts to confirm another plan of reorganization or liquidation, would involve significant delays, uncertainty, and substantial additional administrative costs.  Moreover, as described above, the Debtors believe that the Plan maximizes value for all parties in interest as compared to a chapter 7 liquidation.

Dated: July 15, 2011

TUBO DE PASTEJÉ, S.A. DE C.V.

 /s/ Rafael Dávila Olvera
By:  Rafael Dávila Olvera
Title:  Attorney in Fact

 /s/ Carlos Mochón Sacal
By:  Carlos Mochón Sacal
Title:  Attorney in Fact

CAMBRIDGE-LEE HOLDINGS, INC.

 /s/ Rafael Dávila Olvera
By:  Rafael Dávila Olvera
Title:  Attorney in Fact

INDUSTRIAS UNIDAS, S.A. DE C.V.

 /s/ Rafael Dávila Olvera
By:  Rafael Dávila Olvera
Title:  Attorney in Fact

 /s/ Carlos Mochón Sacal
By:  Carlos Mochón Sacal
Title:  Attorney in Fact

IUSA, S.A. DE C.V.

 /s/ Rafael Dávila Olvera
By:  Rafael Dávila Olvera
Title:  Attorney in Fact

NY3 3093898.3

/s/ Carlos Mochón Sacal
By:  Carlos Mochón Sacal
Title:  Attorney in Fact

INDUSTRIAS UNIDAS DE PASTEJÉ, S.A. DE C.V.

/s/ Rafael Dávila Olvera
By:  Rafael Dávila Olvera
Title:  Attorney in Fact

/s/ Carlos Mochón Sacal
By:  Carlos Mochón Sacal
Title:  Attorney in Fact

GAS PADILLA, S.A. DE C.V.

/s/ Carlos Mochón Sacal
By:  Carlos Mochón Sacal
Title:  Attorney in Fact

IUSA COMERCIALIZADORA, S.A. DE C.V.

/s/ Rafael Dávila Olvera
By:  Rafael Dávila Olvera
Title:  Attorney in Fact

/s/ Carlos Mochón Sacal
By:  Carlos Mochón Sacal
Title:  Attorney in Fact

FORGAMEX, S.A. DE C.V.

/s/ Carlos Mochón Sacal
By:  Carlos Mochón Sacal
Title:  Attorney in Fact

CENTRO COMERCIAL Y CULTURAL PASTEJÉ, S.A. DE C.V.

/s/ Carlos Mochón Sacal
By:  Carlos Mochón Sacal
Title:  Attorney in Fact

CONVIVENCIA Y EDUCACIÓN INFANTIL PASTEJÉ, S.A. DE C.V.

/s/ Carlos Mochón Sacal
By:  Carlos Mochón Sacal
Title:  Attorney in Fact

NY3 3093898.3